UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

GENCO IMPORTING INC.  d/b/a MANITOBA'S
and RICHARD MANITOBA

               Plaintiff,

        vs.

CITY OF NEW YORK, EMILY LLOYD, in her
capacity as Commissioner of the New York City
Department of Environmental Protection and as
Chairman of the New York City Environmental
Control Board, NEW YORK CITY
DEPARTMENT OF ENVIRONMENTAL
PROTECTION, NEW YORK CITY
ENVIRONMENTAL CONTROL BOARD,

             Defendants.

Civil Action No. 07 - 3560 (LAK)

**AMENDED
COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF AND
DAMAGES**

Plaintiffs Genco Importing Inc. d/b/a Manitoba's and Richard Manitoba (collectively "Manitoba's"), by its attorneys, Akin Gump Strauss Hauer & Feld LLP, as and for its complaint against Defendants, allege as follows:

## INTRODUCTION

1.     The performance and presentation of live music constitutes speech, and is protected by the Constitution of the United States.  Of this there can be no dispute.

2.     The *volume at which such music is performed* is an essential component of musical expression and is likewise speech protected by the Constitution from unreasonable and/or improper governmental regulation.  (*See Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989); *Casey v. City of Newport*, 308 F.3d 106, 118 (1st Cir. 2002).)

3.      This case involves two provisions of the New York City Administrative Code (the "Code").[1]  For many years, Plaintiffs have operated a small bar located at Avenue B and 6th Street in the heart of New York City's East Village.  The bar was established principally as a shrine to the punk rock music and performers of the 1970s and other eras as well, and Plaintiffs seek to promote and perpetuate the enjoyment of such music today, in part by presenting new musical acts that bear a relationship to the punk rock genre.

4.      The Code provisions at issue unreasonably and improperly interfere with Plaintiffs' presentation of live music and, as detailed below, violate Plaintiffs' constitutional rights as provided by the First and Fourteenth Amendments.

5.      In or about October 2006, Defendants issued an alleged violation under Code § 24-241.1 against Manitoba's, seeking to impose a fine of $8,000.  In or about February 2007, Defendants issued a second alleged violation against Manitoba's, this one under Code § 24-218, seeking to impose a fine of $875.  Both violations charged that Plaintiffs had violated certain volume restrictions in connection with live musical performances.

6.      Neither violation has yet been adjudicated.  Nevertheless, as a result of the alleged violations issued by Defendants and their potentially ruinous fines, Manitoba's has been forced to stop presenting live music performances and thereby forego its First Amendment rights.

7.      Plaintiffs challenge the two Code provisions underlying the alleged violations, and the subsequent amendments to such Code provisions, as unconstitutional.  Plaintiffs allege that Code § 24-241.1 and its successor, New Code § 24-231, effective July 1, 2007: (1) violate due process on their face; and (2) substantially burden protected speech.

---

[1] An amended version of the Code went into effect on July 1, 2007 and is referred to herein as the "New Code."

8.      Code § 24-241.1 and New Code § 24-231 (together "the Commercial Music Prohibitions") are unconstitutional because they provide inadequate notice of the conduct they proscribe, make compliance contingent on the actions of third-party private citizens and other factors wholly beyond the control of persons subject to the Code (such as other sound sources, ambient noise, atmospheric conditions, open doors and windows, and the sound-proofing effect of the construction materials used in various structures other than those from which the music is emanating), allow for arbitrary and discriminatory enforcement, disproportionately target music over other forms of protected speech, and place a severe and unjustified burden on speech in violation of the First and Fourteenth Amendments to the United States Constitution.

9.      Under the Commercial Music Prohibitions, a first-time-offender may be fined up to $8,000. The fine doubles with the second offense and triples with the third—for a potential maximum of $48,000.

