UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

GENCO IMPORTING INC. d/b/a MANITOBA'S
and RICHARD MANITOBA,

<div align="right">Plaintiffs,</div>

- against -

CITY OF NEW YORK, EMILY LLOYD, in her
capacity as Commissioner of the New York City
Department of Environmental Protection and as
Chairman of the New York City Environmental
Control Board, NEW YORK CITY DEPARTMENT
OF ENVIRONMENTAL PROTECTION, NEW
YORK CITY ENVIRONMENTAL CONTROL
BOARD,

<div align="right">Defendants.</div>

-----------------------------------------------------------------------x

**DECLARATION IN
SUPPORT OF
DEFENDANTS'
MOTION TO DISMISS**

07 Civ. 3560 (LAK)

(ECF Case)

AVE MARIA BRENNAN, declares under the penalty of perjury, pursuant to 28

U.S.C. § 1746, as follows:

1.       I am an Assistant Corporation Counsel in the Office of Michael A.

Cardozo, Corporation Counsel of the City of New York, attorney for the defendants. I am an

attorney admitted to practice law before the courts of the State of New York and before this

Court. I submit this declaration in support of defendants' motion to dismiss the amended

complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

2.       Plaintiff commenced this action by summons and complaint, dated May 3,

2007, seeking a judgment "[d]eclaring and determining that the offending provision of New

York City's Administrative Code [Sections 24-241.1 and 24-218] are void and unenforceable as

violative of the United States Constitution...." Wherefore clause of complaint at (a). The

complaint also sought a judgment "[p]ermanently enjoining Defendants from enforcing future

violations issued under Code §§ 24-241.1 and 24-218 against Manitoba's" and "from enforcing the violation issued against Manitoba's...." Wherefore clause of complaint at (b) and (c). A copy of the summons and complaint, dated May 3, 2007 is annexed hereto as Exhibit "A."

3.    By notice of motion dated June 21, 2007, defendants sought an order dismissing the complaint on the grounds that it failed to state a claim upon which relief could be granted against defendants.

4.    Plaintiffs' opposition to defendants' motion to dismiss was to be served on July 23, 2007. However, instead of serving papers in opposition to the motion, plaintiffs served an amended complaint. The amended complaint also challenges as unconstitutional Sections 24-241.1 and 24-218 of the Administrative Code of the City of New York, as well as the amendments to those sections that became effective July 1, 2007, i.e., Sections 24-231 and 24-218. As did the complaint, the amended complaint also seeks a judgment "[d]eclaring and determining that the offending provision of New York City's Administrative Code are void and unenforceable as violative of the United States Constitution...." Wherefore clause (a) of amended complaint. Unlike in the complaint, the Wherefore clause in the amended complaint does not seek an injunction. A copy of the amended complaint, dated July 23, 2007 is annexed hereto as Exhibit "B."

5.    The New York City Noise Code effective July 1, 2007 was adopted by the New York City Council on December 21, 2005 and approved by the Mayor on December 29, 2005 as Local Law 113 of 2005. A copy of the Local Law is annexed hereto as Exhibit "B." In the Local Law, text that was deleted from the prior law is indicated by brackets and new text is indicated by italicized typeface.

6.    For all of the reasons set forth in the accompanying memorandum of law, defendants' motion to dismiss the claims set forth in the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should be granted in its entirety.

Dated:    New York, New York
          August 29, 2007

_Ave Maria Brennan_

AVE MARIA BRENNAN (AB 7488)

**Exhibit A**

AO 440 (Rev. 10/93) Summons in a Civil Action - SDNY WEB 4/99

# United States District Court

_____ Southern _____    **DISTRICT OF** _____ **New York** _____

GENCO IMPORTING INC. d/b/a Manitoba's

### SUMMONS IN A CIVIL CASE

**V.**

CITY OF NEW YORK, EMILY LLOYD, NEW
YORK CITY DEPARTMENT OF
ENVIRONMENTAL PROTECTION, NEW YORK
CITY ENVIRONMENTAL CONTROL BOARD

CASE NUMBER:

## 07 CV 3560

## JUDGE KAPLAN

TO: (Name and address of defendant)

City of New York
New York City Law Department
100 Church Street
New York, NY 10007

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

David Zensky
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Ave.
New York, NY 10022

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

_Marcos Quintero_

(BY) DEPUTY CLERK

MAY 0 3 2007

DATE

AO 440  (Rev. 10/93)  Summons In a Civil Action -SDNY  WEB 4/99

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | |
| NAME OF SERVER (*PRINT*) | TITLE |

*Check one box below to indicate appropriate method of service*

☐   Served personally upon the defendant.  Place where served: _____
_____

☐   Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.
Name of person with whom the summons and complaint were left: _____
_____

☐   Returned unexecuted: _____
_____
_____
_____

☐   Other (*specify*): _____
_____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

    I declare under penalty of perjury under the laws of the United States of America that the foregoing
information contained in the Return of Service and Statement of Service Fees is true and correct.


Executed on _____          _____
                      Date                                    Signature of Server


                                             _____
                                             Address of Server


(1)    As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

OFFICE COPY

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JUDGE KAPLAN

| | |
|---|---|
| GENCO IMPORTING INC. d/b/a MANITOBA'S,<br><br>    Plaintiff,<br><br>vs.<br><br>CITY OF NEW YORK, EMILY LLOYD, in her capacity as Commissioner of the New York City Department of Environmental Protection and as Chairman of the New York City Environmental Control Board, NEW YORK CITY DEPARTMENT OF ENVIRONMENTAL PROTECTION, NEW YORK CITY ENVIRONMENTAL CONTROL BOARD,<br><br>    Defendants. | **07 CV 3560**<br>Civil Action No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**<br><br> |

Plaintiff Genco Importing Inc. d/b/a Manitoba's ("Manitoba's"), by its attorneys, Akin Gump Strauss Hauer & Feld LLP, as and for its complaint against Defendants, alleges as follows:

## SUMMARY

1.     Manitoba's challenges two provisions the New York City Administrative Code as unconstitutional.

2.     Manitoba's alleges that New York City Administrative Code § 24-241.1 ("Code § 24-241.1"): (1) violates due process on its face; and (2) substantially burdens protected speech on its face.

3.     Manitoba's alleges that New York City Administrative Code § 24-218 ("Code § 24-218"): (1) substantially burdens protected speech, as applied to Manitoba's; (2) violates due process, as applied to Manitoba's; (3) violates due process on its face; and (4) substantially burdens protected speech on its face.

## INTRODUCTION

4.    Manitoba's, which operates a small bar and live music performance venue located in New York City's East Village, challenges the constitutionality of Code § 24-241.1 and Code § 24-218. In or about October 2006, Defendants issued a violation under Code § 24-241.1 against Manitoba's, seeking to impose a fine of up to $8,000. In or about February 2007, Defendants issued a second violation under Code § 24-218, seeking to impose a fine up to $875.

5.    Both violations were issued to Manitoba's in connection with live musical performances occurring at Manitoba's' place of business.

6.    Neither violation has yet been adjudicated. Nevertheless, as a result of the violations issued by Defendants and their potentially burdensome fines, Manitoba's has stopped hosting live music performances, a practice in which it had engaged consistently since its inception. In fact, under Code § 24-241.1 a first-time-offender may be fined up to $8,000. The fine doubles with the second offense and triples with the third—for a potential maximum of $48,000.

7.    Code § 24-241.1 is unconstitutional. It provides inadequate notice of the conduct it proscribes, makes compliance contingent on the actions of a third-party private citizen, allows for arbitrary and discriminatory enforcement, and places a severe and unjustified burden on protected speech in violation of the First and Fourteenth Amendments to the United States Constitution.

8.    Code § 24-218 is also unconstitutional, both on its face and as applied to Manitoba's. It provides inadequate notice of the conduct it proscribes, allows for arbitrary and discriminatory enforcement, and places a severe and unjustified burden on protected speech in violation of the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), (4), 2201, and 2202, and 42 U.S.C. § 1983.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred within this District.

## THE PARTIES

11.     Manitoba's is a corporation established under the laws of the State of New York. Its principal place of business is at 99 Avenue B in New York City's East Village, where it operates as a bar and performance venue for local musicians. Manitoba's has been in continuous operation since January 14, 1999 and since that time has featured pre-recorded and live music performances. Manitoba's is part-owned and operated by its namesake, Richard Manitoba, an East Village resident who has been well-known in the music industry for over thirty years as Handsome Dick Manitoba, lead singer for punk rock bands The Dictators, Manitoba's Wild Kingdom, and The MC5.

12.     Defendant City of New York, by and through the Office of the Mayor, appoints "the heads of administrations, departments, [and] all commissioners," including the Commissioner of the New York City Department of Environmental Protection. N.Y. City Charter § 6.

13.     Defendant Emily Lloyd is Commissioner of New York City Department of Environmental Protection and Chairman of New York City Environmental Control Board. Appointed in 2005, she is charged with a duty to "enforce all laws, rules and regulations to eliminate noise pollution." N.Y. City Charter § 1403d.

14.    Defendant New York City Department of Environmental Protection is a New York City agency responsible, *inter alia*, for all "functions and operations of the city relating to...noise pollution." N.Y. City Charter § 1403.

15.    Defendant New York City Environmental Control Board is required to enforce all provisions of the New York City Administrative Code relating to noise pollution. N.Y. City Charter § 1404c(1)(d).

16.    Defendants are all proper defendants under 42 U.S.C. § 1983 because they enforce the provisions at issue as a matter of official policy and as part of a systematic and deliberate law enforcement effort. At all times herein mentioned, Defendants acted under color of state law.

## FACTS

17.    Manitoba's has been in continual operation since January 14, 1999.

18.    Manitoba's occupies a space it leases on the ground floor of a of a multi-story, walk-up building on New York City's Avenue B near 6th Street. The neighborhood is a night-life destination, often crowded with foot traffic, and there are numerous bars and restaurants immediately next to and across the street from Manitoba's, as well as all along Avenue B. As with most other bars and restaurants in the neighborhood, there are residential units located above Manitoba's.

19.    Prior to approximately 2002, Manitoba's featured live musical performances almost daily. These performances often featured bands playing punk rock music and usually involved electronically-amplified instruments.

20.    In approximately 2002, Manitoba's limited the live music performances it hosted to about one per week, usually held on Monday evenings. This decision was made, in part, to

accommodate the changing character of the neighborhood and respect the rights and concerns of its neighbors. These performances almost always began at approximately eight o'clock p.m. and ended promptly at ten o'clock p.m.

21.    Upon information and belief, between approximately 2002 and October 23, 2006, Defendants never issued Manitoba's a violation or assessed a penalty against it.

22.    Upon information and belief, on or about October 23, 2006, an inspector associated with Defendants investigated a noise complaint made by a resident of the second floor of the building where Manitoba's is located. Upon information and belief, that resident was aware of Manitoba's' existence and the nature of its business prior to purchase this apartment.

23.    Following the investigation, the inspector informed the Manitoba's staff that it was in violation of the New York Administrative Code in connection with a live music performance because the sound level readings the inspector had taken from the inside of a residential unit purportedly exceeded the 45 dB(A) limit. Manitoba's received by mail the Notice of Violation and Hearing sometime after the investigation and may now be fined up to $8,000.

24.    On or about February 12, 2007, a night on which Manitoba's featured a live musical performance, an inspector associated with Defendants informed the Manitoba's staff that, unless the volume of the music being played was lowered, Manitoba's would again be cited for violating the New York Administrative Code. The band had finished performing and thus played no additional live music.

25.    Approximately two weeks later, however, Manitoba's received by mail a second Notice of Violation and Hearing, this time issued under Code § 24-218, New York City's general noise provision. They may be fined up to an additional $875.

26.    Upon information and belief, the basis for the second violation was a live musical performance by a three-piece band utilizing electronically amplified instruments. The investigating inspector purportedly took noise meter readings from a hallway in the complainant's apartment building and concluded that Manitoba's was in violation of Code § 24-218 because the volume of the music exceeded 45 dB(A).

27.    After receiving the second violation, Manitoba's stopped featuring live music altogether for the first time since its inception.

28.    Manitoba's has suffered significant economic harm as a result of its decision to stop hosting live music performances. Evenings on which Manitoba's featured live music performances drew in many more patrons than evenings without live music. Accordingly, Manitoba's' profits have been materially and adversely affected.

29.    A hearing on both violations is scheduled for May 8, 2007 before an administrative law judge associated with the New York City Environmental Control Board. Under New York law, the administrative law judge lacks authority to address Manitoba's' constitutional claims.

## CLAIMS FOR RELIEF

### COUNT ONE
**(Code § 24-241.1 Violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution)**

30.    Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 29 as if set forth herein in full.

31.    Code § 24-241.1 is entitled "Commercial music" and reads as follows:

> No person shall make or cause or permit to be made
> or caused any music originating from or in
> connection with the operation of any commercial
> establishment or enterprise when the level of sound

of such music, as measured inside any residential
unit is in excess of either;
    (a) 45dB(A) as measured with a sound meter; or
    (b) 45dB in any one-third octave band having a
       center frequency between 63 hertz and 500
       hertz inclusive (ANSI bands numbers 18
       through 27, inclusive, in accordance with
       American national standards institute
       standard S1.6-1984.

32.    A first offense under Code § 24-241.1 may be fined up to $8,000. The fine doubles for the second offense and triples for the third, for a maximum total of $48,000 for three offenses.

33.    Code § 24-241.1 deprives ordinary persons of the right to fair notice of the conduct the ordinance proscribes and allows for arbitrary and discriminatory enforcement. Therefore, Code § 24-241.1 violates the Due Process Clause of the Fourteenth Amendment because it is unconstitutionally vague.

34.    Through the enforcement of Code § 24-241.1, Defendants, acting under color of state law, have deprived and will deprive Manitoba's of the rights, privileges, and immunities secured to it by the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

## COUNT TWO
### (Code § 24-241.1 Violates the Right to Free Speech, Protected by the First and Fourteenth Amendments to the United States Constitution)

35.    Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 34 as if set forth herein in full.

36.    The hosting of live musical performances or playing of pre-recorded music by a commercial establishment constitutes speech protected under the First and Fourteenth Amendments to the United States Constitution.

37.    Code § 24-241.1 burdens substantially more protected speech than is constitutionally permissible to further New York City's legitimate noise control policy. Code § 24-241.1 therefore infringes upon the right to free speech protected by the First and Fourteenth Amendments to the United States Constitution.

