UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

GENCO IMPORTING INC. d/b/a MANITOBA'S
and RICHARD MANITOBA,

> Plaintiff,

vs.

CITY OF NEW YORK, EMILY LLOYD, in her
capacity as Commissioner of the New York City
Department of Environmental Protection and as
Chairman of the New York City Environmental
Control Board, NEW YORK CITY
DEPARTMENT OF ENVIRONMENTAL
PROTECTION, NEW YORK CITY
ENVIRONMENTAL CONTROL BOARD,

> Defendants.

---

Civil Action No. 07-3560 (LAK)

**ORAL ARGUMENT REQUESTED**

---

## GENCO IMPORTING INC. d/b/a MANITOBA'S  AND RICHARD MANITOBA'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

David M. Zensky (DZ5913)
Jason W. Sunshine (JS0562)
Ryan N. Marks (Bar Admission Pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022
(212) 872-1000 (Telephone)
(212) 872-1001 (Facsimile)

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT....................................................................................1

STATEMENT OF FACTS ........................................................................................4
    **I.**    Background ...............................................................................................4
    **II.**   Enforcement of The New York Administrative Code...........................5
    **III.**  The Alleged Violations............................................................................6
    **IV.**  The Challenged Code Provisions............................................................7
           **A.**    The Commercial Music Prohibitions.........................................7
           **B.**    The Unreasonable Noise Prohibitions ......................................9

ARGUMENT ..........................................................................................................11
    **I.**    Manitoba's' Facial Challenges Are Not Moot .....................................11
    **II.**   The Standard For A Motion To Dismiss ..............................................12
    **III.**  Manitoba's Has Sufficiently Pled That The Commercial Music
          Prohibitions Are Unconstitutional........................................................13
           **A.**    Manitoba's Has Sufficiently Pled That The Commercial Music
                Prohibitions Violate Due Process Because The Opportunity To
                Comply Hinges Upon The Conduct Of A Third-Party Private
                Resident..........................................................................................13
           **B.**    The Commercial Music Prohibitions Chill Protected Speech
                Because They Burden Substantially More Speech Than Necessary........17
    **IV.**  Manitoba's Has Sufficiently Pled That The Unreasonable Noise
          Prohibitions Are Unconstitutional........................................................22
           **A.**    Manitoba's Pled That The DEP's Application Of
                Code Section 24-218 Violated Due Process And The First
                Amendment Because Manitoba's Had No Notice Of The Conduct
                Prohibited And The Manner In Which It Was Applied Chilled
                Protected Speech ...........................................................................22
           **B.**    The Unreasonable Noise Prohibitions Violate Due Process On
                Their Face Because They Give Insufficient Notice Of The Conduct
                They Proscribe ..............................................................................26
           **C.**    The Unreasonable Noise Prohibitions On Their Face Substantially
                Burden Protected Speech Because They Are Not Narrowly
                Tailored .........................................................................................29

CONCLUSION.......................................................................................................33

TABLE OF AUTHORITIES

FEDERAL CASES

*Agran v. City of New York*, 1997 WL. 354705 at *2 (S.D.N.Y. June 25, 1997)...............13

*Asquith v. City of Beaufort*, 911 F. Supp. 974 (D.S.C. 1995)...........................................16

*Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955 (2007).........................12, 15

*Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115 (2d Cir. 1975) ..............12

*Casey v. City of Newport*, 308 F.3d 106 (1st Cir. 2002)........................17, 18, 25, 26, 30, 31

*Catanzano v. Wing*, 277 F.3d 99 (2d Cir. 2001) ................................................................12

*Chatin v. Coombe*, 186 F.3d 82 (2d Cir. 1999)..................................................................22

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................................13

*Dae Woo Kim v. City of New York,*, 774 F. Supp. 164 (S.D.N.Y. 1991)............14, 15, 16, 27

*Deegan v. City of Ithaca*, 444 F.3d 135 (2d Cir. 2006) ..........................................23, 25, 26

*Dupres v. City of Newport, Rhode Island*, 978 F. Supp. 429 (D.R.I. 1997) .....................16

*Farrell v. Burke*, 449 F.3d 470 (2d Cir. 2006)......................................................13, 14, 16

*General Media Commc'ns v. Cohen*, 131 F.3d 273 (2d Cir. 1997) ...................................22

*Grayned v. City of Rockford*, 408 U.S. 108 (1972)................................................................
.......................................................................13, 14, 15, 16, 17, 22, 26, 27, 29, 32

*Howard Opera House Assoc. v. Urban Outfitters, Inc.,* 131 F. Supp. 2d 559 (D.
Vt. 2001) .................................................................................................19, 20, 32

*Iqbal v. Hasty*, 490 F.3d 143 (2d. Cir. 2007).....................................................................13

*Lewis v. Continental Bank Corp.*, 494 U.S. 472 (1990).....................................................12

*Scheuer v. Rhodes*, 416 U.S. 232 (1974)............................................................................13

*Sharkey's, Inc. v. City of Waukesha*, 265 F. Supp. 984 (E.D.Wis. 2003) ...............14, 32

*Smith v. Goguen*, 415 U.S. 566 (1974) ..............................................................................14

*Spencer v. Kemma*, 523 U.S. 1 (1998) ...............................................................................12

*Stewart v. Nynex Corp.*, 78 F. Supp. 2d 172 (S.D.N.Y. 1999)............................................11

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) ..................................................................13

*Turley v. Giuliani*, 86 F. Supp. 2d 291 (S.D.N.Y. 2000) ...................................................31

*Turner Broadcasting Sys v. FCC*, 512 U.S. 622 (1994).....................................................18

*United States v. Ohiri*, No. 03-2239, 2005 U.S. App. LEXIS 10677 (10th Cir.
June 7, 2005).........................................................................................................12

*United States v. Roberts*, 363 F.3d 118 (2d Cir. 2004)......................................................22

*Vincenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007) ..........................18, 19, 25, 29, 31, 33

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)......................................17, 19, 25, 33

STATE CASES

*Harlem Yacht Club v. New York City Envtl. Bd.*, 836 N.Y.S.2d 66 (1st Dep't 2007) .........31

*New York v. Firth*, 3 N.Y.2d 472 (1957).....................................................................13, 26, 27

*People v. Bakolas*, 462 N.Y.S.2d 844 (1983)................................................................27, 28

*People v. New York Rock Trap Corp.*, 57 N.Y.2d 371 (1982) ...............................15, 16, 28

*People v. Taub*, 37 N.Y.2d 530 (1975) ..............................................................................19

ADMINISTRATIVE CASES

*New York City v. Harlem Yacht Club, Department of Environmental Protection,*
   Appeal Nos. 36316 & 36317 , May 25, 2004 ................................................................6

RULES AND STATUTES

Fed.R.Civ.P. 8 ...............................................................................................13, 20
New York City Administrative Code § 24- 202 (prior to July 1, 2007)......................5, 6, 7
New York City Administrative Code § 24- 203(a) (prior to July 1, 2007) ...................7, 22
New York City Administrative Code § 24- 207 (prior to July 1, 2007)..........................6
New York City Administrative Code §§ 24-257(b)(8), (10) (prior to July 1, 2007)............
   .................................................................................................8, 10, 11
New York City Administrative Code. N.Y. City Charter § 1404c(1)(d) (prior to
   July 1, 2007)................................................................................................5
New York City Administrative Code Section 24-241.1 (prior to July 1, 2007)
   .................................................................................................1, 7, 8, 9, 10
New York City Administrative Code § 24-218 (prior to July 1, 2007).....................2, 9, 24
New York City Administrative Code § 24-218(b) (enacted July 1, 2007).......................29
New York City Administrative Code § 24-231 (enacted July 1, 2007) ....................8, 9, 13

ADDITIONAL SOURCES

13A Wright, Federal Practice & Procedure § 3533 (2d ed. 1984) .....................................12

Plaintiffs Genco Importing Inc. d/b/a Manitoba's and Richard Manitoba (together, "Manitoba's") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the amended complaint.

