UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENCO IMPORTING INC. d/b/a MANITOBA'S and RICHARD MANITOBA,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF NEW YORK, EMILY LLOYD, in her capacity as Commissioner of the New York City Department of Environmental Protection and as Chairman of the New York City Environmental Control Board, NEW YORK CITY DEPARTMENT OF ENVIRONMENTAL PROTECTION, NEW YORK CITY ENVIRONMENTAL CONTROL BOARD,<br><br>Defendants. | Civil Action No. 07-3560 (LAK) |

## AFFIDAVIT OF ALAN FIERSTEIN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

I, Alan Fierstein, being duly sworn, do hereby depose and declare as follows:

1. I submit this affidavit in support of Genco Importing Inc. d/b/a Manitoba's and Richard Manitoba's ("Manitoba's") Memorandum of Law in Opposition to Defendants' motion to dismiss the amended complaint in the above-captioned matter.

2. I am president of Acoustilog, Inc., a company I founded in 1976. The company manufactures acoustic equipment and consults with both businesses and citizens regarding noise control and compliance with applicable noise laws and regulations.

3. I have performed over 5,000 acoustic consultations over the past thirty years, have authored many articles on acoustics, and have testified as an expert witness in numerous cases involving acoustics and noise regulation. I am familiar with the manner in which

the New York City Department of Environmental Protection ("DEP") enforces the city's noise control laws, and have been consulted in relation to a number of DEP enforcement actions. Additionally, I testified before the City Council regarding the ramifications of the recently enacted amendments to New York City's noise code.

4. In the course of consulting with clients regarding compliance with noise control laws and regulations, I have become familiar with all the provisions at issue in this case, including Sections 24-218 and 24-241.1 of the New York City Administrative Code, as it existed prior to July 1, 2007 (the "Code"), and Sections 24-218 and 24-231 of the current version of the New York City Administrative Code, effective July 1, 2007 (the "New Code") (Code Section 24-218 and New Code Section 24-218 are together referred to herein as the "Unreasonable Noise Prohibitions," and Code Section 24-241.1 and New Code Section 24-231 are together referred to herein as the "Commercial Music Prohibitions").

5. I have reviewed Manitoba's' complaint and the two Notices of Violation and Hearing underlying this action, along with their accompanying Inspection Reports.

6. It is extremely difficult, and in some cases impossible, for businesses to comply with the Commercial Music Prohibitions. Without being able to take measurements from residential units affected by music volume, there is absolutely no way, other than banning all live music or turning stereos down to barely audible levels, for a business to ensure compliance. The manner in which sound moves past windows and walls, across streets and through buildings, and the extent to which volume is diminished or enhanced in traveling from source to receiving point, is significantly influenced by a number of factors, including building insulation, the presence of open doors or windows, the volume

of ambient sound, including street traffic and crowd noise, and the presence of noise caused by heaters, radiators, and water pipes.

7. Where measurement is possible, there remain significant barriers to compliance with the Commercial Music Prohibitions. First, due to the way the various factors referred to above affect sound volume, music could be louder in a unit geographically farther from the music's source than in another, closer unit. Thus, a business cannot ensure compliance simply by measuring sound levels from the residential unit nearest to the music's source.

8. Second, changes to the environment in which music is played, such as the construction of new windows or the installation of new carpeting, can alter the acoustics of the entire environment. Therefore, a business cannot be sure that it is in compliance with the Commercial Music Prohibitions merely because it was at some time in the past.

9. Third, the taking of proper sound measurements requires advanced tools and professional expertise. Many noise meters fail to account for ambient noise, and record everyday sounds such as those caused by shuffling footsteps, outside traffic, or the water running through building pipes. In addition, decisions have to be made as to which sounds should be considered ambient noise and excluded from measurements of music volume. And where a meter is not properly calibrated or adjusted to the appropriate settings, movements of the meter's needle will be out of sync with the sounds being heard concurrently by the measurer. Businesses seeking to comply with the Commercial Music Prohibitions usually lack the expertise necessary to address such issues and properly isolate music sound.

10. In my experience, assisting clients in ensuring compliance with the Unreasonable Noise Prohibitions is also extremely difficult. It is nearly impossible to prevent leakage into a street or hallway—through air vents, windows, or doors—of sounds that, though low in volume, may trigger violations.

11. Moreover, to the extent that compliance requires sound measurement, businesses encounter the same problems as those discussed with regard to the Commercial Music Prohibitions above.

_____
Alan Fierstein

Sworn to be before this
26 day of September, 2007

_____
Notary Public

STANLEY TISCHLER
Commissioner of Deeds
City of New York • No. 4-3961
Certificate Filed in New York County
Commission Expires May 1, 200_