10.     The fines for violating the Commercial Music Prohibitions are wildly disproportionate to those imposable for every other noise violation under the Code, making it clear that the Code improperly targets and seeks to deter certain forms of constitutionally protected speech and expression over others. Indeed, though a person issued a first violation under the Commercial Music Prohibitions may be fined $8,000, a person shouting at an equivalent volume and in the same context is subject to a maximum fine of just $875.[2]

11.     Plaintiffs also allege that Code § 24-218 and its successor, New Code § 24-218 (together "the Unreasonable Noise Prohibitions"): (1) substantially burden protected speech, as

---

[2] Under the New Code, the maximum fines would be $8,000 and $1,000, respectively.

applied to Manitoba's; (2) violate due process, as applied to Manitoba's; (3) substantially burden

protected speech on their face; and (4) violate due process on their face.

12.     The Unreasonable Noise Prohibitions are unconstitutional because they provide

inadequate notice of the conduct they proscribe, allow for arbitrary and discriminatory

enforcement, and place a severe and unjustified burden on protected speech in violation of the

First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331, 1343(a)(3), (4), 2201, and 2202, and 42 U.S.C. § 1983.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial

part of the events or omissions giving rise to this claim occurred within this District.

## THE PARTIES

15.     Plaintiff Genco Importing Inc. d/b/a Manitoba's is a corporation established under

the laws of the State of New York. Its principal place of business is at 99 Avenue B in New York

City's East Village, between 6th and 7th Streets, where it operates a bar and performance venue

known as Manitoba's. Manitoba's has been in continuous operation since January 14, 1999 and

since that time has consistently featured pre-recorded and live musical performances.[3]

16.     Plaintiff Richard Manitoba, an East Village resident, is part owner of and

namesake to Manitoba's. He has been well-known in the music industry for over thirty years as

Handsome Dick Manitoba, lead singer for punk rock bands The Dictators, Manitoba's Wild

Kingdom, and The MC5.

---

[3] Manitoba's underwent a partial change of ownership in 2005. Richard Manitoba has owned part of the business since founding it in 1999.

17.     Defendant City of New York, by and through the Office of the Mayor, appoints "the heads of administrations, departments, [and] all commissioners," including the Commissioner of the New York City Department of Environmental Protection. (N.Y. City Charter § 6.)

18.     Defendant Emily Lloyd is Commissioner of New York City Department of Environmental Protection and Chairman of New York City Environmental Control Board.

19.     Defendant New York City Department of Environmental Protection is a New York City agency responsible, *inter alia*, for all "functions and operations of the city relating to . . . noise pollution." (N.Y. City Charter § 1403.)

20.     Defendant New York City Environmental Control Board is required to enforce all provisions of the New York City Administrative Code relating to noise pollution. (N.Y. City Charter § 1404c(1)(d).)

21.     Defendants are all proper defendants under 42 U.S.C. § 1983 because they enforce the provisions at issue as a matter of official policy and as part of a systematic and deliberate law enforcement effort. At all times herein mentioned, Defendants acted under color of state law.

## FACTS

### A. Manitoba's' History, Purpose, and Surrounding Environment

22.     Manitoba's is a world famous shrine to the punk rock music and performers of the 1970s and later eras. Its walls are bedecked with photographs and memorabilia. The music it celebrates – and plays during its hours of operation – often conveys messages of non-conformity and anti-authoritarianism, and is typically loud, fast, and predominated by electric guitars and

drums.  Examples of this music that may be known to the Court include The Ramones, The Stooges, The Clash, The Sex Pistols, and, from a later time period, Nirvana.

23.      Since first opening in January 1999, Manitoba's has occupied a space it leases on the ground floor of a of a multi-story, walk-up building on New York City's Avenue B between 6th and 7th Streets.  Avenue B and the surrounding East Village neighborhood have a long history of bars featuring live and pre-recorded music.