38.    Through the enforcement of Code § 24-241.1, Defendants, acting under color of state law, have deprived and will deprive Manitoba's of the rights, privileges, and immunities secured to it by the First and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

**COUNT THREE**
**(Code § 24-218, As Applied in this Case, Violated Manitoba's'**
**Right to Free Speech, Protected by the First and Fourteenth Amendments)**

39.    Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 38 as if set forth herein in full.

40.    Code § 24-218 is entitled "General prohibitions" and reads as follows:

> No person shall make, continue or cause or permit to be made or continued any unreasonable noise, except that this section shall not apply to any sound from any source where the decibel level of such sound is within the limits prescribed by another section of this title and where there is compliance with all other applicable requirements of law with respect to such sound.

41.    Code § 24-203(ccc) defines unreasonable noise to

> mean[] any excessive or unusually loud sound that disturbs the peace, comfort or repose of a reasonable person of normal sensitivities or injures or endangers the health or safety of a reasonable person of normal sensitivities, or which causes injury to plant or animal life, or damage to property or business.

42.     Code § 24-218, as applied to Manitoba's, burdened substantially more protected speech than is constitutionally permissible. Therefore, Defendants violated Manitoba's' rights under the First and Fourteenth Amendments to the United States Constitution.

43.     Defendants' enforcement of Code § 24-218 against Manitoba's, under color of state law, has deprived and will deprive Manitoba's of the rights, privileges, and immunities secured to it by the First and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

## COUNT FOUR
### (Code § 24-218, As Applied in this Case, Violated Manitoba's' Due Process Rights, Protected by the Fourteenth Amendments)

44.     Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 43 as if set forth herein in full.

45.     Defendants' interpretation of Code § 24-218's unreasonable noise standard in this case deprived Manitoba's of its right to fair notice of the conduct that the provision proscribes and allows for arbitrary and discriminatory enforcement. The application of Code § 24-218 in this case therefore deprived Manitoba's of the right to due process secured to it by the Fourteenth Amendment to the United States Constitution.

46.     Through the enforcement of Code § 24-218 in this manner, Defendants, acting under color of state law, have deprived and will deprive Manitoba's of the rights, privileges, and immunities secured to it by the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

## COUNT FIVE
### (Code § 24-218, On its Face, Violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution)

47.    Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 46 as if set forth herein in full.

48.    Code § 24-218 deprives ordinary persons of the right to fair notice of the conduct the ordinance proscribes and allows for arbitrary and discriminatory enforcement. Therefore, Code § 24-218 violates the Due Process Clause of the Fourteenth Amendment because it is unconstitutionally vague.

49.    Defendants' enforcement of Code § 24-218 against Manitoba's, under color of state law, has deprived and will deprive Manitoba's of the rights, privileges, and immunities secured to it by the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

## COUNT SIX
### (Code § 24-218, On its Face, Violates the Right to Free Speech, Protected by the First and Fourteenth Amendments to the United States Constitution)

50.    Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 49 as if set forth herein in full.

51.    Code § 24-218 burdens substantially more protected speech than is constitutionally permissible to further New York City's legitimate noise control policy. Code § 24-218 therefore infringes upon the right to free speech protected by the First and Fourteenth Amendments to the United States Constitution.

52.    Defendants' enforcement of Code § 24-218 against Manitoba's, under color of state law, has deprived and will deprive Manitoba's of the rights, privileges, and immunities

secured to it by the First and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

### COUNT SEVEN
**(Manitoba's Has Suffered Damages as a Result of the
Violation of Its Constitutional Rights)**

53.    Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 52 as if set forth herein in full.

54.    On account of Defendants' actions, Manitoba's has suffered damages resulting from lost trade, lost revenues, and the infringement of its constitutional rights.

### JURY DEMAND

55.    Manitoba's hereby demands a trial by jury on all issues so triable

## PRAYER FOR RELIEF

WHEREFORE, Manitoba's respectfully asks this Court to enter judgment in its favor and against Defendants:

a.  Declaring and determining that the offending provisions of New York City's Administrative Code are void and unenforceable as violative of the United States Constitution;

b.  Permanently enjoining Defendants from enforcing future violations issued under Code §§ 24-241.1 and 24-218 against Manitoba's;

c.  Permanently enjoining Defendants from enforcing the violations issued against Manitoba's;

d.  Awarding Manitoba's damages for its unlawful prosecution, the deprivation of its constitutional liberties, and the costs incurred in this litigation, including reasonable attorneys' fees;

e.  Granting such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
May 3, 2007

David M. Zensky (DZ5913)
Jason W. Sunshine (JS0562)
Ryan N. Marks (Bar Admission Pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, NY 10022
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

*Counsel for Plaintiff*

**Exhibit B**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

GENCO IMPORTING INC. d/b/a MANITOBA'S
and RICHARD MANITOBA

               Plaintiff,

          vs.

CITY OF NEW YORK, EMILY LLOYD, in her
capacity as Commissioner of the New York City
Department of Environmental Protection and as
Chairman of the New York City Environmental
Control Board, NEW YORK CITY
DEPARTMENT OF ENVIRONMENTAL
PROTECTION, NEW YORK CITY
ENVIRONMENTAL CONTROL BOARD,

               Defendants.

Civil Action No. 07 - 3560 (LAK)

**AMENDED
COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF AND
DAMAGES**

Plaintiffs Genco Importing Inc. d/b/a Manitoba's and Richard Manitoba (collectively "Manitoba's"), by its attorneys, Akin Gump Strauss Hauer & Feld LLP, as and for its complaint against Defendants, allege as follows:

## INTRODUCTION

1.      The performance and presentation of live music constitutes speech, and is protected by the Constitution of the United States. Of this there can be no dispute.

2.      The *volume at which such music is performed* is an essential component of musical expression and is likewise speech protected by the Constitution from unreasonable and/or improper governmental regulation. (*See Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989); *Casey v. City of Newport*, 308 F.3d 106, 118 (1st Cir. 2002).)

3.      This case involves two provisions of the New York City Administrative Code (the "Code").[1]  For many years, Plaintiffs have operated a small bar located at Avenue B and 6th Street in the heart of New York City's East Village.  The bar was established principally as a shrine to the punk rock music and performers of the 1970s and other eras as well, and Plaintiffs seek to promote and perpetuate the enjoyment of such music today, in part by presenting new musical acts that bear a relationship to the punk rock genre.

4.      The Code provisions at issue unreasonably and improperly interfere with Plaintiffs' presentation of live music and, as detailed below, violate Plaintiffs' constitutional rights as provided by the First and Fourteenth Amendments.

5.      In or about October 2006, Defendants issued an alleged violation under Code § 24-241.1 against Manitoba's, seeking to impose a fine of $8,000.  In or about February 2007, Defendants issued a second alleged violation against Manitoba's, this one under Code § 24-218, seeking to impose a fine of $875.  Both violations charged that Plaintiffs had violated certain volume restrictions in connection with live musical performances.

6.      Neither violation has yet been adjudicated.  Nevertheless, as a result of the alleged violations issued by Defendants and their potentially ruinous fines, Manitoba's has been forced to stop presenting live music performances and thereby forego its First Amendment rights.

7.      Plaintiffs challenge the two Code provisions underlying the alleged violations, and the subsequent amendments to such Code provisions, as unconstitutional.  Plaintiffs allege that Code § 24-241.1 and its successor, New Code § 24-231, effective July 1, 2007: (1) violate due process on their face; and (2) substantially burden protected speech.

---

[1] An amended version of the Code went into effect on July 1, 2007 and is referred to herein as the "New Code."

8.      Code § 24-241.1 and New Code § 24-231 (together "the Commercial Music Prohibitions") are unconstitutional because they provide inadequate notice of the conduct they proscribe, make compliance contingent on the actions of third-party private citizens and other factors wholly beyond the control of persons subject to the Code (such as other sound sources, ambient noise, atmospheric conditions, open doors and windows, and the sound-proofing effect of the construction materials used in various structures other than those from which the music is emanating), allow for arbitrary and discriminatory enforcement, disproportionately target music over other forms of protected speech, and place a severe and unjustified burden on speech in violation of the First and Fourteenth Amendments to the United States Constitution.

9.      Under the Commercial Music Prohibitions, a first-time-offender may be fined up to $8,000. The fine doubles with the second offense and triples with the third—for a potential maximum of $48,000.

10.     The fines for violating the Commercial Music Prohibitions are wildly disproportionate to those imposable for every other noise violation under the Code, making it clear that the Code improperly targets and seeks to deter certain forms of constitutionally protected speech and expression over others. Indeed, though a person issued a first violation under the Commercial Music Prohibitions may be fined $8,000, a person shouting at an equivalent volume and in the same context is subject to a maximum fine of just $875.[2]

11.     Plaintiffs also allege that Code § 24-218 and its successor, New Code § 24-218 (together "the Unreasonable Noise Prohibitions"): (1) substantially burden protected speech, as

---

[2] Under the New Code, the maximum fines would be $8,000 and $1,000, respectively.

applied to Manitoba's; (2) violate due process, as applied to Manitoba's; (3) substantially burden protected speech on their face; and (4) violate due process on their face.

12.    The Unreasonable Noise Prohibitions are unconstitutional because they provide inadequate notice of the conduct they proscribe, allow for arbitrary and discriminatory enforcement, and place a severe and unjustified burden on protected speech in violation of the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), (4), 2201, and 2202, and 42 U.S.C. § 1983.

14.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred within this District.

## THE PARTIES

15.    Plaintiff Genco Importing Inc. d/b/a Manitoba's is a corporation established under the laws of the State of New York. Its principal place of business is at 99 Avenue B in New York City's East Village, between 6th and 7th Streets, where it operates a bar and performance venue known as Manitoba's. Manitoba's has been in continuous operation since January 14, 1999 and since that time has consistently featured pre-recorded and live musical performances.[3]

16.    Plaintiff Richard Manitoba, an East Village resident, is part owner of and namesake to Manitoba's. He has been well-known in the music industry for over thirty years as Handsome Dick Manitoba, lead singer for punk rock bands The Dictators, Manitoba's Wild Kingdom, and The MC5.

---

[3] Manitoba's underwent a partial change of ownership in 2005. Richard Manitoba has owned part of the business since founding it in 1999.

17.    Defendant City of New York, by and through the Office of the Mayor, appoints "the heads of administrations, departments, [and] all commissioners," including the Commissioner of the New York City Department of Environmental Protection. (N.Y. City Charter § 6.)

18.    Defendant Emily Lloyd is Commissioner of New York City Department of Environmental Protection and Chairman of New York City Environmental Control Board.

19.    Defendant New York City Department of Environmental Protection is a New York City agency responsible, *inter alia*, for all "functions and operations of the city relating to . . . noise pollution." (N.Y. City Charter § 1403.)

20.    Defendant New York City Environmental Control Board is required to enforce all provisions of the New York City Administrative Code relating to noise pollution. (N.Y. City Charter § 1404c(1)(d).)

21.    Defendants are all proper defendants under 42 U.S.C. § 1983 because they enforce the provisions at issue as a matter of official policy and as part of a systematic and deliberate law enforcement effort. At all times herein mentioned, Defendants acted under color of state law.

## FACTS

### A. Manitoba's' History, Purpose, and Surrounding Environment

22.    Manitoba's is a world famous shrine to the punk rock music and performers of the 1970s and later eras. Its walls are bedecked with photographs and memorabilia. The music it celebrates – and plays during its hours of operation – often conveys messages of non-conformity and anti-authoritarianism, and is typically loud, fast, and predominated by electric guitars and

drums. Examples of this music that may be known to the Court include The Ramones, The Stooges, The Clash, The Sex Pistols, and, from a later time period, Nirvana.

23.    Since first opening in January 1999, Manitoba's has occupied a space it leases on the ground floor of a of a multi-story, walk-up building on New York City's Avenue B between 6th and 7th Streets. Avenue B and the surrounding East Village neighborhood have a long history of bars featuring live and pre-recorded music.

24.    Today, the East Village in general, and Avenue B in particular, are nightlife destinations. On the same single block stretch as Manitoba's there are four other bars and/or restaurants. There are two "Middle Eastern" bars that play loud dance music heard clearly all over the block. On the corner, there is a legendary, 60-year-old bar named 7B, which is frequented by New York University students. A French bistro adjacent to Manitoba's plays its jazz music with the windows open. In addition, there are two delicatessens on the block, one of which is open 24 hours a day.

25.    This pattern of bars and restaurants exists up and down Avenue B for several blocks in either direction from Manitoba's. Like Manitoba's, many host live musical acts. Weekdays are generally crowded, with a variety of music emanating from the different bar cultures on the block. Weekends are very crowded and the street and its atmosphere can fairly be compared to the busiest and most exciting big city destinations in the country. Suffice it to say, Avenue B is a very active, bustling, and *loud* street.

26.    In addition to bars, restaurants, delicatessens, and other commercial establishments, Avenue B contains some residential units, both next to and on top of these commercial establishments. But no one moving here could ever mistake Avenue B for York

Avenue, West End Avenue, or any other of New York City's quiet, predominantly residential streets.

27.     A central part of Manitoba's' mission is to keep the music it celebrates alive. Thus, showcasing new acts that share a musical, political, and emotional foundation with the punk rock music of the 1970s is extremely important to Manitoba's.

28.     Until approximately 2002, Manitoba's presented live musical performances several days a week, generally featuring multi-piece bands using electronically-amplified instruments. Thereafter, Manitoba's limited the live musical performances to about one per week, usually scheduled for Monday evenings. These performances began at approximately eight o'clock p.m. and *ended before approximately ten o'clock p.m.* In addition to restricting the hours during which it presented live musical acts, Manitoba's has double-paned glass windows and two doors to keep the sound coming from its stereo and jukebox contained inside.

### B. The Commercial Music Prohibitions and Alleged Violation

29.     Upon information and belief, on or about October 23, 2006, an inspector associated with Defendants investigated a noise complaint made by a resident of the second floor of the building where Manitoba's is located. Upon information and belief, that resident was aware of Manitoba's' existence and the nature of its business prior to purchasing this apartment.

30.     Following the investigation, the inspector informed Manitoba's' staff that it was in violation of the Code in connection with a live musical performance because the sound level readings the inspector had taken from *inside the complainant's residential unit* purportedly exceeded the Commercial Music Prohibitions' 45 dB(A)[4] limit. Sometime after the

---

[4] "dB(A)" is the sound level measurement unit applied to sounds measured, in decibels, "with a sound level meter using the 'A' weighting network." *See* Code § 24-203(a). The Code defines "decibel" as follows: "The

investigation, Manitoba's received by mail the Notice of Violation and Hearing charging a violation of Code § 24-241.1.