## PRELIMINARY STATEMENT

This case involves clear-cut violations of First and Fourteenth Amendment rights arising out of the enforcement of New York City's noise control scheme against Manitoba's, a small bar that serves as a local live music venue.   Manitoba's was charged with two violations of New York City Administrative Code ("Code") Sections 24-241.1 and 24-218, which Defendants intend to prosecute pending the outcome of this case.  Faced with the prospect of debilitating fines, Manitoba's was forced to stop hosting all live music performances, a practice of cultural and economic importance in which it had engaged continuously for nearly a decade.  The Code provisions under which the citations were issued, the manner in which they were applied in this case, and the subsequent amendments to them violate the United States Constitution.

The question for this Court is whether Manitoba's has adequately alleged one or more such constitutional violations. The answer is yes. Each of the claims alleged in Manitoba's Amended Complaint (the "Complaint") raises a host of factual issues that cannot be decided on less than a full record. Accordingly, Defendants' motion to dismiss should be denied.

Code Section 24-241.1, pursuant to which the first violation was issued, prohibits playing music in connection with the operation of a commercial establishment louder than 45 dB(A), "as measured inside any residential unit." A new version of the provision, also requiring measurement inside a residential unit, replaced Code Section 24-241.1 on July 1, 2007 ("New Code Section 24-231") (together with Code Section 24-241.1, the "Commercial Music Prohibitions"). An establishment wishing to comply with the Commercial Music Prohibitions has no reasonable opportunity to know whether it is in compliance, particularly since compliance

is contingent upon the conduct of third-party neighbors, who can deny access to their residences for the taking of sound level measurements. Therefore, the Commercial Music Prohibitions: (1) violate due process, because an establishment seeking to comply with the provisions is denied the opportunity to know what conduct is prohibited; and (2) violate the First Amendment, by placing substantial and unjustified burdens on speech; in order to ensure compliance, live music venues must keep their live music, a form of protected speech, down to the level of quiet conversation—effectively, they cannot play live music at all.

Even if access to neighboring residences *were* available, the burden of compliance is prohibitive. Each time an establishment plays live or pre-recorded music, and perhaps multiple times in a given day or night, its representative must knock on doors, guessing which are within the music's foreseeable audible range, in order to take sound level measurements and ensure compliance. The 45 dB(A) limit is a moving target. Compliance is dependent on countless factors, such as ambient noise, building insulation, and open doors and windows. Thus, when music complies with the Commercial Music Prohibitions in one residence, it might still be louder than 45 dB(A) in another. The burden of compliance has caused Manitoba's, and undoubtedly causes many other establishments, to opt instead not to exercise their free speech rights. Where the exercise of free speech is so impeded, it cannot reasonably be considered free.

Code Section 24-218, under which the second violation was issued, states that "[n]o person shall make, continue or cause or permit to be made or continued any *unreasonable noise*." The amended version of Code Section 24-218, which went into effect on July 1, 2007 ("New Code Section 24-218") (together with Code Section 24-241.1, the "Unreasonable Noise Prohibitions"), includes the same prohibition. The application of Code Section 24-218 against Manitoba's, using an arbitrary 45 dB(A) standard, was unconstitutional, because it: (1) violates

due process, since Manitoba's had no notice of Defendants' interpretation of unreasonable noise, which derived from neither the definition of "unreasonable noise" nor Code Section 24-218 itself; and (2) places an unconstitutional burden on speech protected by the First Amendment, by effectively forcing Manitoba's to stop hosting live musical performances.

Moreover, the Unreasonable Noise Provisions are unconstitutional on their face, because they: (1) violate due process, since they give insufficient notice of the conduct they prohibit; and (2) place an unconstitutional burden on protected speech, because, without any guidelines or factors for determining which sounds constitute unreasonable noise, they are not narrowly tailored, allow for arbitrary and discriminatory enforcement, and chill far more speech than necessary to the accomplishment of their objectives.

The United States Supreme Court has repeatedly mandated that the context and character of the area in which laws implicating protected speech are enforced should weigh heavily in the constitutional analysis of such laws. That Manitoba's' East Village neighborhood is comprised almost entirely of low-rise buildings with loud nightlife destinations, shops, and boutiques on their ground floors, and apartments and condominiums above, is therefore a crucial consideration. However, the challenged provisions take no account of the culture, and concomitant sound levels, of the neighborhoods in which they are enforced.

The Complaint clearly described the factual circumstances giving rise to the violations in question, contended that the ordinances under which they were issued are unconstitutional, and asserted that Defendants deprived Manitoba's of its First and Fourteenth Amendment rights. Moreover, though Manitoba's relies on the allegations set forth in the Complaint, to assist the Court, Manitoba's' expert witness has submitted an affidavit attesting to the myriad factual

variables for which a constitutional analysis of the challenged provisions must account, including the significant burdens on compliance they present.

Notwithstanding Defendants' attempt to litigate prematurely the merits of the Complaint's allegations, Manitoba's need only to have put Defendants on notice of the nature and basis of its claims to defeat a motion to dismiss, a requirement with which it has certainly complied. Its allegations should not be dismissed on anything less than a complete record. Defendants' motion to dismiss should therefore be denied.

## STATEMENT OF FACTS

### I.    Background

Manitoba's is a bar and, until recently, live music venue located in the heart of New York City's East Village. Manitoba's is operated and partially owned by its namesake, plaintiff Richard Manitoba, and has been in business since January, 1999. Complaint ¶¶ 16, 23. Richard Manitoba has had a long career in the music industry, most of which was dedicated to performing as lead singer for The Dictators, a band influential in punk rock music's evolution in New York City in the 1970s. Manitoba's is a small bar located on Avenue B near 6th street, in an area long associated with punk rock. Complaint ¶¶ 22, 23. As a tribute, Richard Manitoba decorated Manitoba's with photographs and artifacts relating to the punk rock movement. *Id.* The neighborhood is a night-life destination that is often crowded with foot traffic moving between its numerous commercial establishments. There are numerous bars and restaurants immediately next to and across the street from Manitoba's, as well as all along Avenue B. As with most other bars and restaurants in the neighborhood, there are residential units located above Manitoba's. Until approximately 2002, Manitoba's featured live musical performances almost daily. *See* Complaint ¶ 28. These performances almost always involved multi-piece bands using electronically amplified instruments. Complaint ¶ 28.

In 2002, partly to accommodate the changing character of the neighborhood, Manitoba's limited live musical performances to about one per week, usually scheduled for Monday evenings. Manitoba's ensured that the weekly live performances, beginning at approximately 8:00 p.m., ended promptly by 10:00 p.m. Complaint ¶ 28. These performances were not only financially important to Manitoba's, they were also a way for Manitoba's to maintain a cultural connection with the East Village's rich history of punk rock. *See* Complaint ¶ 27.

## II.    Enforcement of The New York Administrative Code

Defendant City of New York, through its Mayor, appoints the Commissioner of the New York City Department of Environmental Protection. Defendant Emily Lloyd, appointed in 2005, serves as the Commissioner of the New York City Department of Environmental Protection and Chairman of the New York City Environmental Control Board (the "DEP"). Defendant New York City Environmental Control Board (the "Board") appoints administrative law judges to hear cases against persons alleged to have violated New York City's quality of life laws, including the Noise Code.

The Board is required to enforce all provisions of the New York City Charter and the Code. N.Y. City Charter § 1404c(1)(d). Seven of the Board's thirteen members are commissioner members and six are citizen members. Each of the commissioner members, including Commissioner Lloyd, has authority to issue violations returnable to the Board. One of the six citizen members is designated as the "noise specialist."[1] The Board appoints administrative law judges to hear cases and issue recommended dispositions. A defendant may appeal a recommended decision to the Board, but only after paying the fine levied. Rules of the

---

[1] *See* New York City Environmental Control Board, *Who We Are*, at http://www.nyc.gov/html/ecb/html/about/who.shtml (last visited September 19, 2007).

City of New York, title 15 § 31-73. The Board's Administrative Law Judges lack the authority to address constitutional arguments.[2]

The DEP is empowered to inspect private residences and "any device which creates or may create unreasonable noise." Code § 24-207. When an inspector finds reasonable cause to believe the Code has been violated, a Notice of Violation and Hearing stating the provision allegedly violated, a hearing date, and a description of the violation is issued and sent to the accused.