24.      Today, the East Village in general, and Avenue B in particular, are nightlife destinations.  On the same single block stretch as Manitoba's there are four other bars and/or restaurants.  There are two "Middle Eastern" bars that play loud dance music heard clearly all over the block.  On the corner, there is a legendary, 60-year-old bar named 7B, which is frequented by New York University students.  A French bistro adjacent to Manitoba's plays its jazz music with the windows open.  In addition, there are two delicatessens on the block, one of which is open 24 hours a day.

25.      This pattern of bars and restaurants exists up and down Avenue B for several blocks in either direction from Manitoba's.  Like Manitoba's, many host live musical acts. Weekdays are generally crowded, with a variety of music emanating from the different bar cultures on the block. Weekends are very crowded and the street and its atmosphere can fairly be compared to the busiest and most exciting big city destinations in the country.  Suffice it to say, Avenue B is a very active, bustling, and *loud* street.

26.      In addition to bars, restaurants, delicatessens, and other commercial establishments, Avenue B contains some residential units, both next to and on top of these commercial establishments.  But no one moving here could ever mistake Avenue B for York

Avenue, West End Avenue, or any other of New York City's quiet, predominantly residential streets.

27.    A central part of Manitoba's' mission is to keep the music it celebrates alive. Thus, showcasing new acts that share a musical, political, and emotional foundation with the punk rock music of the 1970s is extremely important to Manitoba's.

28.    Until approximately 2002, Manitoba's presented live musical performances several days a week, generally featuring multi-piece bands using electronically-amplified instruments. Thereafter, Manitoba's limited the live musical performances to about one per week, usually scheduled for Monday evenings. These performances began at approximately eight o'clock p.m. and *ended before approximately ten o'clock p.m.* In addition to restricting the hours during which it presented live musical acts, Manitoba's has double-paned glass windows and two doors to keep the sound coming from its stereo and jukebox contained inside.

## B. The Commercial Music Prohibitions and Alleged Violation

29.    Upon information and belief, on or about October 23, 2006, an inspector associated with Defendants investigated a noise complaint made by a resident of the second floor of the building where Manitoba's is located. Upon information and belief, that resident was aware of Manitoba's' existence and the nature of its business prior to purchasing this apartment.

30.    Following the investigation, the inspector informed Manitoba's' staff that it was in violation of the Code in connection with a live musical performance because the sound level readings the inspector had taken from *inside the complainant's residential unit* purportedly exceeded the Commercial Music Prohibitions' 45 dB(A)[4] limit. Sometime after the

---

[4] "dB(A)" is the sound level measurement unit applied to sounds measured, in decibels, "with a sound level meter using the 'A' weighting network." *See* Code § 24-203(a). The Code defines "decibel" as follows: "The

investigation, Manitoba's received by mail the Notice of Violation and Hearing charging a violation of Code § 24-241.1.

31.    Pursuant to Table V in Code § 24-257(b)(5), Manitoba's may be fined up to $8,000 if found to have violated Code § 24-241.1, $16,000 for a second violation, and $24,000 for a third violation.  Further, the Code, in §§ 24-257(b)(8) and (10), appears to authorize Defendants to increase these potential fines by 25% to 100%, depending on the alleged circumstances.  These fines are imposed solely for violations in connection with musical performances, are more than twice the amount of the next largest fine imposable for a noise violation and almost ten times larger than the fines imposable under the Code against other types of speech.

32.    A violation of Code § 24-241.1 (and its successor, New Code § 24-231) is not based on the sound level inside of the place where the music is being performed; rather a violation occurs if a sound measurement taken *inside any residential unit* (under Code § 24-241.1), or *inside any receiving property dwelling* (under New Code § 24-231), exceeds 45 dB(A).  45 dB(A) is approximately the volume of a quiet conversation.[5]

33.    It is impossible, however, for Manitoba's to monitor the sound level inside the private residences above, behind, and next to the bar each time it seeks to present a musical act (much less repeatedly throughout the course of a performance, as the volume of the music varies, and as the effect of ambient sound and other sources of music and noise contributing to the noise levels in any given apartment vary as well).  It is therefore impossible for Manitoba's ever again

---

decibel is one-tenth of a bel.  Thus, the decibel is a unit of level when the base of the logarithm is the tenth root of ten, and the quantities concerned are proportional to power."  Code § 24-203(y).