31.     Pursuant to Table V in Code § 24-257(b)(5), Manitoba's may be fined up to $8,000 if found to have violated Code § 24-241.1, $16,000 for a second violation, and $24,000 for a third violation. Further, the Code, in §§ 24-257(b)(8) and (10), appears to authorize Defendants to increase these potential fines by 25% to 100%, depending on the alleged circumstances. These fines are imposed solely for violations in connection with musical performances, are more than twice the amount of the next largest fine imposable for a noise violation and almost ten times larger than the fines imposable under the Code against other types of speech.

32.     A violation of Code § 24-241.1 (and its successor, New Code § 24-231) is not based on the sound level inside of the place where the music is being performed; rather a violation occurs if a sound measurement taken *inside any residential unit* (under Code § 24-241.1), or *inside any receiving property dwelling* (under New Code § 24-231), exceeds 45 dB(A). 45 dB(A) is approximately the volume of a quiet conversation.[5]

33.     It is impossible, however, for Manitoba's to monitor the sound level inside the private residences above, behind, and next to the bar each time it seeks to present a musical act (much less repeatedly throughout the course of a performance, as the volume of the music varies, and as the effect of ambient sound and other sources of music and noise contributing to the noise levels in any given apartment vary as well). It is therefore impossible for Manitoba's ever again

---

decibel is one-tenth of a bel. Thus, the decibel is a unit of level when the base of the logarithm is the tenth root of ten, and the quantities concerned are proportional to power." Code § 24-203(y).

[5] *See* National Institute on Deafness and Other Communication Disorders, Common Sounds, *available at* http://www.nidcd.nih.gov/health/education/teachers/common_sounds.asp.

to host musical performances and know if it is in compliance with the Commercial Music Prohibitions.

34.    Moreover, given the high ambient noise level on Avenue B described above, and the other sources of music and sound coming from the street and other establishments on Avenue B over which Manitoba's has no control, it is arbitrary and grossly unreliable to penalize Manitoba's (or any other individual commercial establishment) for the noise level in any given residential unit.  Likewise, Manitoba's has no control over atmospheric conditions, the opening or closing of doors and windows, and the quality of the materials used in the construction of neighboring residences, all of which affect how sound travels.

### C. The Unreasonable Noise Prohibitions and Alleged Violation

35.    On or about February 12, 2007, a night on which Manitoba's featured a live musical performance, an inspector associated with Defendants informed Manitoba's' staff that, unless the volume of the music being played was lowered, Manitoba's would again be cited for violating the Code.  The band had finished performing and thus played no additional live music.

36.    Approximately two weeks later, however, Manitoba's received by mail a second Notice of Violation and Hearing, this time issued under Code § 24-218, New York City's general noise provision.  Under this alleged violation, Manitoba's may now be fined up to an additional $875.

37.    Upon information and belief, the basis for the second violation was a live musical performance by a three-piece band utilizing electronically-amplified instruments.  The investigating inspector purportedly took noise meter readings from *an exterior hallway* in the complainant's apartment building and concluded that Manitoba's was in violation of Code § 24-218 because the volume of the music in the hallway exceeded 45 dB(A).

38.    Since receiving the second violation, Manitoba's has had to cease presenting live, amplified musical acts to avoid the very real risk of ruinous, repetitive fines. Manitoba's is a small business that averages *gross* receipts of approximately $6,000 per week. Because of the economic magnitude of such potential fines, for the first time in its existence, Manitoba's has completely stopped featuring live music performances since receiving the two notices of violation. Further, Manitoba's has determined that the cost of complete sound-proofing would be prohibitive at this time.

39.    The inability to continue to present live musical acts has inhibited Manitoba's' expression and left it unable to fulfill part of its mission to share the music it celebrates with its patrons and thereby keep this music alive.

40.    Manitoba's has suffered economic losses as a result of its decision to stop featuring live musical performances. Specifically, its average revenues on Monday nights, the only night on which it featured live musical performances, have dropped 47%.

41.    A hearing on both violations is scheduled for September 11, 2007 before an administrative law judge associated with Defendant New York City Environmental Control Board. Under New York law, the administrative law judge lacks authority to address Manitoba's' constitutional claims.

## CLAIMS FOR RELIEF

### COUNT ONE
### (The Commercial Music Prohibitions Violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution)

42.    Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 41 as if set forth herein in full.

43.    Code § 24-241.1 is entitled "Commercial music" and reads as follows:

No person shall make or cause or permit to be made
or caused any music originating from or in
connection with the operation of any commercial
establishment or enterprise when the level of sound
of such music, as measured inside any residential
unit is in excess of either;

    (a) 45dB(A) as measured with a sound level
        meter; or

    (b) 45dB in any one-third octave band having a
        center frequency between 63 hertz and 500
        hertz inclusive (ANSI bands numbers 18
        through 27, inclusive[)], in accordance with
        American national standards institute
        standard S1.6-1984.

44.    A first offense under Code § 24-241.1 may result in a fine of up to $8,000. The

fine doubles for the second offense and triples for the third, for a total of $48,000 for three

offenses. However, under Code §§ 24-257(b)(8) and (10), the fines may be increased by as

much as 100%.

45.    New Code § 24-231 went into effect on July 1, 2007, is entitled "Commercial

music," and reads, in relevant part, as follows:

    (a) No person shall make or cause or permit to be
        made or caused any music originating from or in
        connection with the operation of any
        commercial establishment or enterprise when
        the level of sound attributable to such music, as
        measured inside any receiving property
        dwelling unit:

        (1) is in excess of 42 dB(A) as measured
            with a sound level meter; or

        (2) is in excess of 45 dB in any one-third
            octave band having a center frequency
            between 63 hertz and 500 hertz (ANSI
            bands numbers 18 through 27,
            Inclusive), in accordance with American
            National Standards Institute standard
            S1.6-1984; or

        (3) causes a 6 dB(C) or more increase in the
            total sound level above the ambient

> sound level as measured in decibels in
> the "C" weighting network provided that
> the ambient sound is in excess of 62
> dB(C).

46.    Violation of the Commercial Music Prohibitions is based on the sound level as measured *inside a residential unit* (under Code § 24-241.1), or *inside any receiving property dwelling* (under New Code § 24-231), rather than inside the commercial establishment playing the music itself. It is impossible, however, for Manitoba's to monitor the sound level inside the private residences above, behind, and next to the bar, and therefore impossible for Manitoba's to ever again host musical performances and know if it is in compliance with the Commercial Music Prohibitions.

47.    The Commercial Music Prohibitions thus deprive ordinary persons of the right to fair notice of the conduct the ordinances proscribe and allow for arbitrary and discriminatory enforcement. Therefore, the Commercial Music Prohibitions violate the Due Process Clause of the Fourteenth Amendment because they are unconstitutionally vague.

48.    Through the enforcement of the Commercial Music Prohibitions, Defendants, acting under color of state law, have deprived and will deprive Manitoba's of the rights, privileges, and immunities secured to it by the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

## COUNT TWO
**(The Commercial Music Prohibitions Violate the Right to Free Speech, Protected by the First and Fourteenth Amendments to the United States Constitution)**

49.    Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 48 as if set forth herein in full.

50.    The hosting of live musical performances or playing of pre-recorded music by a commercial establishment constitutes speech protected under the First and Fourteenth Amendments to the United States Constitution.

51.    The Commercial Music Prohibitions burden substantially more protected speech than is constitutionally permissible to further New York City's noise control policy. The Commercial Music Prohibitions therefore infringe upon the right to free speech protected by the First and Fourteenth Amendments to the United States Constitution.

52.    The fines imposable against commercial music are grossly disproportionate to those applicable to other forms of speech of equivalent volume and magnitude. The Code thus singles out music, which is constitutionally protected speech, and does so in a manner that is insufficiently justified by any governmental interest in reducing noise.

53.    The Commercial Music Prohibitions unconstitutionally restrict free speech even if they do not target the specific *content* of musical speech. The Commercial Music Prohibitions' 45 dB(A) limit, under which violations may be issued only where measurements are taken from the inside of a residential unit, renders compliance with the Commercial Music Prohibitions contingent on the actions of third-parties and other factors, and requires that those wishing to comply gain access to all residences within audible range of the music. In order to ensure compliance with the provisions in the absence of such access and with no control over the various other factors affecting sound level measurements, commercial music must be played at a volume lower than 45dB(A), approximately the volume of quiet conversation. As a result, constitutionally protected speech is chilled in violation of the First Amendment.

54.    Through the enforcement of the Commercial Music Prohibitions, Defendants, acting under color of state law, have deprived and will deprive Manitoba's of the rights,

privileges, and immunities secured to it by the First and Fourteenth Amendments to the United

States Constitution and protected under 42 U.S.C. § 1983.

## COUNT THREE
### (Code § 24-218, As Applied in this Case, Violated Manitoba's' Due Process Rights, Protected by the Fourteenth Amendments)

55.    Manitoba's repeats and realleges each and every allegation contained in

paragraphs 1 through 54 as if set forth herein in full.

56.    Code § 24-218 is entitled "General prohibitions" and reads as follows:

> No person shall make, continue or cause or permit
> to be made or continued any unreasonable noise,
> except that this section shall not apply to any sound
> from any source where the decibel level of such
> sound is within the limits prescribed by another
> section of this title and where there is compliance
> with all other applicable requirements of law with
> respect to such sound.

57.    Code § 24-203(ccc) defines unreasonable noise to mean:

> [A]ny excessive or unusually loud sound that
> disturbs the peace, comfort or repose of a
> reasonable person of normal sensitivities or injures
> or endangers the health or safety of a reasonable
> person of normal sensitivities, or which causes
> injury to plant or animal life, or damage to property
> or business.

58.    Defendants' application of Code § 24-218's unreasonable noise standard in this

case deprived Manitoba's of its right to fair notice of the conduct that the provision proscribes,

thereby allowing for arbitrary and discriminatory enforcement.  In enforcing Code § 24-218

against Manitoba's, Defendants invented and enforced a 45 dB(A) standard for defining

unreasonable noise.  Code § 24-218 contains no such standard, and Manitoba's thus did not have

fair notice that such a standard would be applied.  The application of Code § 24-218 in this case

therefore deprived Manitoba's of the right to due process secured to it by the Fourteenth Amendment to the United States Constitution.

59.    Through the enforcement of Code § 24-218 in this manner, Defendants, acting under color of state law, have deprived and will deprive Manitoba's of the rights, privileges, and immunities secured to it by the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

<div align="center">

**COUNT FOUR**
**(Code § 24-218, As Applied in this Case, Violated Manitoba's'**
**Right to Free Speech, Protected by the First and Fourteenth Amendments)**

</div>

60.    Manitoba's repeats and realleges each and every allegation contained in paragraphs 1 through 59 as if set forth herein in full.

61.    Code § 24-218, as applied in this case, burdened substantially more protected speech than is constitutionally permissible. The 45 dB(A) standard created by Defendants for defining unreasonable noise, under a provision containing no restriction on its scope or limit on its interpretation, subjects to penalty *any* sound louder than the approximate volume of quiet conversation, as measured from anywhere and in any context. Defendants' application of Code § 24-218 in this manner thus forced Manitoba's to stop hosting live musical performances. Defendants therefore violated Manitoba's' rights under the First and Fourteenth Amendments to the United States Constitution.

62.    Defendants' enforcement of Code § 24-218 against Manitoba's, under color of state law, has deprived and will deprive Manitoba's of the rights, privileges, and immunities secured to it by the First and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

**COUNT FIVE**
**(The Unreasonable Noise Prohibitions, On Their Face, Violate the Due Process**
**Clause of the Fourteenth Amendment to the United States Constitution)**

63.    Manitoba's repeats and realleges each and every allegation contained in

paragraphs 1 through 62 as if set forth herein in full.

64.    New Code § 24-218 is entitled "General prohibitions" and reads, in relevant part,

as follows:

> (a) No person shall make, continue or cause or
> permit to be made or continued any
> unreasonable noise[, except that this section
> shall not apply to any sound from any source
> where the decibel level of such sound is within
> the limits prescribed by another section of this
> title and where there is compliance with all
> other applicable requirements of law with
> respect to such sound].
>
> (b) Unreasonable noise shall include but shall not
> be limited to sound, attributable to any device,
> that exceeds the following prohibited noise
> levels:
>
> > (1) Sound, other than impulsive sound,
> > attributable to the source, measured at a
> > level of 7 db(A) or more above the
> > ambient sound level at or after 10:00
> > p.m. and before 7:00 a.m., as measured
> > at any point within a receiving property
> > or as measured at a distance of 15 feet or
> > more from the source on a public right-
> > of-way.
> >
> > (2) Sound, other than impulsive sound,
> > attributable to the source, measured at a
> > level of 10 db(A) or more above the
> > ambient sound level at or above the
> > ambient sound level at or after 7:00 a.m.
> > and before 10:00 p.m. as measured at
> > any point within a receiving property or
> > as measured at a distance of 15 feet or
> > more from the source on a public right-
> > of-way.
> >
> > (3) Impulsive sound, attributable to the
> > source, measured at a level of 15 dB(A)

or more above the ambient sound level, as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way. Impulsive sound levels shall be measured in the A-weighting network with the sound level meter set to fast response. The ambient sound level shall be taken in the A-weighting network with the sound level meter set to slow response.

(c) Notwithstanding the provisions of subdivision b of this section, where a particular sound source or device is subject to decibel level limits and requirements specifically prescribed for such source or device elsewhere in this code, the decibel level limits set forth in this section shall not apply to such sound source or device.

65.    New Code § 24-203(ccc) defines unreasonable noise to mean:

[A]ny excessive or unusually loud sound that disturbs the peace, comfort or repose of a reasonable person of normal sensitivities, injures or endangers the health or safety of a reasonable person of normal sensitivities or which causes injury to plant or animal life, or damage to property or business.

66.    The Unreasonable Noise Prohibitions' "unreasonable noise" standard deprives ordinary persons of the right to fair notice of the conduct the ordinances proscribe and allow for arbitrary and discriminatory enforcement. The standard contains no limitation on its scope or application. Nor are there any guidelines for its interpretation or restrictions on the discretion to be used in its enforcement. Therefore, the Unreasonable Noise Prohibitions violate the Due Process Clause of the Fourteenth Amendment because they are unconstitutionally vague.