## III.    The Alleged Violations

On October 23, 2006, purportedly in response to a complaint, a DEP inspector came to the building where Manitoba's is located, took sound level measurements inside one of its residential units, and issued a violation under Code Section 24-241.1. Complaint ¶¶ 29, 30. After the investigation, the inspector verbally informed Manitoba's' staff that a violation would be issued. Complaint ¶ 30. Manitoba's then received a Notice of Violation and Hearing by mail. *Id.* The Notice of Violation and Hearing indicated that a five-piece band using amplified instruments was performing at the time of the violation, causing sound level readings inside the complainant's apartment to exceed Code Section 24-241.1's 45 dB(A) standard. Complaint ¶ 30.

On February 12, 2007, a DEP inspector personally informed members of Manitoba's' staff that, unless the volume of the live music being played was lowered, a violation would be issued. Complaint ¶ 35. The musicians, having finished their set, then stopped performing altogether. Complaint ¶ 35. About two weeks later, however, Manitoba's received a second violation, which arose out of the events of February 12, 2007, and was issued under Code

---

[2] *See NYC v. Harlem Yacht Club*, Department of Environmental Protection, Appeal Nos. 36316 & 36317, May 25, 2004.

Section 24-218. Complaint ¶ 36. Manitoba's alleged that the investigating inspector "took noise meter readings from an exterior hallway in the complainant's apartment building and concluded that Manitoba's was in violation of Section 24-218 because the volume of the music in the hallway exceeded 45 dB(A)." Complaint ¶ 37. The inspector indicated on his Inspection Report that, under Code Section 24-218, 45 dB(A) is the "allowable" limit. *See* Declaration of Jason W. Sunshine in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint, dated September 26, 2007 ("Sunshine Decl."), at Ex. B.

Following the second violation, Manitoba's stopped featuring live music altogether, for the first time in its history. Complaint ¶ 38. As a result, Manitoba's has suffered substantial economic losses. Complaint ¶ 40. Pending the outcome of this case, Defendants have agreed to adjourn the administrative hearings relating to the two violations issued to Manitoba's.

## IV.    The Challenged Code Provisions

### A.    The Commercial Music Prohibitions

Code Section 24-241.1, entitled "Commercial music," prohibits playing music in connection with the operation of a commercial establishment louder than 45 dB(A),[3] "as measured inside any residential unit." Code Section 24-241.1 reads as follows:

> No person shall make or cause or permit to be made or caused any music originating from or in connection with the operation of any commercial establishment or enterprise when the level of sound of such music, *as measured inside any residential unit* is in excess of either;
>
> (a) *45dB(A) as measured with a sound level meter*; or

---

[3] "dB(A)" is the sound level measurement unit applied to sounds measured, in decibels, "with a sound level meter using the 'A' weighting network." *See* Code § 24-203(a). The Code defines "decibel" as follows: "The decibel is one-tenth of a bel. Thus, the decibel is a unit of level when the base of the logarithm is the tenth root of ten, and the quantities concerned are proportional to power." Code § 24-203(y).

> (b) 45dB in any one-third octave band having a center
>     frequency between 63 hertz and 500 hertz inclusive
>     (ANSI bands numbers 18 through 27, inclusive[)], in
>     accordance with American [N]ational [S]tandards
>     [I]nstitute standard S1.6-1984.

(Emphasis supplied.)

New Code Section 24-231, which went into effect on July 1, 2007, also prohibits the

playing of music in connection with the operation of a commercial establishment in excess of

various decibel levels, "as measured inside any receiving property dwelling unit." In relevant

part, New Code Section 24-231 reads as follows:

> (a) No person shall make or cause or permit to be made or caused
>     any music originating from or in connection with the operation
>     of any commercial establishment or enterprise when the level
>     of sound attributable to such music, *as measured inside any
>     receiving property dwelling unit*:
>
> (1) is in excess of *42 dB(A) as measured with a sound level
>     meter*; or
> (2) is in excess of 45 dB in any one-third octave band having a
>     center frequency between 63 hertz and 500 hertz (ANSI
>     bands numbers 18 through 27, Inclusive), in accordance
>     with American National Standards Institute standard S1.6-
>     1984; or
> (3) causes a 6 dB(C) or more increase in the total sound level
>     above the ambient sound level as measured in decibels in
>     the "C" weighting network provided that the ambient sound
>     is in excess of 62 dB(C).

(Emphasis supplied.)

A first offense under the Commercial Music Prohibitions may result in an $8,000 penalty,

which doubles upon a second and triples with a third, for a maximum total of $48,000 for three

offenses. Code § 24-257(b)(5); New Code § 24-257(b)(5). Further, the Code appears to

authorize Defendants to increase these potential fines by 25% to 100%, depending on the alleged

circumstances. Code §§ 24-257(b)(8), (10); New Code §§ 24-257(b)(8), (10).

## B.    The Unreasonable Noise Prohibitions

Code Section 24-218, entitled "General prohibitions," states, in pertinent part, that "[n]o person shall make, continue or cause or permit to be made or continued any unreasonable noise." Code Section 24-218 reads as follows:

> No person shall make, continue or cause or permit to be made or continued *any unreasonable noise*, except that this section shall not apply to any sound from any source where the decibel level of such sound is within the limits prescribed by another section of this title and where there is compliance with all other applicable requirements of law with respect to such sound.

(Emphasis supplied.)

Code Section 24-203(ccc) defines unreasonable noise to mean:

> [A]ny excessive or unusually loud sound that disturbs the peace, comfort or repose of a reasonable person of normal sensitivities or injures or endangers the health or safety of a reasonable person of normal sensitivities, or which causes injury to plant or animal life, or damage to property or business.

Code Section 24-218's successor similarly prohibits the making of "unreasonable noise," though it adds an open-ended list of various sound levels that will satisfy the definition of "unreasonable noise." Nevertheless, as explained in detail below, New Code Section 24-218(c) renders these purported guidelines inapplicable to commercial music. New Code Section 24–218 reads as follows:

> (a) No person shall make, continue or cause or permit to be made or continued *any unreasonable noise*[, except that this section shall not apply to any sound from any source where the decibel level of such sound is within the limits prescribed by another section of this title and where there is compliance with all other applicable requirements of law with respect to such sound].[4]
>
> (b) Unreasonable noise shall include but shall not be limited to sound, attributable to any device, that exceeds the following prohibited noise levels:

---

[4] Brackets in original.

(1) Sound, other than impulsive sound, attributable to the source, measured at a level of 7 db(A) or more above the ambient sound level at or after 10:00 p.m. and before 7:00 a.m., as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way.

(2) Sound, other than impulsive sound, attributable to the source, measured at a level of 10 db(A) or more above the ambient sound level at or above the ambient sound level at or after 7:00 a.m. and before 10:00 p.m. as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way.

(3) Impulsive sound, attributable to the source, measured at a level of 15 dB(A) or more above the ambient sound level, as measured at any point within a receiving property or as measured at a distance of 15 feet or more from the source on a public right-of-way.  Impulsive sound levels shall be measured in the A-weighting network with the sound level meter set to fast response.  The ambient sound level shall be taken in the A-weighting network with the sound level meter set to slow response.

(c) Notwithstanding the provisions of subdivision b of this section, where a particular sound source or device is subject to decibel level limits and requirements specifically prescribed for such source or device elsewhere in this code, the decibel level limits set forth in this section shall not apply to such sound source or device.

(Emphasis supplied.)

New Code Section 24-203(ccc) defines unreasonable noise to mean:

[A]ny excessive or unusually loud sound that disturbs the peace, comfort or repose of a reasonable person of normal sensitivities, injures or endangers the health or safety of a reasonable person of normal sensitivities or which causes injury to plant or animal life, or damage to property or business.

A first offense under the Unreasonable Noise Prohibitions may result in a penalty of $875, which doubles upon a second and triples with a third, for a maximum total of $5,250 for three offenses. Code § 24-257(b)(5); New Code § 24-257(b)(5).  Further, the Code appears to

authorize Defendants to increase these potential fines by 25% to 100%, depending on the alleged circumstances.  Code §§ 24-257(b)(8), (10); New Code §§ 24-257(b)(8), (10).