[5] *See* National Institute on Deafness and Other Communication Disorders, Common Sounds, *available at* http://www.nidcd.nih.gov/health/education/teachers/common_sounds.asp.

to host musical performances and know if it is in compliance with the Commercial Music Prohibitions.

34.     Moreover, given the high ambient noise level on Avenue B described above, and the other sources of music and sound coming from the street and other establishments on Avenue B over which Manitoba's has no control, it is arbitrary and grossly unreliable to penalize Manitoba's (or any other individual commercial establishment) for the noise level in any given residential unit.  Likewise, Manitoba's has no control over atmospheric conditions, the opening or closing of doors and windows, and the quality of the materials used in the construction of neighboring residences, all of which affect how sound travels.

### C. The Unreasonable Noise Prohibitions and Alleged Violation

35.     On or about February 12, 2007, a night on which Manitoba's featured a live musical performance, an inspector associated with Defendants informed Manitoba's' staff that, unless the volume of the music being played was lowered, Manitoba's would again be cited for violating the Code.  The band had finished performing and thus played no additional live music.

36.     Approximately two weeks later, however, Manitoba's received by mail a second Notice of Violation and Hearing, this time issued under Code § 24-218, New York City's general noise provision.  Under this alleged violation, Manitoba's may now be fined up to an additional $875.

37.     Upon information and belief, the basis for the second violation was a live musical performance by a three-piece band utilizing electronically-amplified instruments.  The investigating inspector purportedly took noise meter readings from *an exterior hallway* in the complainant's apartment building and concluded that Manitoba's was in violation of Code § 24-218 because the volume of the music in the hallway exceeded 45 dB(A).

38.    Since receiving the second violation, Manitoba's has had to cease presenting live, amplified musical acts to avoid the very real risk of ruinous, repetitive fines. Manitoba's is a small business that averages *gross* receipts of approximately $6,000 per week. Because of the economic magnitude of such potential fines, for the first time in its existence, Manitoba's has completely stopped featuring live music performances since receiving the two notices of violation. Further, Manitoba's has determined that the cost of complete sound-proofing would be prohibitive at this time.

39.    The inability to continue to present live musical acts has inhibited Manitoba's' expression and left it unable to fulfill part of its mission to share the music it celebrates with its patrons and thereby keep this music alive.

40.    Manitoba's has suffered economic losses as a result of its decision to stop featuring live musical performances. Specifically, its average revenues on Monday nights, the only night on which it featured live musical performances, have dropped 47%.

41.    A hearing on both violations is scheduled for September 11, 2007 before an administrative law judge associated with Defendant New York City Environmental Control Board. Under New York law, the administrative law judge lacks authority to address Manitoba's' constitutional claims.

## CLAIMS FOR RELIEF

### COUNT ONE
### (The Commercial Music Prohibitions Violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution)

42.    Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 41 as if set forth herein in full.

43.    Code § 24-241.1 is entitled "Commercial music" and reads as follows:

> No person shall make or cause or permit to be made
> or caused any music originating from or in
> connection with the operation of any commercial
> establishment or enterprise when the level of sound
> of such music, as measured inside any residential
> unit is in excess of either;
>
> > (a) 45dB(A) as measured with a sound level
> > meter; or
> > (b) 45dB in any one-third octave band having a
> > center frequency between 63 hertz and 500
> > hertz inclusive (ANSI bands numbers 18
> > through 27, inclusive[)], in accordance with
> > American national standards institute
> > standard S1.6-1984.

44.     A first offense under Code § 24-241.1 may result in a fine of up to $8,000. The

fine doubles for the second offense and triples for the third, for a total of $48,000 for three

offenses. However, under Code §§ 24-257(b)(8) and (10), the fines may be increased by as

much as 100%.