67.    Defendants' enforcement of the Unreasonable Noise Prohibitions against Manitoba's, under color of state law, has deprived and will deprive Manitoba's of the rights,

privileges, and immunities secured to it by the Fourteenth Amendment to the United States

Constitution and protected under 42 U.S.C. § 1983.

## COUNT SIX
### (The Unreasonable Noise Prohibitions, On Their Face, Violate the Right to Free Speech, Protected by the First and Fourteenth Amendments to the United States Constitution)

68.     Manitoba's repeats and realleges each and every allegation contained in

paragraphs 1 through 67 as if set forth herein in full.

69.     The Unreasonable Noise Prohibitions burden substantially more protected speech

than is constitutionally permissible to further New York City's noise control policy.  Because it

contains no limitation on its scope or application, nor any guidelines for its interpretation or

restrictions on the discretion to be used in its enforcement, the Unreasonable Noise Prohibitions'

"unreasonable noise" standard leaves those wishing to comply with it guessing which speech

will be subject to sanction.  Therefore, the Unreasonable Noise Prohibitions chill constitutionally

protected speech and infringe upon the right to free speech protected by the First and Fourteenth

Amendments to the United States Constitution.

70.     Defendants' enforcement of the Unreasonable Noise Prohibitions against

Manitoba's, under color of state law, has deprived and will deprive Manitoba's of the rights,

privileges, and immunities secured to it by the First and Fourteenth Amendments to the United

States Constitution and protected under 42 U.S.C. § 1983.

## COUNT SEVEN
### (Manitoba's Has Suffered Damages as a Result of the Violation of Its Constitutional Rights)

71.     Manitoba's repeats and realleges each and every allegation contained in

paragraphs 1 through 70 as if set forth herein in full.

72.    On account of Defendants' actions, Manitoba's has suffered damages resulting from lost trade, lost revenues, and the infringement of its constitutional rights.

## **JURY DEMAND**

73.    Manitoba's hereby demands a trial by jury on all issues so triable

## PRAYER FOR RELIEF

WHEREFORE, Manitoba's respectfully asks this Court to enter judgment in its favor and against Defendants:

a. Declaring and determining that the offending provisions of New York City's Administrative Code are void and unenforceable as violative of the United States Constitution;

b. Awarding Manitoba's damages for its unlawful prosecution, the deprivation of its constitutional liberties, and the costs incurred in this litigation, including reasonable attorneys' fees;

c. Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
July 23, 2007

David M. Zensky (DZ5913)
Jason W. Sunshine (JS0562)
Ryan N. Marks (Bar Admission Pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, NY 10022
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

*Pro Bono Counsel for Plaintiffs*

**Exhibit C**

# LOCAL LAWS
## OF
## THE CITY OF NEW YORK
### FOR THE YEAR 2005

---

### No. 113

---

Introduced by Council Members Gennaro, Avella, Comrie, Fidler, Jackson, Provenzano, Recchia, Weprin, Liu, Addabbo Jr. and The Public Advocate (Ms. Gotbaum) (by request of the Mayor). Passed under a Mayor's Message of Necessity.

## A LOCAL LAW

**To amend the administrative code of the city of New York, in relation to the noise control code and the repeal of subchapters 4, 5 and 6 of chapter 2 of title 24 of such code.**

*Be it enacted by the Council as follows:*

Section 1. Section 24-202 of the administrative code of the city of New York, as amended by local law number 22 for the year 2002, is amended to read as follows:

§24-202 Declaration of policy.  It is hereby declared to be the public policy of the city to reduce the ambient [noise] *sound* level in the city, so as to preserve, protect and promote the public health, safety and welfare, and the peace and quiet of the inhabitants of the city, prevent injury to human, plant and animal life and property, foster the convenience and comfort of its inhabitants, and facilitate the enjoyment of the natural attractions of the city. It is the public policy of the city that every person is entitled to ambient [noise] *sound* levels that are not detrimental to life, health and enjoyment of his or her property. It is hereby declared that the making, creation or maintenance of excessive and unreasonable noises within the city affects and is a menace to public health, comfort, convenience, safety, welfare and the prosperity of the people of the city. For the purpose of controlling and reducing such noises, it is hereby declared to be the policy of the city to set the unreasonable *and prohibited* noise standards and decibel levels contained herein and to consolidate certain of its noise control legislation into this code. The necessity for legislation by enactment of the provisions of this chapter is hereby declared as matter of legislative determination.

This code shall be liberally construed so as to effectuate the purposes described in this section. Nothing herein shall be construed to abridge the emergency powers of the board of health or the right of the department of health and mental hygiene to engage in any of its necessary or proper activities. [Nothing herein shall abridge the powers and responsibilities of the] *It is the intent of the council that the* police department [to] *as well as other agencies of the city designated by the commissioner of the department of environmental protection shall have the authority to* enforce the provisions of this code *and police officers and designated employees of the department of environmental*

2

*protection and of such other city agencies shall have the power to issue summonses, appearance tickets and notices of violation for violations of this code.*

§2. Section 24-203 of such code is amended to read as follows:

§24-203 General definitions. When used in the New York city noise control code *the following terms shall have the following meanings:*

[(a)] *(1)* "A" level means the [total] sound level [of all noise] as measured with a sound level meter using the "A" weighting network. The unit of measurement is the [db(A)] *dB(A). This frequency weighting network for the measurement of sound levels shall comply with standards established by the American National Standards Institute specifications for sound level meters S1.4-1971, as amended or S1.4-1983, as amended.*

[(b)] *(2)* Activity means any act or combination of acts which actually results in the production of sound.

[(c)] *(3)* Air compressor means a device which draws in air or gas, compresses it, and delivers it at a higher pressure.

[(d) Aircraft means any device that is used or intended to be used for flight in the air but does not include any such device used only in the service of a government or political subdivision thereof unless such device is engaged in carrying persons or property for commercial purposes. Aircraft includes but is not limited to:

    1. subsonic transport aircraft;

    2. subsonic turbojet-powered aircraft;

    3. aircraft capable of flying at supersonic speeds;

    4. rotocraft;

    5. vertical take-off and landing aircraft (VTOL aircraft);

    6. short take-off and landing aircraft (STOL aircraft); and

    7. aircraft capable of landing or taking off on water.]

[(e)] *(4)* Air horn means a device intended to produce a sound signal by means of compressed air or gas or exhaust gas.

[(f)] *(5)* Airport means an area of land or water that is used or intended to be used for the landing and take off of aircraft, and includes its buildings and facilities, if any.

[(g)] *(6)* Ambient [noise] *sound* means [the all-encompassing noise associated with a given environment, being usually a composite of sounds from many sources near and far] *the sound level at a given location that exists as a result of the combined contribution in that location of all sound sources, excluding the contribution of a source or sources under investigation for violation of this code and excluding the contribution of extraneous sound sources. For purposes of the enforcement of this code, the ambient sound level of a given location may be determined based upon measurements taken at a comparable site (which includes but is not limited to comparable physical locations and time of day) in the nearby area.*

[(h)] *(7)* Apparatus means any mechanism which prevents, controls, detects, measures or records the production of sound.

*(8)* Audible status indicator means any sound reproduction device on a motor vehicle that emits or causes to be emitted any continuous or near continuous sound (exceeding 5 seconds if tonal in nature or any duration if verbal in nature) for the purpose of warning that an audible burglar alarm has been installed on such motor vehicle and is operational or for creating the appearance that such an alarm has been installed on such motor vehicle and is operational.*

[(i)] *(9)* Authorized emergency vehicle means [every ambulance and every vehicle operated by a police department, fire department, fire patrol, chief or assistant chief of a fire department, county or deputy county fire coordinator, county or assistant county fire

3

marshal, sheriff, or by a chief, assistant chief or deputy chief of a police department, a regular paid deputy sheriff or a motor vehicle of the New York city housing authority when engaged in the performance of duty as a peace officer, or by an authorized public utility company when on emergency calls, every state-owned vehicle operated by a law enforcement officer of the conservation department when engaged in performance of duty in enforcement of the environmental conservation law, and every vehicle operated by a bridge authority or bridge and tunnel authority when on emergency calls] *an authorized emergency vehicle as defined by section 101 of the vehicle and traffic law.*

[(j)] *(10)* Board means the environmental control board of the city of New York.

[(k)] *(11)* Building means a building as defined in [article two of subchapter two of chapter one of title twenty-seven of the code] *section 27-232 of the administrative code.*

[(l)] *(12)* Building aperture means any designed opening in a building to which a person may reasonably have access including but not limited to any door, gate, window, skylight or hatch.

[(m)] *(13)* Burglar alarm means any sound signal device designed and intended to produce a sound signal upon unauthorized entrance by a person into a building or motor vehicle.

[(n)] *(14)* "C" level means the [total] sound level [of all noise] as measured with a sound level meter using the "C" weighting network. The unit of measurement is the [db(C)]*dB(C). This frequency weighting network for the measurement of sound levels shall comply with standards established by the American National Standards Institute specifications for sound level meters S1.4-1971, as amended or S1.4-1983, as amended.*

[(o)] *(15)* Certificate means an operating or temporary operating certificate.

[(p)] *(16)* Charter means the New York city charter including all of its amendments.

[(q)] *(17)* Circulation device means any device which circulates a gas or fluid, including but not limited to any air conditioner, pump, cooling tower, fan or blower.

[(r)] *(18)* Claxon means any manually, mechanically, or electrically powered device, other than an emergency signal device, including but not limited to a motor vehicle horn, which is intended to, and when operated actually does, emit a sound signal.

[(s)] *(19)* This code means the New York city noise control code.

[(t)] *(20)* Commissioner means commissioner of environmental protection *or his or her authorized representative.*

[(u)] *(21)* Construction *or construction work* means any or all activity[, except tunneling,] necessary or incidental to the erection, demolition, assembling, altering, installing or equipping of buildings, public or private highways, roads, premises, parks, utility lines including such lines in already-constructed tunnels, or other property, including land clearing, grading, excavating and filling.

[(v)] *(22)* Construction device means any device designed and intended for use in construction including, but not limited to any air compressor, pile driver, [manual tool] *sledgehammer,* bulldozer, pneumatic hammer, steam shovel, derrick, crane, steam or electric hoist*, construction vehicle or pneumatic or electric tool.*

[(w)] *(23)* Construction material means any material, regardless of composition, designed and customarily used in construction including but not limited to any rails, pillars, columns, beams, bricks, flooring, wall, ceiling or roofing material, gravel, sand, cement or asphalt.

[(x)] *(24)* Container means any receptacle, regardless of contents, manufactured from wood, metal, plastic, paper or any other material including but not limited to any barrel, basket, box, crate, tub, bottle, can or refuse container.

4

[(y)] *(25)* Decibel[. The decibel is one-tenth of a bel. Thus, the decibel is a unit of level when the base of the logarithm is the tenth root of ten, and the quantities concerned are proportional to power.] *means the practical unit of measurement for sound pressure level: the number of decibels of a measured sound is equal to 20 times the logarithm to the base 10 of the ratio of the sound pressure to the pressure of a reference sound (20 micropascals); abbreviated "dB".*

[(z)] *(26)* Device means any mechanism which is intended to or which actually produces sound when operated or handled.

[(aa)] *(27)* Department means the department of environmental protection.

[(bb)] *(28)* Dwelling means any building *lawfully* occupied in whole or in part as the temporary or permanent residence of one or more natural persons.

[(cc)] *(29)* Dynamic insertion loss means the difference between two sound pressure levels which are measured at the same point in space before and after a muffler is inserted between the measurement point and the sound source under operating conditions.

[(dd)] *(30)* Emergency means a public calamity or an exposure of any person or property to imminent danger.

[(ee)] *(31)* Emergency signal device means any gong, siren whistle, or siren or any air horn or any similar device the use of which on authorized emergency vehicles is permitted by subdivision twenty-six of section three hundred seventy-five of the vehicle and traffic law.

[(ff)] *(32)* Exhaust source means a system which removes and transports air or gas from a device.

*(33) Extraneous sound is sound that is intense, intermittent, not representative of the relatively steady sound levels at a given location and not attributable to a source or sources under investigation for violation of this code. Such sound includes but is not limited to sirens of passing emergency vehicles, unusually loud motor vehicle braking (screeching) or exhaust noise, people shouting, animal vocalization, passing aircraft, horn honking, car door slamming and passing trains. Notwithstanding the foregoing provision, sounds that are individually persistent or controlling of the sound level at a given location shall not be considered to be extraneous sounds if they constitute more than 50 percent of the duration of an ambient or total sound level measurement such as for example the sound of a passing aircraft at a specific location if airplanes regularly pass over such location and the proximity of such passing aircraft to the location, its sound level, and the duration of such sound level, control the sound level at the given location at the time the sound source under investigation is being measured. For the purposes of the enforcement of this code, extraneous sounds are excluded when measuring the ambient sound level at a given location and when measuring the sound level of a source or sources under investigation for violation of this code except where such sounds are themselves under investigation for violation of this code.*

*(34) Impulsive sound is sound that is of short duration, where each peak of sound lasts 2 seconds or less. The sound is characterized by abrupt onset and rapid decay. As used in this code, the term impulsive sound shall not include music.*

[(gg)] *(35)* Internal combustion engine means a device for the production of energy by means of the combustion under pressure of fossil fuel.

[(hh)] *(36)* Lawn care device means any device powered mechanically, by electricity, by gasoline, by diesel fuel or by any other fuel, which is intended to be used or is actually used for the mowing of grass, the cutting or chipping of trees, tree roots or tree branches, or the clearing of leaves or other vegetation from lawns, sidewalks, public

5

streets or public highways and shall include, but not be limited to, such devices as lawn mowers and lawn mower attachments, lawn edgers, leaf blowers, leaf vacuums, mulchers and chippers.

*(37) Lmax means the maximum measured sound level at any instant in time.*

[(ii)] *(38)* Motor vehicle means any device which is propelled by an engine in or upon which a person or material may be transported on the ground and which is intended to be operated upon a public highway.

[(jj)] *(39)* Muffler means an apparatus generally consisting of but not limited to a series of chambers or baffles for the purpose of transmitting gases while reducing sound levels.

[(kk)  Noise means an erratic, intermittent, or statistically random oscillation.]

[(ll)] *(40)* Owner means and includes the owner of the freehold of the premises or lesser estate therein, or mortgagee thereof, a lessee or agent of any of the above persons, a lessee of a device or his or her agent, a tenant, operator, or any other person who has regular control of a device or an apparatus.

[(mm)] *(41)* Paving breaker means any powered construction device intended to cut or trench pavement, subbase macadam, gravel, concrete or hard ground.