**ARGUMENT**

Manitoba's has pled facts sufficient to support its challenges to the Commercial Music Prohibitions and the Unreasonable Noise Prohibitions.  Defendants argue that Manitoba's' facial challenges are moot because the Code was amended after the Complaint was filed, and that the remaining challenges should be dismissed because the ordinances in question are proper time, place, and manner regulations of protected speech.  Rather than address whether the elements of the claims have been alleged, Defendants' motion improperly and prematurely seeks adjudication of Manitoba's' claims on the merits and without the benefit of a complete factual record.  As discussed in greater detail below, Manitoba's has sufficiently pled its claims, which find ample support in the law.  Accordingly, Defendants' motion to dismiss should be denied.

## I.    Manitoba's' Facial Challenges Are Not Moot

Manitoba's' facial challenges to Code Sections 24-218 and 24-241.1 are not moot. Manitoba's was fined based on provisions that were unconstitutional regardless of whether they were applied correctly and as intended.  That the law was subsequently amended or replaced is immaterial; Manitoba's was issued violations that Defendants intend to prosecute and remains subject to fines based on the ordinances at issue.  Thus, Manitoba's' injury, and its right to redress it, remain the same.  Manitoba's' claims that Code Sections 24-218 and 24-241.1 are facially unconstitutional are in dispute, justiciable, and part of a live case and controversy.

Defendants' argument fails even when held to the standards for mootness they themselves recite.  They note, correctly, that "[a] case becomes moot when interim relief or events have *eradicated the effects* of the defendant's act or omission," *Stewart v. Nynex Corp.*, 78 F. Supp. 2d 172, 179 (S.D.N.Y. 1999) (emphasis supplied), and that, for a case to be justiciable, the parties

must "continue to have a 'personal stake in the outcome' of the lawsuit." *Spencer v. Kemma*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477-78 (1990)). "'The central question . . . is constant—whether decision of a once living dispute continues to be justified by a sufficient prospect that the decision will have an impact on the parties.'" *Catanzano v. Wing*, 277 F.3d 99, 107 (2d Cir. 2001) (quoting 13A Wright, FEDERAL PRACTICE & PROCEDURE § 3533 (2d ed. 1984)). As previously stated, Manitoba's continues to be subject to prosecution for the violations issued under the Code. Accordingly, the effects of Defendants' actions have not been "eradicated" at all, and Manitoba's' facial challenges plainly raise a justiciable dispute, under these or any other applicable standards. *See Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1116 n.1 (2d Cir. 1975) (appeal of denial of motion to stay penalties not rendered moot by dismissal of underlying lawsuit, because penalties that possibly accrued prior to commencement of the action remained at issue); *U.S. v. Ohiri*, No. 03-2239, 2005 U.S. App. LEXIS 10677, at *10-11 (10th Cir., June 7, 2005) (former inmate's challenge of criminal sentence not moot, though sentence had been fully served, since the inmate remained subject to significant fines).

Manitoba's continues to have a stake in the outcome of this lawsuit. A favorable decision on its facial claims would result in Manitoba's' no longer being subject to prosecution or penalty, and could enable Manitoba's to recover damages for the violation of its constitutional rights. Therefore, Defendants' claim that Manitoba's' facial challenges to Code Sections 24-218 and 24-241.1 are moot is meritless. *See Spencer*, 523 U.S. at 7.

## II.    The Standard For A Motion To Dismiss

The Defendants do not set forth the standard for deciding a motion to dismiss, but those standards make clear that, in order to state a claim upon which relief can be granted, a complaint must merely allege "enough facts to state a claim to relief that is plausible on its face." *Bell*

*Atlantic Corp. v. Twombly*, __ U.S. __, __, 127 S.Ct. 1955, 1974 (2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *see* Fed.R.Civ.P. 8 (stating that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief"); *Agran v. City of New York*, 1997 WL 354705, at *2 (S.D.N.Y. June 25, 1997) (to plead constitutional violations, "plaintiff must allege facts showing that a person acting under color of state law deprived plaintiff of a right, privilege, or immunity guaranteed by the United States Constitution or federal law").

A well-pleaded complaint need not contain "detailed factual allegations," *Conley v. Gibson*, 355 U.S. 41, 47 (1957), as it functions only to provide a defendant with notice of a plaintiff's claims and the grounds on which they rest. *Swierkiewicz v. Sorema*, 534 U.S. 506, 514 (2002). Any allegation that such claims lack legal merit should be addressed in the summary judgment context. *Iqbal v. Hasty*, 490 F.3d 143, 153, (2d. Cir. 2007) (citations omitted).

Defendants argue that Manitoba's' allegations are "still somewhat unclear," apparently hoping that the Court will hold the Complaint to a more stringent standard than the law requires. Defendants' Motion at 13. The standard outlined above is clear, however, and Manitoba's has pled facts sufficient to state a claim for the deprivation of its constitutional rights.

**III.    Manitoba's Has Sufficiently Pled That The Commercial Music Prohibitions Are Unconstitutional**

**A.    Manitoba's Has Sufficiently Pled That The Commercial Music Prohibitions Violate Due Process Because The Opportunity To Comply Hinges Upon The Conduct Of A Third-Party Private Resident**

It is well settled that "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) (quoting *Grayned v. City of Rockford*, 408 U.S. 108, 108-09 (1972)) (internal citations and quotation marks omitted); *see also New York v. Firth*, 3 N.Y.2d 472, 474 (1957) (finding statute

unconstitutionally vague and stating that "[f]or validity [a] statute must be informative on its face"). Moreover, where an ordinance "is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts," *Smith v. Goguen*, 415 U.S. 566, 573 (1974),[5] because, "where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms." *Farrell*, 449 F.3d at 485 (quoting *Grayned*, 408 U.S. at 108-09).

The facts set forth in the Complaint are sufficient to show that, on their face, the Commercial Music Prohibitions are unconstitutionally vague under these standards. In addition to providing a detailed factual recitation regarding the character of Manitoba's' neighborhood, the Complaint alleges that on October 23, 2006, a DEP inspector, acting as Defendants' agent, informed Manitoba's that it was in violation of Code Section 24-241.1 and issued a violation in connection with a live musical performance at Manitoba's. *See* Complaint ¶¶ 22-28, 29-34. The Complaint also alleged that the Commercial Music Prohibitions (including New Code Section 24-231) require that the sound level inside neighboring private residences be monitored in order to ensure compliance—a task not entirely within Manitoba's' control. *See* Complaint ¶¶ 32-33, 53; Affidavit of Alan Fierstein in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint, dated September 26, 2007 ("Aff.") ¶¶ 6-9. The Complaint further alleged that, because it cannot determine whether it is in compliance with the Commercial Music Prohibitions, Manitoba's has stopped hosting live musical performances. *See* Complaint ¶¶ 42-48. Manitoba's, accordingly, has pled "enough facts to state a claim to relief

---

[5] Citing *Sharkey's, Inc. v. City of Waukesha*, 265 F.Supp. 2d 984, 990 (E.D.Wis. 2003), Defendants argue that Manitoba's is not entitled to the more stringent standard reserved for protected speech because the ordinances in question are content neutral. Defendant's position is mistaken. In *Dae Woo Kim v. City of New York*, this Court applied the more stringent standard to content-neutral noise ordinances similar to those here where "the ordinance in question [was] *applicable* to protected expression." 774 F.Supp. 164, 169 (S.D.N.Y. 1991) (emphasis supplied).

that is plausible on its face," and those facts are sufficient to put Defendants on notice of the grounds upon which the relief sought rests. *Bell Atlantic Corp.*, 127 S.Ct. at 1974.

Absent a narrowing construction by the state courts, federal courts will look "to the words of the ordinance itself, the interpretations the state court has given to analogous statutes, and, perhaps to some degree, the interpretation of the statute given by those charged with enforcing it," in order to interpret state law. *Grayned*, 408 U.S. at 110 (citations and internal quotations omitted); *see also Dae Woo Kim*, 774 F.Supp. at 169.