45.     New Code § 24-231 went into effect on July 1, 2007, is entitled "Commercial

music," and reads, in relevant part, as follows:

> (a) No person shall make or cause or permit to be
> made or caused any music originating from or in
> connection with the operation of any
> commercial establishment or enterprise when
> the level of sound attributable to such music, as
> measured inside any receiving property
> dwelling unit:
>
> > (1) is in excess of 42 dB(A) as measured
> > with a sound level meter; or
> > (2) is in excess of 45 dB in any one-third
> > octave band having a center frequency
> > between 63 hertz and 500 hertz (ANSI
> > bands numbers 18 through 27,
> > Inclusive), in accordance with American
> > National Standards Institute standard
> > S1.6-1984; or
> > (3) causes a 6 dB(C) or more increase in the
> > total sound level above the ambient

sound level as measured in decibels in
the "C" weighting network provided that
the ambient sound is in excess of 62
dB(C).

46.     Violation of the Commercial Music Prohibitions is based on the sound level as

measured *inside a residential unit* (under Code § 24-241.1), or *inside any receiving property*

*dwelling* (under New Code § 24-231), rather than inside the commercial establishment playing

the music itself.  It is impossible, however, for Manitoba's to monitor the sound level inside the

private residences above, behind, and next to the bar, and therefore impossible for Manitoba's to

ever again host musical performances and know if it is in compliance with the Commercial

Music Prohibitions.

47.     The Commercial Music Prohibitions thus deprive ordinary persons of the right to

fair notice of the conduct the ordinances proscribe and allow for arbitrary and discriminatory

enforcement.  Therefore, the Commercial Music Prohibitions violate the Due Process Clause of

the Fourteenth Amendment because they are unconstitutionally vague.

48.     Through the enforcement of the Commercial Music Prohibitions, Defendants,

acting under color of state law, have deprived and will deprive Manitoba's of the rights,

privileges, and immunities secured to it by the Fourteenth Amendment to the United States

Constitution and protected under 42 U.S.C. § 1983.

**COUNT TWO**
**(The Commercial Music Prohibitions Violate the Right to Free Speech, Protected**
**by the First and Fourteenth Amendments to the United States Constitution)**

49.     Manitoba's repeats and realleges each and every allegation contained in

paragraphs 1 through 48 as if set forth herein in full.

50.     The hosting of live musical performances or playing of pre-recorded music by a commercial establishment constitutes speech protected under the First and Fourteenth Amendments to the United States Constitution.

51.     The Commercial Music Prohibitions burden substantially more protected speech than is constitutionally permissible to further New York City's noise control policy.  The Commercial Music Prohibitions therefore infringe upon the right to free speech protected by the First and Fourteenth Amendments to the United States Constitution.

52.     The fines imposable against commercial music are grossly disproportionate to those applicable to other forms of speech of equivalent volume and magnitude.  The Code thus singles out music, which is constitutionally protected speech, and does so in a manner that is insufficiently justified by any governmental interest in reducing noise.

53.     The Commercial Music Prohibitions unconstitutionally restrict free speech even if they do not target the specific *content* of musical speech.  The Commercial Music Prohibitions' 45 dB(A) limit, under which violations may be issued only where measurements are taken from the inside of a residential unit, renders compliance with the Commercial Music Prohibitions contingent on the actions of third-parties and other factors, and requires that those wishing to comply gain access to all residences within audible range of the music.  In order to ensure compliance with the provisions in the absence of such access and with no control over the various other factors affecting sound level measurements, commercial music must be played at a volume lower than 45dB(A), approximately the volume of quiet conversation.  As a result, constitutionally protected speech is chilled in violation of the First Amendment.

54.     Through the enforcement of the Commercial Music Prohibitions, Defendants, acting under color of state law, have deprived and will deprive Manitoba's of the rights,

privileges, and immunities secured to it by the First and Fourteenth Amendments to the United

States Constitution and protected under 42 U.S.C. § 1983.