[(nn)] *(42)* Person means any individual, partnership, company, corporation, association, firm, organization, governmental agency, administration or department, or any other group of individuals, or any officer or employee thereof.

*(43) Personal audio device means a portable sound reproduction device as normally and customarily used for personal purposes including but not limited to a personal radio, phonograph, television receiver, tape recorder or compact disc player.  For the purposes of this definition such term shall include a sound reproduction device installed in or operated from a motor vehicle whether or not portable.*

*(44) Plainly audible sound means any sound for which any of the content of that sound, such as, but not limited to comprehensible musical rhythms, is communicated to a person using his or her unaided hearing faculties.  For the purposes of the enforcement of this code, the detection of any component of music, including but not limited to the rhythmic bass by a person using his or her unaided hearing faculties is sufficient to verify plainly audible sound.  It is not necessary for such person to determine the title, specific words or artist of such music.  In the case of motor vehicles the detection of the sound of a muffler or of an exhaust by a person using his or her unaided hearing faculties is sufficient to verify plainly audible sound.  Plainly audible sound does not require measurement with a sound level meter.*

[(oo)] *(45)* Power tool means any device powered mechanically, by electricity, by gasoline, by diesel fuel or by any other fuel, which is intended to be used or is actually used for, but shall not be limited to, the performance of such functions as cutting, nailing, stapling, sawing, vacuuming or drilling.

*(46) Public right-of-way means a public highway, road, street, avenue, alley, driveway, path, sidewalk, roadway or any other public place or public way.*

[(pp)] *(47)* Railroad means a railroad, other than a rapid transit railroad or street railroad, operated for public use in the conveyance of persons or property for compensation, with all bridges, ferries, tunnels, equipment, switches, spurs, tracks, stations and terminal facilities used, operated or owned by or in connection therewith.

[(qq)] *(48)* Rapid transit railroad means a rapid transit railroad used for local service in the transportation of passengers as a common carrier for hire together with the appurtenances, facilities and equipment thereof.

6

*(49)  Receiving property means real property, including but not limited to buildings, grounds, offices and dwelling units, from which sound levels from sound sources outside such property may be measured.  For the purposes of this definition, individual offices or dwelling units within a building may constitute a receiving property.*

[(rr)] *(50)* Refuse [compacting] *collection* vehicle means a motor vehicle designed *or used* to [compact and] remove, *collect, or transport* refuse, *solid waste or recyclables.*

[(ss)] *(51)* Sound means an oscillation in pressure, stress, particle displacement, particle velocity, etc., in a medium with internal forces (e.g., elastic, viscous), or the superposition of such propagated oscillation which evokes an auditory sensation.

[(tt)] *(52)* Sound level meter means any instrument including a microphone, an amplifier, an output meter, and frequency weighting networks for the measurement of noise and sound levels in a specified manner and which complies with standards established by the Amercian National Standards Institute specifications for sound level meters S1.4-1971, as amended *or S1.4-1983, as amended.*

[(uu)] *(53)*  Sound pressure level (decibels) means [a sound that is]*an expression of the acoustic pressure calculated as* twenty times the logarithm to the base ten of the ratio of the *root mean square of the* pressure of the sound to the reference pressure, [2 x 10-4 microbars] *20 micropascals.*

[(vv)] *(54)* Sound reproduction device means a device intended primarily for the production or reproduction of sound, including but not limited to any musical instrument, radio receiver, television receiver, tape recorder, phonograph or *electronic* sound amplifying system.

[(ww)] *(55)*  Sound signal means any sound produced by a sound signal device designed to transmit information.

[(xx)] *(56)* Sound signal device means a device designed to produce a sound signal when operated, including but not limited to any claxon, air horn, whistle, bell, gong, siren, but not an emergency signal device.

[(yy)]  *(57)* Sound source means any activity or device [as herein defined] *that emits sound.*

[(zz)] *(58)* This code means the *New York city* noise control code.

*(59)  Total sound level means that measured sound level that represents the combined sound level of the source or sources under investigation and the ambient sound level. Total sound level measurements shall exclude extraneous sound sources.*

[(aaa)] *(60)* Tunnel means an underground passage which is intended for use as a railway, aqueduct, road, sewer or major utility artery.

[(bbb)] *(61)* Tunneling means any activity necessary or incidental to the construction of any tunnel, including the sinking of shafts to tunnel or to an intermediate level and the surface activities required to sink the shafts and construct the tunnel.

[(ccc)]) *(62)* Unreasonable noise means any excessive or unusually loud sound that disturbs the peace, comfort or repose of a reasonable person of normal sensitivities, injures or endangers the health or safety of a reasonable person of normal sensitivities or which causes injury to plant or animal life, or damage to property or business.

*(63) Refuse collection facility means any structure, building or other premises at which solid waste is received for the purpose of subsequent transfer to another location regardless of whether such solid waste is subject to any processing or reduction in volume at such structure, building or premises.*

[(ddd)] Zone means any zone as defined in the zoning resolution of the city of New York, except that zone shall not mean any ambient noise quality zone under subchapter

7

five or subchapter six of this chapter of this code or any noise sensitive zone under subchapter four of this chapter of this code

(ddd) Nursing home means a facility providing therein nursing care to sick, invalid, infirm, disabled, or convalescent persons in addition to lodging and board or health-related service, or any combination of the foregoing, and in addition thereto, providing nursing care and health-related service, or either of them, to persons who are not occupants of the facility.

(eee) Audible status indicator means any sound reproduction device on a motor vehicle that emits or causes to be emitted any continuous or near continuous sound for the purpose of warning that an audible burglar alarm has been installed on such motor vehicle and is operational or for creating the appearance that such an alarm has been installed on such motor vehicle and is operational.]

§3  Sections 24-204, 24-205, 24-206 and 24-207 of the administrative code of the city of New York, sections 24-204, 24-205 and 24-207 as amended by local law number 18 for the year 1993, are amended to read as follows:

§24-204  General powers of the commissioner. *(a)* Subject to the provisions of this code, the commissioner may take such action as may be necessary to abate a sound source which causes or may cause, by itself or in combination with any other sound source or sources, an unreasonable *or prohibited* noise. The commissioner may exercise or delegate any of the functions, powers and duties vested in him or her or in the department by this code.

*(b) The commissioner shall promulgate such rules as are necessary to effectuate the purposes of this code, including, without limitation, rules setting forth specifications for the operation, installation, best available technology, or manufacture of sound generating equipment or devices, or sound mitigation equipment or devices.*

*(c) The commissioner shall promulgate such rules as are necessary with regard to standards and procedures to be followed in the measurement of sound pressure levels governed by the provisions of this code, provided that such standards and procedures are substantially in compliance with any similar standards and procedures promulgated by the American National Standards Institute, International Standards Organization, Society of Automotive Engineers, Compressed Air and Gas Institute, American Society of Heating, Refrigeration, and Air Conditioning Engineers, American Refrigeration Institute or any generally recognized professional standard-setting organization.*

*(d) The police department, as well as other agencies of the city designated by the commissioner, shall have the authority to enforce the provisions of this code and police officers and designated employees of the department and of such other city agencies shall have the power to issue summonses, appearance tickets and notices of violation for violations of this code.*

§24-205 Investigations and studies by the commissioner. *(a)* The commissioner may make or cause to be made any investigation or study which in his or her opinion is desirable for the purpose of enforcing this code or controlling or abating an unreasonable *or prohibited* noise. For such purposes, the commissioner may make tests, conduct hearings, compel the attendance of witnesses, and take their testimony under oath and may compel the production of books, papers and other things reasonably necessary to the matter under consideration.

*(b) The commissioner shall study and propose strategies to control and/or reduce sound levels associated with airports, rapid transit and railroad operations and within twenty-four months of the effective date of this section shall report to the mayor his or*

8

*her findings and recommendations, specifically identifying those recommendations that may only be implemented through state or federal legislation or rules.*

*(c) The commissioner, in conjunction with the police department, shall study noise abatement strategies for audible motor vehicle burglar alarms and within twenty-four months of the effective date of this section shall report to the mayor his or her findings and recommendations.*

*(d) The commissioner, in conjunction with the police department, shall study on an ongoing basis emerging technology in acoustical measurement and shall periodically report to the mayor his or her findings and recommendations regarding the testing and potential use of equipment for enforcement of this code. In conjunction with such study, the commissioner may issue a request for expressions of interest to determine new and emerging technological solutions for accurate and efficient measurement of sounds as enumerated in this code.*

*(e) The commissioner shall study the impact of motor vehicle back-up warning devices installed on motor vehicles on ambient sound levels and within twenty-four months of the effective date of this section shall report to the mayor his or her findings and recommendations, specifically identifying those recommendations that may only be implemented through state or federal legislation.*

§24-206 Testing by order of the commissioner. (a) If the commissioner has reasonable cause to believe that any device is in violation of this code, the commissioner may order the owner of the device to conduct such tests as are necessary in the opinion of the commissioner to determine whether the device or its operation is in violation of this code and to submit the test results to the commissioner within ten days after the tests are completed.

(b) Such tests shall be conducted in a manner approved by the commissioner. If any part of the test is conducted at a place other than the site where the device is located, that part of the test shall be certified by a laboratory acceptable to the commissioner. The commissioner may require that the entire test results shall be reviewed and certified by *(i)* a professional engineer *with acoustical experience as specified in the rules of the department or (ii) a noise consultant with qualifications of education and/or acoustical experience as set forth in the rules of the department.*

(c) [The owner shall notify the commissioner of the time and place of a test at least seven days before the commencement of such test. Reasonable facilities shall be made available for the commissioner to witness the test.

(d)] If in the opinion of the commissioner, tests by the department are necessary, the commissioner may order the owner to provide such access to the device as the commissioner may reasonably request, to provide a power source suitable to the points of testing, and to provide allied facilities, exclusive of sound level meter. These provisions shall be made at the expense of the owner of the device. The owner shall be furnished with copies of the analytical results of the data collected.

*(d) If after the analysis of such testing, it is determined by the commissioner that such device or devices generate sound levels that exceed the limits of this code, the commissioner may make recommendations for modifications and/or mitigation measures to bring such device or devices into compliance.*

*(e) The commissioner may issue a separate notice of violation for every 24-hour period of noncompliance with the orders of the commissioner issued pursuant to this section.*

9

§24-207 Inspection. (a) The department may inspect at any reasonable time and in a reasonable manner any device which creates or may create unreasonable *or prohibited* noise including but not limited to the premises where the device is used.

(b) The department may inspect at any reasonable time and in a reasonable manner any record relating to a use of a device which creates or may create unreasonable *or prohibited* noise.

(c) No person shall refuse entry or access into the public areas of a multiple dwelling or a place of business to an authorized employee of the department *or other authorized city employee* who presents appropriate credentials, nor shall any person refuse entry or access into any other portion of a [premise]*premises* to an authorized employee of the department *or other authorized city employee* who presents appropriate credentials and a [search] warrant *for such inspection.*

*(d)  No person shall refuse to allow an authorized employee of the department or other authorized city employee who presents appropriate credentials to perform reasonable sound testing on any device or devices, including but not limited to requiring the temporary shutting down of said device or devices for the purposes of such testing except that upon a showing that the inspection would produce a noticeable interruption of services that would cause discomfort to employees or customers or require a building engineer or other professional to work with the equipment, such authorized employee shall reschedule the inspection for a more convenient time.*

§4. Subdivision (a) of section 24-208 of such code is amended to read as follows:

(a) The commissioner may require the written registration of air compressors, paving breakers, refuse compacting vehicles and rapid transit railroads, including but not limited to its rolling stock, track and trackbeds, passenger stations*, circulation devices rated 300,000 BTUs or higher,* tunnels, elevated structures, yards, depots and garages. A period of sixty days shall be allowed for the filing of such registration *measured from the date such registration is required by the commissioner or with respect to devices installed after such requirement is instituted measured from the date of installation.* However, in cases of emergency, the commissioner may designate a shorter period of time.

§5. Section 24-211 of such code is amended to read as follows:

§24-211 Display of permits[,] *and* certificates [and other notices; removal or mutilation prohibited]. Any tunneling permit or certificate required by this code shall be displayed in the vicinity of the device on the premises designated on the tunneling permit or certificate or in the vicinity of the place where the device will be operated or supervised.

§6. Paragraph (1) of subdivision (b) of section 24-213 of such code is amended to read as follows:

(1) Either by mailing the notice, order or decision directed to the person at his or her principal place of business *or home address*; or

§7. Section 24-217 of such code is amended to read as follows:

§24-217 Exemptions. The provisions of this code shall not apply to the operation or use of any organ, bell, chimes or other similar instrument [by] *from on or within* any church, synagogue, mosque or [school] *other house of worship.*

§8. Such code is amended by adding a new section 24-217.1 to read as follows:

*§24-217.1  Measurements.  Unless otherwise specifically provided, all sound level measurements under this code shall be taken in Lmax with the sound level meter set to slow response.*

10

§9.  Section 24-218 of such code, as amended by local law number 18 for the year 1993, is amended to read as follows:

§24-218 General prohibitions. *(a)* No person shall make, continue or cause or permit to be made or continued any unreasonable noise[, except that this section shall not apply to any sound from any source where the decibel level of such sound is within the limits prescribed by another section of this title and where there is compliance with all other applicable requirements of law with respect to such sound].