The New York Court of Appeals has not reviewed the constitutionality of the Commercial Music Prohibitions, but it has long held that noise ordinances ceding too much control to the complaining citizen or too much discretion to those charged with enforcement unconstitutionally violate due process. For example, in *People v. New York Trap Rock Corp.*, the defendant was convicted for making "unnecessary noise" while loading vehicles in connection with its business. 57 N.Y.2d 371, 380 (1982). The ordinance in question prohibited making "unnecessary noise" in "loading or unloading" any vehicle, and then added that, "without limiting the above language, it shall be a violation to load or unload any vehicle . . . within 300 feet of the boundary line of a residential district." *New York Rock Trap Corp.*, 57 N.Y.2d at 376. The Court found the ordinance unconstitutionally vague because, despite the "300 feet" standard, the phrase "without limiting the above language" permitted sanction at any distance, which the defendant "could hardly be expected to have noticed." *New York Trap Rock Corp.*, 57 N.Y.2d at 380. Thus, an ordinance which otherwise appeared to contain an objective standard was essentially standardless, for the "unnecessary noise" standard "could rest upon the malice or animosity of a cantankerous neighbor or boiling point of a particular person." *New York Trap Rock Corp.*, 57 N.Y.2d at 379-80.

In *Dae Woo Kim*, the Southern District adopted the reasoning employed by the Court of Appeals in *New York Trap Rock* and found unconstitutionally vague a nearly identical New York City ordinance prohibiting "unnecessary noise," which was defined as "any sound which annoys . . . the . . . repose . . . of a person." *Dae Woo Kim*, 774 F.Supp. at 166. The Court held that "[b]ecause [the ordinance] provides only this subjective standard, the conduct barred . . . will vary with the listener." *Dae Woo Kim*, 774 F.Supp. at 170; *see also Dupres v. City of Newport, Rhode Island*, 978 F.Supp. 429, 434 (D.R.I. 1997) (citing *Asquith v. City of Beaufort*, 911 F.Supp. 974, 987 (D.S.C. 1995)) (stating that the language of an ordinance "cannot be so ambiguous as to allow the determination of whether a law has been broken to depend upon the 'subjective opinions of complaining citizens and police officials'").

Here, in addition to raising factual issues regarding Manitoba's' burden in complying with the prohibitions, the Complaint states facts sufficient to show that though the Commercial Music Prohibitions may appear to contain an objective standard, they do not. As was the case in *New York Trap Rock* and *Dae Woo Kim*, a complaining citizen, based upon subjective opinion, may render the Commercial Music Prohibitions' 45 dB(A) standard meaningless simply by denying access to his residential unit for the taking of sound measurements. Where a neighbor denies such an opportunity, the party responsible for the music cannot be expected to know whether the music is exceeding the ordinance's decibel limit. *See* Aff. ¶ 6. That is, the party would have been given no "reasonable opportunity to know what is prohibited" by the ordinance. *Farrell*, 449 F.3d at 485 (quoting *Grayned*, 408 U.S. at 108-09). Sanctioning a party in such a case thus would come without "fair warning" that the conduct in question was prohibited and constitute an unconstitutional violation of due process. Defendants do not even address this issue, except to argue that compliance is not contingent upon the actions of a third party because

Manitoba's can purportedly "soundproof [the] bar based upon the maximum decibel level of music played." Defendants' Motion at 29. Not only do they cite no authority for their position, but Defendants' assertion, like their argument attempting to justify the Code's disproportionate targeting of commercial music, raises factual issues that should be resolved upon a full record.

### B. The Commercial Music Prohibitions Chill Protected Speech Because They Burden Substantially More Speech Than Necessary

Music, "as a form of expression and communication, is protected under the First Amendment." *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989). Moreover, not simply music, but also the volume at which it is played, constitutes protected speech—a point Defendants entirely ignore. *See Casey v. City of Newport*, 308 F.3d 106, 118 (1st Cir. 2002) (internal footnotes omitted) (holding that certain messages cannot be conveyed without amplification and stating that "amplifiers are . . . used to create new 'messages' that cannot be conveyed without amplification equipment . . . . Without amplification, some messages are not conveyed at all").

Additionally, and perhaps more importantly for the analysis of an ordinance affecting protected speech, the Supreme Court has concluded that "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned*, 408 U.S. at 117. Indeed, Defendants acknowledge that the "nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." Defendants' Motion at 15 (citing *Grayned*, 408 U.S. at 117) (internal quotations omitted). Upon a full factual record, consideration should therefore be given to the nature and character of the environment in which the violations in question allegedly occurred, which is a loud neighborhood, filled with shops, restaurants, and nightlife destinations.

As alleged in the Complaint, by targeting substantially more speech than necessary, the Commercial Music Prohibitions place a severe, unjustified, and unconstitutional burden on Manitoba's' First Amendment rights. There can be no doubt that Manitoba's pled facts sufficient to put Defendants on notice of its claims. Manitoba's pled the factual circumstances surrounding the issuance of the violation, the context of the neighborhood within which Manitoba's operates, and the fundamental problems with the ordinance. Complaint ¶¶ 29-34, 22-28, 49-54. Specifically, Manitoba's' First Amendment claims flow from the same flaw as that identified in its due process claims—compliance with the Commercial Music Prohibitions is contingent upon the actions of third parties. Manitoba's has alleged that its protected speech is chilled because, "[i]n order to ensure compliance with the provisions in the absence of [access to the surrounding private residences,] and with no control over the various other facts affecting sound level measurements, commercial music must be played at a volume lower than 45 db(A), approximately the volume of quiet conversation." Complaint ¶ 53; Aff. ¶¶ 6-9. Defendants' argument that Manitoba's has not sufficiently pled its claims is wrong and apparently an attempt to have this court prematurely adjudicate the merits of this case upon an incomplete record.

A content neutral regulation that furthers an important governmental interest but imposes an incidental burden on protected speech "must be narrowly tailored," restricting protected speech "no greater than is essential to the furtherance of that interest." *Vincenty v. Bloomberg*, 476 F.3d 74, 84 (2d. Cir. 2007) (citing *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 662 (1994)) (internal quotations omitted). In addition, such a regulation must leave open ample alternative channels of communication. To be "narrowly tailored," a regulation need not be the least restrictive means of advancing the government's interest, but must "focus on the source of the evils the city seeks to eliminate and eliminate them without at the same time banning or

significantly restricting a substantial quantity of speech that does not create the same evils."
*Vincenty*, 476 F.3d at 85 (citing *Ward*, 491 U.S. at 799 n.7); *see also People v. Taub*, 37 N.Y.2d
530, 534-35 (1975) (finding that an ordinance's burdensome sound amplification permit
application process unconstitutionally impinged upon First Amendment rights). The Complaint
specifically alleges that this violation "burden substantially more protected speech than is
constitutionally permissible to further New York City's noise control policy." Complaint ¶ 51.

Manitoba's' research has not produced any judicial decisions reviewing the
constitutionality of the Commercial Music Prohibitions. At least one federal court, however, has
ruled that an ordinance prohibiting sound that can be heard from the property of another or on a
public street was insufficiently narrowly tailored to pass constitutional muster. In *Howard Opera
House Associates v. Urban Outfitters, Inc.*, the defendant challenged the constitutionality of a
noise ordinance that it was alleged to have violated. 131 F.Supp. 2d 559 (D.Vt. 2001).[6] In
relevant part, the ordinance prohibited sound production that could "be audible through walls
between units within the same building, from another property or from the street." 131 F. Supp.
2d 559, 562 (D.Vt. 2001), *aff'd in part and vacated in part on other grounds*, 322 F.3d 125 (2d
Cir. 2003). The Court found that the ordinance was insufficiently narrowly tailored. It
disapproved of the fact that a prudent person wishing to follow the ordinance would have to play
music at unfairly low levels. The court stated that "[t]his absolute ban, without reference to
volume level or any other standard, could apply to music played at quite moderate levels if doors
or windows were open, or if the walls between units of a building were thin . . . and suppresses
more speech than is necessary to further goal [sic] of eliminating excessive noise." *Howard*

---

[6] As discussed in greater detail, *infra* Section IV.A., *Howard Opera House*, though providing guidance,
addresses a different noise ordinance, enforced in a very different context, on a completely different procedural
posture then the instant case.