## COUNT THREE
### (Code § 24-218, As Applied in this Case, Violated Manitoba's' Due Process Rights, Protected by the Fourteenth Amendments)

55.    Manitoba's repeats and realleges each and every allegation contained in

paragraphs 1 through 54 as if set forth herein in full.

56.    Code § 24-218 is entitled "General prohibitions" and reads as follows:

> No person shall make, continue or cause or permit
> to be made or continued any unreasonable noise,
> except that this section shall not apply to any sound
> from any source where the decibel level of such
> sound is within the limits prescribed by another
> section of this title and where there is compliance
> with all other applicable requirements of law with
> respect to such sound.

57.    Code § 24-203(ccc) defines unreasonable noise to mean:

> [A]ny excessive or unusually loud sound that
> disturbs the peace, comfort or repose of a
> reasonable person of normal sensitivities or injures
> or endangers the health or safety of a reasonable
> person of normal sensitivities, or which causes
> injury to plant or animal life, or damage to property
> or business.

58.    Defendants' application of Code § 24-218's unreasonable noise standard in this

case deprived Manitoba's of its right to fair notice of the conduct that the provision proscribes,

thereby allowing for arbitrary and discriminatory enforcement.  In enforcing Code § 24-218

against Manitoba's, Defendants invented and enforced a 45 dB(A) standard for defining

unreasonable noise.  Code § 24-218 contains no such standard, and Manitoba's thus did not have

fair notice that such a standard would be applied.  The application of Code § 24-218 in this case

therefore deprived Manitoba's of the right to due process secured to it by the Fourteenth Amendment to the United States Constitution.

59.     Through the enforcement of Code § 24-218 in this manner, Defendants, acting under color of state law, have deprived and will deprive Manitoba's of the rights, privileges, and immunities secured to it by the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

**COUNT FOUR**
**(Code § 24-218, As Applied in this Case, Violated Manitoba's'**
**Right to Free Speech, Protected by the First and Fourteenth Amendments)**

60.     Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 59 as if set forth herein in full.

61.     Code § 24-218, as applied in this case, burdened substantially more protected speech than is constitutionally permissible.  The 45 dB(A) standard created by Defendants for defining unreasonable noise, under a provision containing no restriction on its scope or limit on its interpretation, subjects to penalty *any* sound louder than the approximate volume of quiet conversation, as measured from anywhere and in any context.  Defendants' application of Code § 24-218 in this manner thus forced Manitoba's to stop hosting live musical performances. Defendants therefore violated Manitoba's' rights under the First and Fourteenth Amendments to the United States Constitution.

62.     Defendants' enforcement of Code § 24-218 against Manitoba's, under color of state law, has deprived and will deprive Manitoba's of the rights, privileges, and immunities secured to it by the First and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

## COUNT FIVE
### (The Unreasonable Noise Prohibitions, On Their Face, Violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution)

63. Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 62 as if set forth herein in full.

64. New Code § 24-218 is entitled "General prohibitions" and reads, in relevant part, as follows:

> (a) No person shall make, continue or cause or permit to be made or continued any unreasonable noise[, except that this section shall not apply to any sound from any source where the decibel level of such sound is within the limits prescribed by another section of this title and where there is compliance with all other applicable requirements of law with respect to such sound].
>
> (b) Unreasonable noise shall include but shall not be limited to sound, attributable to any device, that exceeds the following prohibited noise levels:
>
> > (1) Sound, other than impulsive sound, attributable to the source, measured at a level of 7 db(A) or more above the ambient sound level at or after 10:00 p.m. and before 7:00 a.m., as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way.
> >
> > (2) Sound, other than impulsive sound, attributable to the source, measured at a level of 10 db(A) or more above the ambient sound level at or above the ambient sound level at or after 7:00 a.m. and before 10:00 p.m. as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way.
> >
> > (3) Impulsive sound, attributable to the source, measured at a level of 15 dB(A)

or more above the ambient sound level, as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way. Impulsive sound levels shall be measured in the A-weighting network with the sound level meter set to fast response. The ambient sound level shall be taken in the A-weighting network with the sound level meter set to slow response.