*(b) Unreasonable noise shall include but shall not be limited to sound, attributable to any device, that exceeds the following prohibited noise levels:*

*(1) Sound, other than impulsive sound, attributable to the source, measured at a level of 7 dB(A) or more above the ambient sound level at or after 10:00 p.m. and before 7:00 a.m., as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way.*

*(2) Sound, other than impulsive sound, attributable to the source, measured at a level of 10 dB(A) or more above the ambient sound level at or after 7:00 a.m. and before 10:00 p.m., as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way.*

*(3) Impulsive sound, attributable to the source, measured at a level of 15 dB(A) or more above the ambient sound level, as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way.  Impulsive sound levels shall be measured in the A-weighting network with the sound level meter set to fast response.  The ambient sound level shall be taken in the A-weighting network with the sound level meter set to slow response.*

*(c) Notwithstanding the provisions of subdivision b of this section, where a particular sound source or device is subject to decibel level limits and requirements specifically prescribed for such source or device elsewhere in this code, the decibel level limits set forth in this section shall not apply to such sound source or device.*

*(d)  The decibel level limits set forth in this section shall not apply to sound attributable to construction devices and activities.*

*(e)  Where the commissioner finds that sound from any refuse collection facility regulated by the department of sanitation exceeds the decibel level limits set forth in this section, the commissioner shall order the operator of such facility to submit a certification by a professional engineer as to whether or not the facility is in compliance with the noise standards required by the department of sanitation rules (16 RCNY Ch. 4) and if not in compliance, the mitigation measures that will be undertaken to bring such facility into compliance.  The testing and certification must be submitted to the department and to the department of sanitation within forty-five days after the issuance of such order.  A facility that complies with an order issued pursuant to this section and with any required mitigation measures shall be deemed to be in compliance with the decibel limits of this section.  With respect to any refuse collection facility owned or operated by the department of sanitation such facility shall be deemed to be in compliance with the decibel level limits of this section if it is in compliance with a best management practices plan developed in conjunction with the department.  A notice of violation may only be issued for a refuse collection facility pursuant to this section where the operator of such facility fails to comply with an order of the commissioner issued pursuant to this subdivision or the mitigation measures set forth in a certification.*

§10.  Subchapters 4, 5 and 6 of chapter 2 of title 24 of such code are REPEALED and new subchapters 4, 5 and 6 are added to read as follows:

***SUBCHAPTER 4***

11
### Construction Noise Management

§24-219  *Noise mitigation rules.  (a) The commissioner shall adopt rules prescribing noise mitigation strategies, methods, procedures and technology that shall be used at construction sites whenever any one or more of the construction devices or activities listed below are employed or performed:*

*(1) air compressors.*

*(2) pile drivers.*

*(3) sledgehammers.*

*(4) bulldozers.*

*(5) pneumatic hammers.*

*(6) steam shovels.*

*(7) derricks.*

*(8) cranes.*

*(9) steam or electric hoists.*

*(10) off-road construction vehicles other than trucks.*

*(11) pumps.*

*(12) pneumatic tools.*

*(13) blasting.*

*(14) power tools.*

*(15) tunneling machines.*

*(16) construction devices with internal combustion engines.*

*(17) construction devices that emit impulsive sound.*

*(18) construction devices that create vibration.*

*(19) metal plates used in street construction to temporarily cover excavations.*

*(20) any other construction devices or activities specified in such rules.*

*(b)  Such rules shall include but shall not be limited to:*

*(1) The use of perimeter fences with acoustical insulation, where appropriate.*

*(2) The use of portable barriers with acoustical insulation, where appropriate.*

*(3) The use of acoustical blanket insulation, where appropriate.*

*(4)  Testing of exhaust mufflers and certification, in a form and manner to be specified in the rules, that mufflers meet factory specifications for noise emissions at maximum loading at the commencement of construction at the site.*

*(5)  The development of generic noise mitigation plans, where appropriate.*

*(6)  Additional mitigation measures for sensitive receptors such as hospitals and schools, where appropriate.*

*(c)  The commissioner shall appoint an advisory committee, which shall include, but shall not be limited to, representatives of utility companies and the construction industry, including those industries related to heavy construction, persons with acoustical expertise and/or expertise regarding the health effects of noise, a representative of the city council and employees of the department and of other relevant city agencies. The committee shall provide advice and recommendations to the department relating to construction noise mitigation and shall assist the department in the  development of the noise mitigation rules required by this section.  The commissioner shall consult with the committee regarding any proposed amendments of such rules.  In the development of such rules the commissioner shall consider factors such as the availability, cost and safety of proposed noise mitigation measures.*

§24-220  *Noise mitigation plan.  (a)  Each person, corporation or other business entity performing construction work in the city shall adopt and implement a noise mitigation plan for each construction site in accordance with the provisions of this*

12

subchapter and such rules whenever any one or more of the construction devices or activities listed above or in the department's rules are employed or performed at the site.

(b) Such plan shall be adopted prior to the commencement of construction at the site or, with respect to emergency work, as defined in the department's rules, within three days thereafter, and shall apply to all work at the site throughout the construction process. The plan shall provide in detail the noise mitigation strategies, methods, procedures and technology, as prescribed in the rules of the department or specifically approved by the commissioner in accordance with section 24-221 of this code, for each device or activity employed or performed at the site. Each permit holder or other person in charge of such construction site will be accountable for compliance with such rules and shall ensure that each person performing construction work at the site shall be aware of the plan and shall be responsible for complying with those provisions that affect his or her work.

(c) A copy of the plan shall be kept at the construction site and shall be made available for inspection upon the request of persons authorized to enforce the provisions of this code.

(d) The plan shall be amended whenever additional devices or activities unforeseen at the commencement of construction are employed at the site or at the direction of the commissioner in accordance with section 24-223 of this subchapter.

(e) A plan need not be filed with or approved by the department prior to the commencement of construction if it conforms in all respects to the rules of the department with respect to construction devices and activities employed or performed at the construction site. A plan that deviates in any respect from such rules or an alternative noise mitigation plan required to be certified in conjunction with a undue hardship application pursuant to paragraph (5) of subdivision (e) of section 24-223 shall be subject to the prior approval of the commissioner in accordance with section 24-221 of this code.

(f) This section shall not apply to construction work in connection with the alteration or repair of an existing one or two family owner-occupied dwelling classified in occupancy group J-3 or a convent or rectory.

§24-221 Alternative noise mitigation plan. (a) Upon application, the commissioner may approve an alternative noise mitigation plan for a particular construction site that deviates from strict compliance with the noise mitigation rules. Application for approval of such plan shall be submitted to the department at least ten business days prior to the commencement of construction or as soon as practicable but no later than 24 hours prior to the commencement of construction in a form and manner and accompanied by such information and documentation as shall be set forth in the rules of the department. The commissioner may approve such alternative noise mitigation plan if he or she finds that:

(1) strict compliance with the noise mitigation rules would not be possible or would create an undue hardship because of the location or unique characteristics of the site or of the construction devices or activities to be employed or performed at the site; and

(2) the alternative noise mitigation strategies, methods, procedures or equipment proposed are consistent with the purposes and policies of this code.

(b) Notwithstanding the foregoing provisions, with respect to construction sites where construction is performed pursuant to a permit issued prior to the effective date of this section or in the case of construction by or on behalf of a city agency where construction is performed under a contract bid out prior to the effective date of this section, application for approval of an alternative noise mitigation plan may be

*submitted within 60 days after the effective date of this section.  The commissioner may approve such plan if he or she finds that:*

*(1) strict compliance with the noise mitigation rules would not be possible or would create an undue hardship because of the location or unique characteristics of the site or of the construction devices or activities employed or performed at the site, or*

*(2) strict compliance with such rules would be unreasonable or unduly burdensome with respect to construction work that is imminent or ongoing on the effective date of this section, or*

*(3) with respect to city construction projects, the implementation of contract modifications to achieve strict compliance with such rules would result in unreasonable delay and/or increased expenditure for a necessary public improvement, and*

*(4) the alternative noise mitigation strategies, methods, procedures or equipment proposed are consistent with the purposes and policies of this code.*

*(c)   Where the commissioner rejects an alternative noise mitigation plan, an applicant may appeal such rejection in accordance with the rules of the department.  An alternative plan shall not be in effect unless and until it has been approved by the commissioner  except that where a timely alternative plan has been filed with the commissioner for approval, a construction site in compliance with such alternative plan shall be deemed to be in compliance with this section unless and until such plan is rejected by the commissioner and for a reasonable time thereafter as determined by the commissioner.*

*§24-222  After hours and weekend limits on construction work.  Except as otherwise provided in this subchapter, it shall be unlawful to engage in or to cause or permit any person to engage in construction work other than on weekdays between the hours of 7 a.m. and 6 p.m.  A person may however perform construction work in connection with the alteration or repair of an existing one or two family owner-occupied dwelling classified in occupancy group J-3 or a convent or rectory on Saturdays and Sundays between the hours of 10 a.m. and 4 p.m. provided that such dwelling is located more than 300 feet from a house of worship.*

*§24-223  After hours work authorization.  (a) Notwithstanding section 24-222 of this subchapter, an agency authorized to issue permits for construction work may, along with such permit, issue an after hours work authorization for the work site.  Such after hours authorization may permit construction work to be performed at the site before 7 a.m. or after 6 p.m.  on weekdays and/or on Saturdays and/or Sundays subject to the conditions and restrictions set forth in this section.*

*(b)   The agency issuing such authorization must obtain a certification from its permittee that the permittee has developed a noise mitigation plan for the site in accordance with this subchapter and that such plan is in compliance with the noise mitigation rules.  In the case of emergency work such certification shall be submitted within 3 days after the commencement of the work.*

*(c)   If after hours work at the site is not being performed in compliance with such plan or where no plan is in effect, the department or the agency issuing such authorization, at the request of the commissioner or on its own account, may take appropriate action, including but not limited to the refusal to renew such after hours authorization.*

*(d)   Where there is full compliance with the noise mitigation plan yet nevertheless aggregate sound levels from the site where an after hours authorization is in effect exceed 8dB(A) above the ambient sound level as measured in any residential receiving property dwelling unit (with windows and doors that may affect the measurement*

*closed), the commissioner may request the person performing the work to confer with representatives of the department regarding additional noise mitigation measures that may be employed at the site to reduce aggregate sound levels. After such conference the commissioner may direct amendment of the noise mitigation plan for the site. Failure to respond to a request for a conference or to amend the noise mitigation plan within the time prescribed in a notice issued by the department shall be a violation of this code.*

*(e) Authorization for after hours construction work may only be issued in the following circumstances:*

*(1) Emergency work. Agencies shall authorize such after hours construction work for emergency conditions, inside or outside the property line, involving a threat to public safety or causing or likely to cause the imminent interruption of service required by law, contract or franchise. An emergency authorization issued pursuant to this paragraph shall expire as determined by the agency but no later than the ninetieth day after its issuance and shall be renewable in accordance with agency procedures while the emergency continues.*

*(2) Public safety. Agencies may authorize such after hours work, inside or outside of the property line, where the agency determines that the work cannot reasonably or practicably be performed on weekdays between the hours of 7 a.m. and 6 p.m. because of traffic congestion and/or concern for worker and/or public safety. An authorization issued pursuant to this paragraph shall expire as determined by the agency but no later than the ninetieth day after its issuance and shall be renewable in accordance with agency procedures.*

*(3) City construction projects. Agencies may authorize after hours work by or on behalf of city agencies for projects that are judicially mandated or the subject of consent orders and/or where a project is necessary in the public interest including but not limited to facilities, equipment, and infrastructure for the provision of water, sewerage, sanitation, transportation and other services necessary for the health or safety of the public. An authorization issued pursuant to this paragraph for a city construction project shall remain in effect for the duration of the project.*

*(4) Construction activities with minimal noise impact. The commissioner shall promulgate rules setting forth a list of construction activities with minimal noise impact and specific noise mitigation measures applicable to such activities. Agencies may authorize the performance of such construction activities after hours in accordance with such rules.*

*(5) Undue hardship. Agencies may authorize after hours work if the commissioner certifies that the permit holder has substantiated a claim of undue hardship resulting from unique site characteristics, unforeseen conditions, scheduling commitments and/or financial considerations outside the control of the permit holder and that the applicant has received approval from the department of an alternative noise mitigation plan pursuant to section 24-221 of this subchapter, specifying the activities and devices that will be used for such after hours construction and setting forth the additional mitigation measures, above and beyond those measures otherwise required for such devices and activities pursuant to the department's rules, that the applicant will use to significantly limit noise emissions from the site of such after hours work. Applications for such certification shall be submitted to the department in a form and manner to be set forth in the rules of the department. The applicant for an after hours authorization under this paragraph shall submit such certification to the issuing agency.*

*§24-224 Construction work without noise mitigation plan unlawful. It shall be unlawful to perform work at any construction site in the city that is not in compliance*

15

*with a noise mitigation plan where such plan is required pursuant to this subchapter and with the noise mitigation rules adopted pursuant to this subchapter. Notwithstanding any other provision of this code, construction work performed in accordance with a noise mitigation plan that is in full compliance with this subchapter and such rules shall be deemed to be in compliance with all decibel level limits set forth in other subchapters of this code. The provisions of this subchapter shall supercede all other provisions of this code relating to construction activities or devices that are inconsistent with or in conflict therewith.*

**SUBCHAPTER 5**
**PROHIBITED NOISE**
**SPECIFIC NOISE SOURCES – SOUND LEVEL STANDARD**

*§24-225 Refuse collection vehicles. (a) No person shall sell, offer for sale, operate or permit to be operated a refuse collection vehicle, equipped with a compacter, that produces a maximum sound level when the compacting mechanism is in the compacting cycle but not engaged in compacting a load that exceeds 80 dB(A), when measured by a sound level meter set for slow response at a distance of 35 feet or more from the compacting unit.*

*(b) It shall be unlawful to operate or cause to be operated a refuse collection vehicle, including such a vehicle equipped with a compacter, within 50 feet of any residential receiving property at or after 11:00 p.m. and before 7:00 a.m. if the aggregate sound, not including impulsive sound, generated by the collection and compacting activities exceeds 85 dB(A) when measured by a sound level meter set to slow response at a distance of 35 feet or more from the vehicle. On and after July 1, 2012 such aggregate sound shall not exceed 80 dB(A). The provisions of this subdivision shall not apply to the operation of refuse collection vehicles during an emergency such as a storm or other event that causes delays in refuse collection.*

*§24-226 Air compressors. (a) No person shall operate or cause to be operated an air compressor unless it is equipped with an appropriate muffler with no exhaust leaks.*

*(b) No person shall sell, offer for sale for use within the city of New York, or operate or permit to be operated an air compressor that, when operated, produces a maximum sound level, when measured at a distance of one meter or more from the nearest major surface of such air compressor, exceeding 80 dB(A) for sizes greater than 350 cfm or exceeding 75 dB(A) for sizes 350 cfm or less.*

*(c) Except for construction work outside the property line on a public right-of-way, no person shall operate or permit to be operated an air compressor so as to generate sound levels in excess of 75 dB(A) as measured at any receiving property.*

*§24-227 Circulation devices. (a) No person shall operate or permit to be operated a circulation device in such a manner as to create a sound level in excess of 42 dB(A) when measured inside a receiving property dwelling unit. The measurement shall be taken with the window or terrace door open at a point three feet from the open portion of the window or terrace door.*

*(b) On and after the effective date of this section, when a new circulation device is installed on any building lot or an existing device on any building lot is replaced, the cumulative sound from all circulation devices on such building lot owned or controlled by the owner or person in control of the new device being installed or the existing device being replaced shall not exceed 45 dB(A), when measured as specified in subdivision a of this section. For a period of two years after the effective date of this section, this subdivision shall not apply to the replacement of a circulation device that was installed*