*Opera House*, 131 F. Supp. 2d at 567. Even assuming the prohibition made reference to an objective "volume level," an issue the Court did not address, ordinances, like those at issue here, that do not recognize the factors (such as open doors or windows) that could render such an objective standard meaningless, may unfairly impinge upon protected speech.

Defendants engage in the wrong analysis of Manitoba's First Amendment claims. They focus on arguing that the challenged provisions are proper time, place, and manner restrictions on otherwise protected speech, rather than on articulating why Manitoba's has not met the liberal pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, as they must when moving to dismiss a complaint. In a conclusory manner, Defendants characterize Manitoba's' claims as taking "issue with the City's chosen method for protecting the public (both in their homes and on the streets) from loud noise" and, without analysis, state that this "is not legally significant." Defendants' Motion at 20. Defendants also argue that Manitoba's's contention that the Commercial Music Prohibitions burden more speech than is constitutionally permissible "is not sufficient to render the determination by DEP to issue the notices of violation to plaintiff Genco Importing Inc. d/b/a Manitoba's—or the challenged provisions of Noise Codes themselves—incorrect or unconstitutional." Defendants' Motion at 22. The determination of such issues as a law's constitutionality should be made upon a motion for summary judgment or after a trial—not upon the Complaint alone, as Defendants here would have it. Indeed, all but one of the cases cited by Defendants were decided upon a complete record, and the posture of the one case that was decided on a motion to dismiss required that the court assume the truth of the plaintiffs' allegations in response to the *defendants'* claim that the ordinance in question was unconstitutional. *See Howard Opera House*, 131 F.Supp. 2d at 561-62. Defendants' argument that the DEP's decision to issue a violation immunizes it from constitutional challenge is clearly

mistaken, as such a position would render it impossible ever to challenge the actions of a government agency.

The Court should find, however, after sufficient discovery and upon a complete record, that the Commercial Music Prohibitions burden substantially more speech than necessary. In fact, the ordinances directly contributed to Manitoba's' decision to stop hosting live musical performances altogether, even though many of the performances it hosted may have complied with the ordinance. Each time an establishment plays live or pre-recorded music, in order to ensure compliance, a representative must knock on every door within the music's foreseeable audible range and gain access to every nearby residence in order to take measurements. *See* Aff. ¶¶ 6-9. Where a neighbor denies such access and thereby deprives the establishment of the opportunity to know whether it is in compliance with the Commercial Music Prohibitions, the only prudent way for the establishment to ensure compliance and avoid a potential $8,000 penalty is to limit the volume of the music, *as measured within the establishment itself*, to less than 45db(A), the approximate level of quiet conversation.[7] *See* Aff. ¶¶ 6-9. When an establishment is forced to limit the volume as such, no alternative channel for the hosting of live musical performances remains. Such a burden, like that faced when attempting to measure sound levels even where access to neighboring residences *is* granted, undoubtedly causes many to opt instead not to exercise their free speech rights. *See* Aff. ¶¶ 6-9 (discussing the significant obstacles to compliance with the Commercial Music Prohibitions even where sound level measurements can be taken). Where the exercise of free speech is so impeded, it cannot reasonably be considered free.

---

[7] National Institute on Deafness and Other Communication Disorders, Common Sounds, http://www.nidcd.nih.gov/health/education/teachers/common_sounds.asp (last visited September 18, 2007) (containing chart comparing 40 decibels to the volume of a humming refrigerator and 50-60 decibels to that of a quiet office).

IV.    **Manitoba's Has Sufficiently Pled That The Unreasonable Noise Prohibitions Are Unconstitutional**

    A.    **Manitoba's Has Sufficiently Pled That The DEP's Application Of Code Section 24-218 Violated Due Process And The First Amendment Because Manitoba's Had No Notice Of The Conduct Prohibited And The Manner In Which It Was Applied Chilled Protected Speech**

As described above, due process requires that laws be sufficiently clear to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *General Media Commc'ns v. Cohen*, 131 F.3d 273, 286 (2d Cir. 1997) (quoting *Grayned*, 408 U.S. at 108). The due process concern here is "whether the statute . . . as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *U.S. v. Roberts*, 363 F.3d 118, 123 (2d Cir. 2004); *see also Chatin v. Coombe*, 186 F.3d 82, 86-87 (2d Cir. 1999) (agreeing with district court that stricter review should be applied to sanctions imposed by civil provisions that "are more akin to criminal rather than civil penalties" and also implicate constitutional rights).

The facts alleged in the Complaint are sufficient to show that the DEP's application of Code Section 24-218 violated Manitoba's' right to due process under the Fourteenth Amendment because Manitoba's did not have fair notice that the DEP imposed a 45 dB(A) standard for determining which sounds constitute "unreasonable noise." *See* Complaint ¶ 58. As it did for its challenge to the Commercial Music Prohibitions, Manitoba's pled the factual circumstances surrounding its alleged violation of Code Section 24-218 and the specific reasons it believes the application of that provision was unconstitutional. Complaint ¶¶ 35-41. Specifically, Code Section 24-218 states, in part, that: "No person shall make, continue or cause or permit to be made or continued any unreasonable noise." Unreasonable noise is defined as "any excessive or unusually loud sound that disturbs the peace, comfort or repose of a reasonable person of normal sensitivities or injures or endangers the health or safety of a reasonable person of normal

sensitivities." Code § 24-203(ccc). Unlike the Commercial Music Prohibitions, Code Section 24-218 contains no restriction on where sound measurements can be taken, nor any further guidance to assist in determining which sounds meet the definition. As the general noise provision, it is specifically designed as a "catch-all" applicable in a variety of contexts and to a variety of noise sources. *See e.g.* Aff. ¶ 11 (attesting to the difficulty in preventing low volume sound from leaking into a street or hallway, and that such leakage may trigger a violation under the Unreasonable Noise Prohibitions). Given the breadth of the ordinance and the concomitant risk of overbroad and unpredictable application, the lack of guidance is significant, especially where the provision affects protected speech.

In *Deegan v. City of Ithaca*, the Second Circuit reversed the district court's grant of summary judgment, finding unconstitutional the defendants' application of a noise ordinance substantially similar to Code Section 24-218. 444 F.3d 135, 137 (2d Cir. 2006). The plaintiff claimed his rights to due process and free speech were violated when he stopped publicly preaching the tenets of his religion after being warned by an officer that he was in violation of a city ordinance prohibiting "unreasonable noise." *Deegan*, 444 F.3d at 138-39. The defendants stipulated that they construed the "unreasonable noise" provisions at issue to prohibit "any type of noise, including speech," that could be heard from at least 25 feet away from its source. *Id.* at 140. The Court found that the defendants' interpretation—as prohibiting any noise that could be heard from at least 25 feet away from its source—was unconstitutional. Specifically, the court observed that "the statute [was] enforced based on a single factor not mentioned in the statute" and found that "Defendants' unpredictable construction and application of the ordinance . . . deprived [the plaintiff] of his right to understand what conduct violated the law." *Id.* at 145-46.

The DEP's application of Code Section 24-218 against Manitoba's, like the application of the ordinance in *Deegan*, was unconstitutional.  Whereas in *Deegan* the defendants imposed a "25 foot rule," here the DEP imposed a 45 dB(A) rule to determine whether Manitoba's had created "unreasonable noise" in violation of Code Section 24-218.  The DEP inspector purportedly took noise meter readings from an exterior hallway in Manitoba's' building and concluded that Manitoba's was in violation of the Code.  *See* Sunshine Decl. at Ex. B.  The DEP interpreted Code Section 24-218's "unreasonable noise" standard to mean any purportedly offending sound (non-ambient noise) measured to be louder than 45dB(A), the approximate sound level of quiet conversation.[8]  Complaint ¶ 37.