(c) Notwithstanding the provisions of subdivision b of this section, where a particular sound source or device is subject to decibel level limits and requirements specifically prescribed for such source or device elsewhere in this code, the decibel level limits set forth in this section shall not apply to such sound source or device.

65.    New Code § 24-203(ccc) defines unreasonable noise to mean:

[A]ny excessive or unusually loud sound that disturbs the peace, comfort or repose of a reasonable person of normal sensitivities, injures or endangers the health or safety of a reasonable person of normal sensitivities or which causes injury to plant or animal life, or damage to property or business.

66.    The Unreasonable Noise Prohibitions' "unreasonable noise" standard deprives ordinary persons of the right to fair notice of the conduct the ordinances proscribe and allow for arbitrary and discriminatory enforcement. The standard contains no limitation on its scope or application. Nor are there any guidelines for its interpretation or restrictions on the discretion to be used in its enforcement. Therefore, the Unreasonable Noise Prohibitions violate the Due Process Clause of the Fourteenth Amendment because they are unconstitutionally vague.

67.    Defendants' enforcement of the Unreasonable Noise Prohibitions against Manitoba's, under color of state law, has deprived and will deprive Manitoba's of the rights,

privileges, and immunities secured to it by the Fourteenth Amendment to the United States

Constitution and protected under 42 U.S.C. § 1983.

**COUNT SIX**
**(The Unreasonable Noise Prohibitions, On Their Face, Violate the Right to Free Speech,**
**Protected by the First and Fourteenth Amendments to the United States Constitution)**

68.     Manitoba's repeats and realleges each and every allegation contained in

paragraphs 1 through 67 as if set forth herein in full.

69.     The Unreasonable Noise Prohibitions burden substantially more protected speech

than is constitutionally permissible to further New York City's noise control policy.  Because it

contains no limitation on its scope or application, nor any guidelines for its interpretation or

restrictions on the discretion to be used in its enforcement, the Unreasonable Noise Prohibitions'

"unreasonable noise" standard leaves those wishing to comply with it guessing which speech

will be subject to sanction.  Therefore, the Unreasonable Noise Prohibitions chill constitutionally

protected speech and infringe upon the right to free speech protected by the First and Fourteenth

Amendments to the United States Constitution.

70.     Defendants' enforcement of the Unreasonable Noise Prohibitions against

Manitoba's, under color of state law, has deprived and will deprive Manitoba's of the rights,

privileges, and immunities secured to it by the First and Fourteenth Amendments to the United

States Constitution and protected under 42 U.S.C. § 1983.

**COUNT SEVEN**
**(Manitoba's Has Suffered Damages as a Result of the**
**Violation of Its Constitutional Rights)**

71.     Manitoba's repeats and realleges each and every allegation contained in

paragraphs 1 through 70 as if set forth herein in full.

72.     On account of Defendants' actions, Manitoba's has suffered damages resulting from lost trade, lost revenues, and the infringement of its constitutional rights.

## **JURY DEMAND**

73.     Manitoba's hereby demands a trial by jury on all issues so triable

**PRAYER FOR RELIEF**

WHEREFORE, Manitoba's respectfully asks this Court to enter judgment in its favor and against Defendants:

    a.   Declaring and determining that the offending provisions of New York City's Administrative Code are void and unenforceable as violative of the United States Constitution;

    b.   Awarding Manitoba's damages for its unlawful prosecution, the deprivation of its constitutional liberties, and the costs incurred in this litigation, including reasonable attorneys' fees;

    c.   Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       July 23, 2007

David M. Zensky (DZ5913)
Jason W. Sunshine (JS0562)
Ryan N. Marks (Bar Admission Pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, NY 10022
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

*Pro Bono Counsel for Plaintiffs*