16

*on any building lot prior to the effective date of this section by a device of comparable capacity.*

*(c) Except as otherwise provided in subdivision b of this section, with respect to circulation devices installed on any building lot prior to the effective date of this section, the sound level limit of 42 dB(A) referred to in subdivision a of this section shall apply to each individual device except that if the cumulative sound from all devices owned or controlled by the same person on a building lot exceeds 50 dB(A), when measured as specified in subdivision a of this section, the commissioner may order the owner or person in control of such devices to achieve a 5 dB(A) reduction in such cumulative sound level within not more than 12 months after the issuance of such order.*

*§24-228 Construction, exhausts and other devices. (a) No person shall operate or use or cause to be operated or used a construction device or combination of devices in such a way as to create an unreasonable noise. For the purposes of this section unreasonable noise shall include but shall not be limited to sound that exceeds the following prohibited noise levels:*

*(1) Sound, other than impulsive sound, attributable to the source or sources, that exceeds 85 dB(A) as measured 50 or more feet from the source or sources at a point outside the property line where the source or sources are located or as measured 50 or more feet from the source or sources on a public right-of-way.*

*(2) Impulsive sound, attributable to the source, that is 15 dB(A) or more above the ambient sound level as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way. Impulsive sound levels shall be measured in the A-weighting network with the sound level meter set to fast response. The ambient sound level shall be taken in the A-weighting network with the sound level meter set to slow response.*

*(b) Where a particular sound source or device is subject to decibel level limits and requirements specifically prescribed for such source or device elsewhere in this code, such specific decibel limits shall apply to such device or source. However, if aggregate sound levels from a construction site exceed the limits set forth in this section, compliance with such specific decibel limits shall not be a defense in any proceeding relating to a violation of this section.*

*§24-228.1 Exhausts. No person shall cause or permit discharge into the open air of the exhaust of any device, including but not limited to any steam engine, diesel engine, internal combustion engine, power tools, compressors or turbine engine, so as to create an unreasonable noise. For the purposes of this section unreasonable noise shall include but shall not be limited to sound that exceeds the prohibited noise levels set forth in section 24-228.*

*§24-229 Containers and construction material. (a) No person shall handle or transport or cause to be handled or transported on any public right-of-way any container or any construction material in such a way as to create an unreasonable noise. For the purposes of this section unreasonable noise shall include but shall not be limited to the following prohibited noise levels:*

*(1) Sound, other than impulsive sound, attributable to the source measured at a level of 10 dB(A) or more above the ambient sound level, as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way.*

*(2) Impulsive sound, attributable to the source, measured at a level of 15 dB(A) or more above the ambient sound level, as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public*

17

*right-of-way. Impulsive sound levels shall be measured in the A-weighting network with the sound level meter set to fast response. The ambient sound level shall be taken in the A-weighting network with the sound level meter set to slow response.*

*(b) This section shall not apply to the operation of refuse collection vehicles regulated pursuant to section 24-225.*

*§24-230 Paving breakers. (a) No person shall operate or cause to be operated a paving breaker, other than one operated electrically or hydraulically, unless a pneumatic discharge muffler certified by the manufacturer of such muffler to provide a dynamic insertion loss of 5 dB(A) of the sound released from the air discharge of such paving breaker is installed on such air discharge.*

*(b) No person shall sell, offer for sale for use within the city of New York, operate or permit to be operated a paving breaker that when operated produces a maximum sound level that exceeds 95 dB(A), when measured at a distance of one meter or more from a face of such paving breaker.*

*§24-231 Commercial music. (a) No person shall make or cause or permit to be made or caused any music originating from or in connection with the operation of any commercial establishment or enterprise when the level of sound attributable to such music, as measured inside any receiving property dwelling unit:*

*(1) is in excess of 42 dB(A) as measured with a sound level meter; or*

*(2) is in excess of 45 dB in any one-third octave band having a center frequency between 63 hertz and 500 hertz (ANSI bands numbers 18 through 27, Inclusive). in accordance with American National Standards Institute standard S1.6-1984; or*

*(3) causes a 6 dB(C) or more increase in the total sound level above the ambient sound level as measured in decibels in the "C" weighting network provided that the ambient sound level is in excess of 62 dB(C).*

*(b) (1) The commissioner may recommend to the board that there shall be no civil penalty imposed for a first violation of this section if, within 30 days after the issuance of such violation or, if applicable, within the time granted by the commissioner pursuant to paragraph two of this subdivision, the respondent admits liability for the violation and files a certification with the department in a form and manner and containing such information and documentation as shall be prescribed in the department's rules that (i) permanent improvements or modifications have been made to the establishment, including but not limited to the installation of appropriate sound insulation, isolators, suspension mounting and/or sound mitigation devices or materials and (ii) appropriate sound measurements taken in accordance with the department's rules substantiate that the establishment is in full compliance with the sound levels set forth in this section. If the commissioner accepts such certification of compliance, he or she shall recommend to the board that no civil penalty shall be imposed for the violation. Such violation may nevertheless serve as a predicate for purposes of imposing penalties for subsequent violations of this section.*

*(2) Where the completion of appropriate permanent improvements or modifications and testing within 30 days after the issuance of the violation would cause the respondent undue hardship, the respondent may apply to the commissioner for additional time to submit an appropriate certification of compliance, but not more than 30 days. Application for such additional time must be submitted to the commissioner within 30 days after the issuance of the violation along with an admission of liability and appropriate documents in support of the claim of undue hardship.*

*(3) Nothing in this subdivision shall be construed to prohibit enforcement personnel from issuing additional notices of violation, summonses or appearance tickets where*

18

*sound levels exceed the limits set forth in subdivision a of this section during the periods of time set forth in paragraphs one and two of this subdivision for submission of a certification of compliance for a first violation.*

*(c) In any proceeding under this section it shall be an affirmative defense that the receiving property dwelling unit was not lawfully occupied at the time of the violation.*

*(d) The commissioner may grant a variance from strict application of the limits set forth in subdivision (a) of this section for a commercial establishment or enterprise that was in operation at the same site prior to the date of enactment of the local law that added this section if he or she finds that there are practical difficulties or unnecessary hardship in the application of such provisions in the specific case, provided that as a condition to the grant of any such variance, sufficient evidence or data is submitted by an applicant that there are physical conditions or zoning district conditions, including irregularity in lot size characteristics and zoning changes, and that as a result of such physical or zoning district conditions, practical difficulties or unnecessary hardship arise in complying with such provisions. In granting a variance the commissioner may impose such terms and conditions as he or she deems necessary to carry out the intent of this section to minimize noise emissions from the site. Application for a waiver shall be submitted in such form and manner as shall be provided by rules of the department and shall include in detail proposed measures which the applicant proposes will minimize sound from the site. A variance granted pursuant to this subdivision shall not be transferable but shall expire upon a change in ownership, size or location of the commercial establishment or enterprise in accordance with the rules of the department. Violation of the conditions of any variance shall be deemed to be a violation of this section.*

*§24-232 Allowable decibel levels-octave band measurement. (a) No person shall cause or permit a sound source operating in connection with any commercial or business enterprise to exceed the decibel levels in the designated octave bands shown below as measured within a receiving property as specified therein.*

| Octave Band | Maximum Sound Pressure Levels (dB) as measured within a receiving property as specified below | |
|---|---|---|
| Frequency (Hz) | Residential receiving property for mixed use buildings and residential buildings (as measured within any room of the residential portion of the building with windows open, if possible). | Commercial receiving property (as measured within any room containing offices within the building with windows open, if possible). |
| 31.5 | 70 | 74 |
| 63 | 61 | 64 |
| 125 | 53 | 56 |
| 250 | 46 | 50 |
| 500 | 40 | 45 |
| 1000 | 36 | 41 |
| 2000 | 34 | 39 |
| 4000 | 33 | 38 |
| 8000 | 32 | 37 |

19

*(b) All sources that are within the A-scale limits prescribed by any other section of this code must also comply with the octave band decibel levels as specified herein. Compliance with this section does not constitute a defense to violation of decibel limits set by any other section of this code.*

*(c) Measurements performed on residential property shall not be taken in non-living areas such as closets and crawlspaces.*

*(d) This section shall not apply to impulsive sound, music or construction devices or activities.*

*(e) This section shall not apply to any utility structure in existence prior to January 1, 2004. For the purposes of this subdivision the term "utility structure" means any electric substation owned or operated by an electric, gas, or steam utility subject to the jurisdiction of the New York state public service commission.*

*(f) This section shall not apply to any refuse collection facility owned, operated or regulated by the department of sanitation.*

*SUBCHAPTER 6*
*SPECIFIC NOISE SOURCES*
*PLAINLY AUDIBLE AND OTHER STANDARDS*

*§24-233 Personal audio devices. (a) No person shall operate or use or cause to be operated or used any personal audio device in such a manner as to create an unreasonable noise.*

*(b) For the purposes of this section unreasonable noise shall include but shall not be limited to:*

*(1) the operation or use of a personal audio device on or in any public right-of-way so that sound emanating from such device is plainly audible to another individual at a distance of 25 feet or more from the source.*

*(2) the operation or use of a personal audio device from on or inside a motor vehicle, whether moving, parked, stopped or standing, on or in any public right-of-way so that sound emanating from such device is plainly audible to another individual outside of such motor vehicle at a distance of 25 feet or more from the source.*

*(c) Nothing in this section shall be construed to permit the operation or use of a personal audio device where such operation or use would otherwise be prohibited pursuant to section 10-108 or 24-244 of the administrative code.*

*§24-234 Operation or use of sound reproduction device in or on rapid transit railroad, omnibus or ferry. It shall be unlawful to operate or use a sound reproduction device in or on any rapid transit railroad, omnibus or ferry, other than a personal audio device with personal earphones such that sound from such earphones is not plainly audible to another individual at a distance of 5 feet or more from the source.*

*§24-235 Animals. No person having charge, care, custody, or control of any animal shall cause or permit such animal to cause unreasonable noise including, but not limited to, any sound that is plainly audible at any location within any residential receiving property as set forth below:*

*(a) At or after 7 a.m. and before 10 p.m., continuously for a period of 10 minutes or more.*

*(b) At or after 10 p.m. and before 7 a.m., continuously for a period of 5 minutes or more.*

*§24-236 Motor vehicles. (a) Motor vehicles, other than motorcycles, with a maximum gross weight of 10,000 lbs. or less. No person shall cause or permit any motor vehicle, other than a motorcycle, with a maximum gross weight of 10,000 lbs. or less to*

20

operate on a public right-of-way where the muffler or exhaust generates a sound that is plainly audible to another individual at a distance of 150 feet or more from the motor vehicle.

(b) Motorcycles.  No person shall cause or permit any motorcycle to operate on a public right-of-way where the muffler or exhaust generates a sound that is plainly audible to another individual at a distance of 200 feet or more from the motorcycle.

(c) Motor vehicles with a maximum gross weight greater than 10,000 lbs.  No person shall cause or permit any motor vehicle with a maximum gross weight greater than 10,000 lbs. to operate on a public right-of-way where the muffler or exhaust generates a sound that is plainly audible to another individual at a distance of 200 feet or more from the motor vehicle, except when compression brake systems are used in an emergency to stop the vehicle.

(d) (1) No person operating a motor vehicle containing a compression brake system or systems shall apply such compression brake system or systems except when such system or systems are used in an emergency to stop the vehicle.

(2)  The department is authorized to post signs at every entry point of the city containing the following information: THE USE OF COMPRESSION BRAKE SYSTEMS IS PROHIBITED ON STREETS WITHIN NEW YORK CITY WHERE THE SPEED LIMIT IS 35 MILES PER HOUR OR LESS EXCEPT IN CASE OF AN EMERGENCY.

(e)  No person shall cause or permit the total sound from a motor vehicle operating on any public right-of-way to exceed the sound level set forth in section 386 of the vehicle and traffic law and the rules adopted pursuant to such section.

(f) Subdivisions a, b, c and paragraph one of subdivision d of this section may only be enforced on streets where the speed limit is 35 miles per hour or less.

§24-237  Sound signal devices.  (a) No person shall operate or use or cause to be operated or used any claxon installed on a motor vehicle, except as a sound signal of imminent danger or in connection with use as an audible motor vehicle burglar alarm as provided in section 24-238 of this code.

(b) No person shall operate or use or cause to be operated or used an air horn or gong installed on any motor vehicle other than as provided in section 24-241 of this code.

(c) No person shall operate or use or cause to be operated or used any steam whistle attached to any stationary boiler, except to give notice of the time to start and stop work or as a sound signal of imminent danger.

(d)  No person shall operate or use or cause to be operated or used on any public right-of-way any electrically operated or electronic sound signal device (other than a safety device, such as but not limited to a car horn or back up signal, that is actually used for its intended purpose) attached to, on or in a motor vehicle, wagon or manually propelled cart from which food or any other items are sold or offered for sale when the vehicle is stopped, standing or parked.  For the purposes of this subdivision the term "stopped" means the halting of a vehicle, whether occupied or not, except when necessary to avoid conflict with other traffic or in compliance with a police officer or other authorized enforcement officer or a traffic control sign or signal.  The terms "standing" and "parked" shall be as defined in the vehicle and traffic law.

§24-238 Audible burglar alarm and audible status indicator.  (a) No owner of a building or of a motor vehicle shall have in operation an audible burglar alarm thereon unless such burglar alarm shall be capable of and shall automatically terminate its operation within fifteen minutes of its being activated in the case of a building, and three

21

minutes of its being activated in the case of a motor vehicle. No audible burglar alarm on a motor vehicle shall be capable of being activated except by:

(i) direct physical contact with that motor vehicle; or

(ii) through the use of an individual remote activation device, that is activated from no further than 15 feet away from such vehicle and, that is designed to be used with the audible burglar alarm system of a particular vehicle which alarm shall be capable of and shall terminate its audible response within three minutes of its being activated.

(b) No owner of a motor vehicle shall have in operation an audible status indicator on such motor vehicle.

§24-239 Audible burglar alarm or audible status indicator may be disconnected. (a) Notwithstanding the provisions of section 24-238, any member of the police department shall have the right to take such steps as may be reasonable and necessary to disconnect any audible burglar alarm or audible status indicator that is installed on a motor vehicle at any time during the period of its activation.

(b)  The operator of any motor vehicle on which an audible burglar alarm or audible status indicator has been installed shall when parked on a public highway or parking lot open to the public, prominently display the number and telephone number of the owner's local police precinct where information shall be on file to permit communication with the owner of such vehicle.