Manitoba's could not have been expected to know that sound level measurements of live or pre-recorded music greater than 45dB(A)—which apparently may be taken from any location, including immediately outside its entrance—could constitute unreasonable noise and therefore result in a violation and fine.  There is no mention, in either the definition of "unreasonable noise" or the text of Code Section 24-218, of any decibel level standard.  Nor are there any other guidelines for determining which sounds constitute unreasonable noise.  Even more troubling, on the night in question, the DEP inspector purportedly recorded ambient sound at a level of 48 dB(A).  *See* Sunshine Decl. at Ex. B.  Thus, under the 45 dB(A) standard applied by the DEP, Manitoba's would have violated Code Section 24-218 by making *any* noise that resulted in *any* increase above the ambient noise levels.[9]  *See* Aff. at ¶ 9 (discussing the difficulty of isolating

---

[8] National Institute on Deafness and Other Communication Disorders, Common Sounds, http://www.nidcd.nih.gov/health/education/teachers/common_sounds.asp (last visited September 18, 2007).

[9] Code Section 24-203(g) defines ambient noise to mean "the all-encompassing noise associated with a given environment, being usually a composite of sounds from many sources near and far."  Its successor, New Code Section 24-203(6), defines ambient noise to mean "the sound level at a given location that exists as a result of the combined contribution in that location of all sound sources, excluding the contribution of a source or sources under investigation for violation of this code and excluding the contribution of extraneous sound sources.  For purposes of

music from ambient sound). The DEP's expectation that Manitoba's comply with its unstated interpretation of the unreasonable noise standard—its 45 dB(A) rule—constituted a violation of Manitoba's' right to due process.

As alleged in the complaint, not only was the DEP's application of Code Section 24-218 violative of due process, it also infringed on protected speech, because it caused Manitoba's to stop hosting live musical performances altogether. Not only music, but also its amplification, constitutes protected speech. *Casey*, 308 F.3d at 106 (finding that the amplification of music was a message in and of itself, and that "[w]ithout amplification, some messages are not conveyed at all"). A content neutral regulation that serves a legitimate government interest but incidentally imposes a burden on protected speech must be must be narrowly tailored. *Vincenty*, 476 F.3d at 84 (citations omitted). A regulation is narrowly tailored when its enforcement effectuates its purpose without restricting a "substantial quantity" of speech. *See id.* at 85 (citing *Ward*, 491 U.S. at 799 n.7 (1989)).

As described above, the *Deegan* Court found that the defendants' interpretation of the noise ordinance, as prohibiting any sound that could be heard at least 25 feet away from its source, imposed an unconstitutional burden on protected speech. Specifically, noting that the volume of speech that would comply with the "25 foot rule" (56 decibels) was often lower than "the opening and closing of a door," the court found that the defendants' application of the noise ordinance was not narrowly tailored, and restricted considerably more speech than necessary to eliminate excessive noise. *Deegan*, 444 F.3d at 143.

---

the enforcement of this code, the ambient sound level of a given location may be determined based upon measurements taken at a comparable site (which includes but is not limited to comparable physical locations and time of day) in a nearby area."

Similarly, here, the DEP's imposition of its 45 dB(A) rule curtailed substantially more speech than constitutionally permissible, and has contributed to Manitoba's' ceasing to host live musical performances. Defendants' interpretation takes no account of the context and character of the neighborhood within which Manitoba's operates. *See Grayned*, 408 U.S. at 117 ("[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time"). Even if Manitoba's had continued to host live performances, requiring it to limit the music to such a volume level—approximately that of quiet conversation—would equally burden Manitoba's' protected speech and leave no alternative channels of communication open to Manitoba's. *See Casey*, 308 F.3d at 106; Aff. ¶ 6. Accordingly, the facts of the DEP's inspection demonstrate that Code Section 24-218, as applied to Manitoba's, restricted far more speech than necessary to achieve New York City's stated policy goal of "reduc[ing] the ambient noise level." Code § 24-202.

### A. The Unreasonable Noise Prohibitions Violate Due Process On Their Face Because They Give Insufficient Notice Of The Conduct They Proscribe

Where an ordinance is "capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *See Smith*, 415 U.S. at 573; *see also Firth*, 3 N.Y.2d at 474 ("[f]or validity [a] statute must be informative on its face."). The Unreasonable Noise Prohibitions' "unreasonable noise" standard lacks such specificity. It thus cedes excessive discretion to the DEP and leads to arbitrary and discriminatory enforcement, since it may be applied from anywhere and to any sound, regardless of its source or context.

As alleged in the complaint, the "unreasonable noise" standard contained in the Unreasonable Noise Prohibitions does not give sufficient notice of the conduct it proscribes, and the provisions are therefore unconstitutionally vague on their face. More specifically, in addition

to the factual circumstances of the alleged violation described previously, the Complaint alleged that the Unreasonable Noise Prohibitions "contain[] no limitation on [their] scope or application. Nor are there any guidelines for [their] interpretation or restrictions on the discretion to be used in [their] enforcement." Complaint ¶ 66. As with each of Manitoba's' other claims, there can be no doubt that Manitoba's pled facts sufficient to support its constitutional claims.

In reviewing the constitutionality of a state law, federal courts first apply any narrowing state court interpretation. *Grayned*, 408 U.S. at 110 (citations and internal quotations omitted); *see also Dae Woo Kim*, 774 F.Supp. at 169. Research has not uncovered any New York Court of Appeals decisions reviewing the constitutionality of the "unreasonable noise" standard as it is defined in the Unreasonable Noise Prohibitions. However, in *People v. Bakolas*, a non-First Amendment case, the New York Court of Appeals found constitutional a wholly different "unreasonable noise" standard. In *Bakolas*, the standard was contained in a criminal statute and narrowed by mental culpability elements. It targeted sounds intended to cause, or recklessly create the risk of, "public inconvenience, annoyance, or alarm." 462 N.Y.S.2d 844, 845-46 (1983) (quoting McKinney's Penal Law § 240.20, subd. 2) (affirming lower court's finding that the "*culpability requirement . . . saved the statute*" (emphasis supplied)). The Court stressed that "[t]he public nature of the requisite intent or risk" served to "narrow[] the definition" of the standard and render it less manipulable than *New York Trap Rock*'s bar against sounds that annoy "*a person.*" *Bakolas*, 462 N.Y.S.2d at 846 (emphasis supplied by the Court). After distinguishing *New York Trap Rock*, the Court cited four decisions from other jurisdictions finding various forms of the "unreasonable noise" standard constitutional; each involved an "unreasonable noise" standard that was part of a criminal statute and narrowed by mental

culpability requirements. *See Bakolas*, 462 N.Y.S.2d at 847.[10] The court's analysis in *New York Trap Rock,* therefore, does not support Defendants' arguments.

The Unreasonable Noise Prohibitions, however, contain no such limiting factors. First, they contain no culpability requirement and are not specifically targeted at sounds causing "public inconvenience," which, as held in *Bakolas*, would have narrowed their application. 462 N.Y.S.2d at 845-46. Second, the Unreasonable Noise Prohibitions' "safe harbor" clause, which makes them inapplicable "where the decibel level of [an offending] sound is within the limits prescribed by another section," is also insufficient to narrow the DEP's discretion or protect against arbitrary enforcement. Here, for example, the DEP inspector's use of 45dB(A) as the threshold for "unreasonable noise" in the building's hallway, *outside of a residential unit*, was not restricted by the application of Code Section 24-241.1, which requires that measurements be taken *inside a residential unit*. An inspector, simply by measuring music volume from a street or hallway rather than the inside of a residence, can make an end run around the safe harbor clause and find a violation under the Unreasonable Noise Prohibitions where music would be in compliance with the Commercial Music Prohibitions. Accordingly, establishments like Manitoba's are left to guess whether they are subject to the Commercial Music Prohibitions' requirement that music be lower than 45 dB(A), *as measured within a residential unit*, or also to the Unreasonable Noise Prohibitions' "unreasonable noise" standard, which may be interpreted to prohibit music louder than 45 dB(A), *as measured from anywhere at all*.