§24-240 Removal of vehicle with audible burglar alarm or audible status indicator. (a) Notwithstanding the provisions of section 24-239, any member of the police department may arrange for the removal of a motor vehicle from a public highway or parking lot open to the public, when:

(i) an audible burglar alarm installed on such vehicle is operated in violation of this code or an audible status indicator is operated on such vehicle; and

(ii) all reasonable and necessary steps to disconnect such alarm or audible status indicator have been taken without success. Authorized personnel of the department or the department of transportation may request a member of the police department to arrange for removal of such vehicle. When such removal is requested, the notice of violation for operation of an audible burglar alarm in violation of this section or for operation of an audible status indicator shall state that a member of the police department took all reasonable and necessary steps to disconnect such alarm or such audible status indicator without success. Such removal may be accomplished by utilizing any existing city-operated tow-program, rotation tow program established pursuant to section 20-519 of the code or such other procedures as may be established. The cost of towing and storage of such motor vehicle shall be the responsibility of the owner or other person who claims such vehicle.

(b) An opportunity for a hearing before the board shall be provided to the owner of a motor vehicle removed pursuant to this section within five business days after a request for a hearing is made to determine whether there was a basis for such removal. The board shall render a decision within two business days following the conclusion of the hearing.  If it is determined that there was no basis for removal of a vehicle pursuant to this section, the owner of such vehicle may recover from the city any amounts paid by such owner for towing and storage.

§24-241  Emergency signal devices. (a) No person shall operate or use or cause to be operated or used any emergency signal device, except on an authorized emergency vehicle when such vehicle is in the act of responding to an emergency; provided that such device shall not be operated for a period of time longer than is necessary to respond to such emergency. Notwithstanding the foregoing, such a device on a motor

22

*vehicle shall be lawful if designed and used solely as an audible motor vehicle burglar alarm in accordance with section 24-238 and a device attached to a vehicle for the purpose of providing an audible warning when the vehicle is backing up shall be permitted even though the audible warning may consist of a gong or bell sound.*

*(b)  No person shall operate or permit to be operated an emergency signal device installed on an authorized emergency vehicle that when operated at the maximum level creates a sound level in excess of 90 dB(A) when measured at a distance of fifty feet from the center of the forward face of such vehicle. Within one year after the effective date of this subdivision and every two years thereafter, emergency signal devices installed on authorized emergency vehicles shall be tested and certification shall be submitted, in a form approved by the department, that such devices meet the standard set forth in this subdivision for operation at maximum level. Notwithstanding the foregoing provisions, where compliance with the provisions of this subdivision would create an undue hardship, the owner or operator of an authorized emergency vehicle may submit a plan to the commissioner for emergency signal devices to meet the standard set forth in this subdivision within two years after the effective date of this subdivision.  Such plan shall be submitted within one year after the effective date of this subdivision in lieu of the required certification.  This subdivision shall not apply to authorized emergency vehicles of the police department, fire department or authorized emergency vehicles responding to medical emergencies.*

*§24-242  Lawn care devices.  (a) No person shall operate or use or cause to be operated or used any lawn care device:*

*(1) On weekdays before eight a.m. and after seven p.m. or sunset, whichever occurs later; or*

*(2) On weekends and New York state and federal holidays before nine a.m. and after six p.m.; or*

*(3) At any time in such a way as to create an unreasonable noise.  For the purposes of this section unreasonable noise shall include but shall not be limited to an aggregate sound level of 75 dB(A) or more, attributable to the source or sources, as measured at any point within a receiving property.  The provisions of paragraph (1) of this subdivision  shall not apply to an employee of the department of parks and recreation or an agent or contractor of the department of parks and recreation who operates or uses or causes to be operated or used any lawn care device between the hours of seven a.m. and eight a.m. in any location more than three hundred feet from any building that is lawfully occupied for residential use.  The distance of three hundred feet shall be measured in a straight line from the point on the exterior wall of such building nearest to any point in the location at which such lawn care device is operated or used or caused to be operated or used.*

*(b) No person shall operate or use or cause to be operated or used any leaf blower not equipped with a functioning muffler.*

*§24-243 Snow blowers.  The provisions of this code shall not apply to the operation of a snow blower for the purpose of complying with subdivision a of section 16-123 of the administrative code.*

*§24-244  Sound reproduction devices.  (a)  Except as otherwise provided in section 10-108 of the code, no person shall operate or use or cause to be operated or used any sound reproduction device in such a manner as to create unreasonable noise.*

*(b)  No person shall operate or use or cause to be operated or used any sound reproduction device, for commercial or business advertising purposes or for the purpose of attracting attention to any performance, show, sale or display of merchandise, in*

23

*connection with any commercial or business enterprise (including those engaged in the sale of radios, television sets, compact discs or tapes), (i) outside or in front of any building, place or premises or in or through any aperture of such building, place or premises, abutting on or adjacent to a public street, park or place; (ii) in or upon any vehicle operated, standing or being in or on any public street, park or place; (iii) from any stand, platform or other structure; (iv) from any airplane or other device used for flying, flying over the city; (v) from any boat on the waters within the jurisdiction of the city; or (vi) anywhere on the public streets, public sidewalks, parks or places where sound from such sound reproduction device may be heard upon any public street, sidewalk, park or place. Nothing in this section is intended to prohibit incidental sounds emanating from a sporting or an entertainment or a public event for which a permit under section 10-108 of the code has been issued.*

§11.  Paragraph (5) of subdivision (b) of section 24-257 of such code is amended to read as follows:

(5)  Impose a civil penalty in each instance in an amount as set out in table [V] *I* against any person who violates a provision of this code, or of any order, rule or regulation promulgated by the commissioner or the board. Each day during which such violation continues shall constitute a separate violation. The board may remit, in whole or in part, such a civil penalty if, at the conclusion of the hearing or at the time of the board determination under section 24-266 of this code, the respondent is no longer in violation of a provision of this code, or of any order, rule or regulation promulgated by the commissioner or the board;

§12.  Table V following paragraph (5) of section 24-257 of such code is REPEALED and a new table I is added following such paragraph (5) to read as follows:

*TABLE I*

|   | *Civil Penalties* | | | | | |
|---|---|---|---|---|---|---|
| *Violations related to section and subdivision* | *First Violation* | | *Second Violation\** | | *Third and Subsequent Violations\** | |
|  | *Maxi-mum* | *Mini-mum* | *Maxi-mum* | *Mini-mum* | *Maxi-mum* | *Mini-mum* |
| *24-216 (d)* | 2,625 | 650 | 5,250 | 1,300 | 7,875 | 1,950 |
| *24-218* | 1,000 | 350 | 2,000 | 700 | 3,000 | 1,050 |
| *24-218.1* | 50 | 50 | 50 | 50 | 50 | 50 |
| *24-220* | 1,400 | 440 | 2,800 | 880 | 4,200 | 1,320 |
| *24-222* | 3,500 | 875 | 7,000 | 1,750 | 10,500 | 2,625 |
| *24-223* | 3,500 | 875 | 7,000 | 1,750 | 10,500 | 2,625 |
| *24-224* | 3,500 | 875 | 7,000 | 1,750 | 10,500 | 2,625 |
| *24-225* | 1,400 | 440 | 2,800 | 880 | 4,200 | 1,320 |
| *24-226* | 1,400 | 440 | 2,800 | 880 | 4,200 | 1,320 |
| *24-227* | 875 | 220 | 1,750 | 440 | 2,625 | 660 |
| *24-228* | 1,400 | 440 | 2,800 | 880 | 4,200 | 1,320 |
| *24-229* | 1,400 | 440 | 2,800 | 880 | 4,200 | 1,320 |
| *24-230* | 1,400 | 440 | 2,800 | 880 | 4,200 | 1,320 |
| *24-231 (a)* | 8,000 | 2,000 | 16,000 | 4,000 | 24,000 | 6,000 |
| *24-231 (b)* | 1,750 | 440 | 3,500 | 880 | 5,250 | 1,320 |
| *24-231 (c)* | 875 | 350 | 1750 | 700 | 2,625 | 1,050 |
| *24-232* | 1,400 | 440 | 2,800 | 880 | 4,200 | 1,320 |
| *24-233 (a)* | 175 | 50 | 350 | 100 | 525 | 150 |
| *24-233 (b) (1)* | 175 | 50 | 350 | 100 | 525 | 150 |

24

| | | | | | |
|---|---|---|---|---|---|
| *24-233 (b) (2)* | *350* | *100* | *700* | *200* | *1,050* | *300* |
| *24-234* | *175* | *50* | *350* | *100* | *525* | *150* |
| *24-235* | *175* | *50* | *350* | *100* | *525* | *150* |
| *24-236 (a)* | *525* | *150* | *1050* | *300* | *1,575* | *450* |
| *24-236 (b) (c) (d)* | *1,440* | *440* | *2,800* | *880* | *4,200* | *1,320* |
| *24-237 (a)* | *1,000* | *150* | *2,000* | *300* | *3,000* | *450* |
| *24-237 (b)* | *875* | *220* | *1,750* | *440* | *2,625* | *660* |
| *24-237 (c)* | *875* | *220* | *1,750* | *440* | *2,625* | *660* |
| *24-237 (d)* | *1,000* | *350* | *2,000* | *700* | *3,000* | *1,050* |
| *24-238* | *875* | *220* | *1,750* | *440* | *2,625* | *660* |
| *24-239 (b)* | *350* | *100* | *700* | *200* | *1,050* | *300* |
| *24-241* | *1,400* | *440* | *2,800* | *880* | *4,200* | *1,320* |
| *24-242* | *875* | *220* | *1,750* | *440* | *2,625* | *660* |
| *24-244* | *1750* | *440* | *3,500* | *880* | *5,250* | *1,320* |
| *24-245* | *2,625* | *660* | *5,250* | *1,320* | *7,875* | *1,980* |
| *All remaining sections and subdivisions* | *875* | *220* | *1,750* | *440* | *2,625* | *660* |

\*       *By the same respondent of the same provision of law, order, rule or regulation and, if the respondent is the owner, agent, lessee or other person in control of the premises with respect to which the violation occurred, at the same premises (all violations committed within two years).*

§13.  Paragraph (3) of subdivision (c) of section 24-257 of such code is amended to read as follows:

(3) order any person not in possession of [a variance] *an after hours work authorization* issued pursuant to [subdivision (b) of section 24-224 ] *section 24-223 of* this code to cease and desist from construction activities other than during the permissible hours specified in [subdivision (a) of section 24-224] *section 24-222 of* this code and the board may also seal any device used in such construction activities;

§14.  Subdivision (f) of section 24-257 of such code is amended to read as follows:

(f)  (1) The board may order any person to cease and desist from an activity which it reasonably believes causes unreasonable noise which creates imminent peril to the public health and well being, or to cease and desist from an activity which it reasonably believes constitutes a willful or continued violation of any provision of this code or order or regulation, promulgated by the commissioner or board. Such order shall be effective upon service thereof. Any party affected by such an order may request a hearing on written notice, and he or she shall be afforded a hearing, within twenty-four hours after service of such request, pursuant to section 24-263 of this code. If such an accelerated hearing is not requested, then a hearing shall be afforded within ten days of the issuance of the order. The board shall issue its final decision and order thereon within three days from the conclusion of a hearing held pursuant to this subdivision.

[(2)  The board may rescind in whole or in part a variance issued by an agency of the city of New York pursuant to subdivision (b)  of section 24-224 of this code.  Such order shall be effective upon service thereof upon such agency and upon the person to whom such variance was issued.]

§15.  Section 24-258 of such code is amended to read as follows:

§ 24-258  The board.  (a) The board shall be convened by the chairperson or in the chairperson's absence the assistant commissioner of [air resources] *environmental compliance,* or at the request of any three members thereof.

(b) If a member of the board has presided over the initial hearing, he or she shall not be disqualified from reviewing the hearing.

25

(c) Five members of the board, at least two of who shall not be city officials, shall constitute a quorum.

§16. All actions and proceedings, civil or criminal, or administrative proceedings commenced under or by virtue of any provision repealed by this local law and pending immediately prior to the taking effect of such repeal may be prosecuted and defended to final effect in the same manner as they might if such provisions were not so repealed.

§17. On or prior to January 1, 2007 the commissioner of environmental protection shall promulgate noise mitigation rules in accordance with section 24-219 of the administrative code, as added by section 10 of this local law.

§18. This local law shall take effect on July 1, 2007 provided that prior to such effective date agencies may promulgate rules or take other administrative actions necessary for the timely implementation of this local law including the appointment of any advisory committee and provided further that section 17 of this local law shall take effect immediately upon its enactment into law.

THE CITY OF NEW YORK, OFFICE OF THE CITY CLERK, s.s.:

I hereby certify that the foregoing is a true copy of a local law of the City of New York, passed by the Council on December 21, 2005 and approved by the Mayor on December 29, 2005.

VICTOR L. ROBLES, City Clerk of the Council

CERTIFICATION PURSUANT TO MUNICIPAL HOME RULE LAW §27

Pursuant to the provisions of Municipal Home Rule Law §27, I hereby certify that the enclosed Local Law (Local Law 113 of 2005, Council Int. No. 397-A) contains the correct text and:

Received the following vote at the meeting of the New York City Council on December 21, 2005:  47 for, 0 against, 0 not voting.

Was signed by the Mayor on December 29, 2005.

Was returned to the City Clerk on December 30, 2005.

JEFFREY D. FRIEDLANDER, Acting Corporation Counsel

07 Civ. 3560 (LAK) ECF Case

UNITED        STATES        DISTRICT        COURT
SOUTHERN DISTRICT OF NEW YORK

GENCO IMPORTING INC., d/b/a MANTIOBA'S and
RICHARD MANITOBA,

                                                    Plaintiff,

                    - against -

CITY OF NEW YORK, EMILY LLOYD, in her capacity as
Commissioner of the New York City Department of
Environmental Protection and as Chairman of the New York
City Environmental Control Board, NEW YORK CITY
DEPARTMENT OF ENVIRONMENTAL PROTECTION,
NEW YORK CITY ENVIRONMENTAL CONTROL
BOARD,

                                                    Defendants.

**NOTICE OF MOTION TO DISMISS AND
DECLARATION IN SUPPORT WITH EXHIBITS**

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Ave Maria Brennan*
*Tel: (212) 788-0782*

*Due and timely service is hereby admitted*

*New York, N.Y. ..................., 200. . . .*

*...........................Esq.*

*Attorney for........*