Notably, the very body that enacted the current version of Code Section 24-218 has since recognized its inadequacy. In New Code Section 24-218, which went into effect on July 1, 2007,

---

[10] The Court cited three additional decisions in support of its finding from other jurisdictions, all involving criminal statutes: two reviewed an "unusual noise" standard, and one reviewed an "unseemly noise" standard.

the City Council added a new subsection (b), which provides an open-ended, non-exhaustive list of various sound levels, as measured from particular distances and at particular times, that will satisfy the definition of "unreasonable noise." *See* New Code § 24-218(b).  Nevertheless, New Code Section 24-218 still fails to define "unreasonable noise" with the precision necessary to give constitutionally adequate notice of the conduct it proscribes and provides no guidance as to the context in which it is to be enforced, as the Supreme Court required in *Grayned*.  Moreover, under a new subsection (c), subsection (b)'s factors are inapplicable to sounds, such as the commercial music at issue here, that are subject to a decibel limit imposed elsewhere in the Code.  Thus, what the subsection (b) amendments contribute to the provision's clarity with one hand subsection (c) then takes away with the other.

Manitoba's alleged that the DEP apparently construes the Unreasonable Noise Prohibitions extremely broadly, subjecting to penalty *any* sound over the approximate volume of quiet conversation, regardless of source or context.  *See* Complaint ¶¶ 66, 69.  Clearly, Manitoba's has stated a claim that the Unreasonable Noise Prohibitions are unconstitutionally vague and should be permitted to take discovery in order to have its claim adjudicated on a complete record.

### B.    The Unreasonable Noise Prohibitions On Their Face Substantially Burden Protected Speech Because They Are Not Narrowly Tailored

As stated above, regulations, such as the Unreasonable Noise Prohibitions, that are content neutral and further an important governmental interest, but which place an incidental burden on protected speech, must be narrowly tailored so as to restrict speech no more "than is essential to the furtherance of that interest." *Vincenty*, 476 F.3d at 84.  Moreover, any determination of whether an ordinance improperly infringes upon protected speech must account for the context of the neighborhood in which it is enforced.  *See Grayned*, 408 U.S. at 117 ("The

crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."). The Unreasonable Noise Prohibitions, however, chill substantially more speech than necessary. They therefore unconstitutionally infringe upon Manitoba's' First Amendment rights.

The Complaint alleged that the Unreasonable Noise Prohibitions violate the First Amendment to the United States Constitution on their face, because they severely and unjustifiably restrict protected speech. More specifically, in addition to the factual circumstances of the alleged violation previously described, Manitoba's alleged that,

> because [they] contain[] no limitation on [their] scope or application, nor any guidance for [their] interpretation or restrictions on the discretion to be used in [their] enforcement, [the] "unreasonable noise" standard [contained in the Unreasonable Noise Prohibitions] leaves those wishing to comply with [it] guessing which speech will be subject to sanction.

Complaint ¶ 69. As with each of its other claims, here too Manitoba's has sufficiently pled violations of its constitutional rights.

As described in greater detail above, the Unreasonable Noise Prohibitions contain no effective limitation on the discretion used in enforcing them. They may be interpreted to prohibit any sound deemed by an inspector to fit the ordinance's nebulous definition of "unreasonable noise," and thus could be used to prohibit any sound louder than the approximate volume of quiet conversation. This includes almost all amplified music, a form of speech protected by the Constitution. *Casey*, 308 F.3d at 106. Under the Unreasonable Noise Prohibitions, a DEP inspector could take readings immediately outside the open window of an establishment playing pre-recorded music and issue a fine if the readings exceeded 45 dB(A). *See* Aff. ¶ 11. Indeed, the DEP inspector in this case took measurements in the hallway of Manitoba's' building, situated within the East Village of New York, a well-known night-life destination, and found

sound level readings greater than 45 dB(A) to constitute unreasonable noise. *See* Sunshine Decl. at Ex. B.

Such enforcement places no weight on the volume and character of the sound typical of the neighborhood within which the ordinances are being enforced. Per its discussion in *Grayned*, the Supreme Court requires more. Defendants cite to decisions supporting the idea that the Unreasonable Noise Prohibitions, and provisions from other jurisdictions that appear on their surface to be similar, do not violate the First Amendment. One such case, *Harlem Yacht Club v. New York City Environmental Control Board*, a case decided after the Complaint was filed, was decided upon a full factual record, which apparently included the record generated from DEP administrative proceedings, discovery regarding the place where the violation was issued, and testimony from the investigating inspector. 836 N.Y.S. 2d 66, 68 (1st Dep't 2007).

Similarly, Defendants misleadingly cite *Turley v. Giuliani*, 86 F.Supp. 2d 291 (S.D.N.Y. 2000), as a case "where plaintiffs raised a concern about Administrative Code § 24-218" in support of their motion. Defendants' Motion at 22. *Turley* did not address the constitutionality of the Unreasonable Noise Prohibitions. Instead, on a motion for a preliminary injunction, heard on a complete record (including, among other evidence, expert testimony and a demonstration for the court's benefit), the *Turley* court found that the defendants' method "regarding the timing of sound measurements" was not inherently inconsistent with valid time, place, and manner regulations. *Turley*, 86 F.Supp. 2d at 298. Notably, the court found that the defendants' "practice of conferring unfettered discretion on the DEP inspectors in deciding which noises to exclude as extraneous [was] unduly arbitrary." *Turley*, 86 F.Supp. 2d at 298. In any event, that the *Turley* court had the benefit of ample discovery regarding defendants' "practice" in enforcing the ordinances highlights the need for such discovery in the present case.

Defendants also rely on *Howard Opera House* and *Sharkey's, Inc. v. City of Waukesha* to support their motion. *Howard Opera House* differs from the instant case in three critical ways. First, in *Howard Opera House*, the purpose of the law in question—a Vermont ordinance—was to prohibit noise "unsuitable for the time and place." *Howard Opera House*, 131 F.Supp. 2d at 561 n.1. The ordinance at issue in this case—a New York ordinance—contains no mention of the context in which the sound is produced. Second, the procedural posture of *Howard Opera House* was completely different from that of the present case. In *Howard Opera House,* it was the defendant who challenged the constitutionality of the Vermont ordinance and moved to dismiss the plaintiffs' claims that it had violated the ordinance. Accordingly, the court, in denying the defendant's motion, was obligated to assume the truth of the plaintiffs' allegations that the ordinance *was* constitutional and to make all reasonable inferences in their favor. Here, Manitoba's is challenging the constitutionality of the provisions at issue and is therefore entitled to the benefit of all reasonable inferences in *its* favor. *Id.* at 561-62. Third, in finding the Vermont ordinance constitutional in part, the court, as required by *Grayned*, relied on the Vermont Supreme Court's construction of the "unreasonable noise" standard. *Id.* at 565; *see also Grayned*, 408 U.S. at 110 (requiring lower courts to first apply state court interpretations of the law at issue). For similar reasons, *Sharkey's* also substantially differs from the present case. *Sharkey's* involved an ordinance that, unlike the one at issue here, accounted for the context in which the sound was created, it was decided on a motion for summary judgment upon a complete record, and the court relied upon Wisconsin Supreme Court precedent in rendering its decision. 265 F.Supp. 2d at 992-93. Together these cases support denying Defendants' motion and allowing Manitoba's to proceed with discovery and the development of a complete factual record in order to have its claims properly adjudicated.

Manitoba's has not yet been afforded the same opportunity to pursue its claims as the litigants in the cases discussed above. Upon the Court's granting such an opportunity, Manitoba's intends to demonstrate, among other things, that the challenged provisions are unreasonable, particularly given the generally loud and lively nature of New York's East Village, a neighborhood that epitomizes New York City's unique balance between cultural, commercial, and residential. A statute capable of such broad, unpredictable interpretation plainly does not "focus on the source of the evils the city seeks to eliminate and eliminate them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Vincenty*, 476 F.3d at 85 (citing *Ward*, 491 U.S. at 799 n.7). Here, though Manitoba's raises no dispute that the government has a legitimate interest in curtailing excessive noise, the breadth of the Unreasonable Noise Prohibitions has caused it to stop hosting *all* live musical performances. This result is a clear example of the ordinance's capacity to chill far more speech than necessary to further that interest.

## CONCLUSION

For all the foregoing reasons, the Court should dismiss Defendants' motion to dismiss the Complaint.

Dated: September 26, 2007
      New York, New York

David M. Zensky (DZ5913)
Jason W. Sunshine (JS0562)
Ryan N. Marks (Bar Admission Pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022
Ph: 212.872.1000
Fx: 212.872.1001

*Counsel for Plaintiffs*